## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>     Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| AMBAC ASSURANCE CORPORATION,<br><br>     Plaintiff,<br><br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO; JOSÉ B. CARRIÓN III; ANDREW G. BIGGS; CARLOS M. GARCÍA; ARTHUR J. GONZÁLEZ; JOSÉ R. GONZALEZ; ANA J. MATOSANTOS; DAVID A. SKEEL, JR.,<br><br>     Defendants. | Adv. Proc. No. 20-_____ |

---

[1]The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and ); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## ADVERSARY COMPLAINT

Plaintiff Ambac Assurance Corporation ("Ambac"), by its attorneys, for its Adversary Complaint against defendants the Financial Oversight and Management Board for Puerto Rico ("Oversight Board" or "Board"), José B. Carrión III, Andrew G. Biggs, Carlos M. García, Arthur J. González, José R. González, Ana J. Matosantos, and David A. Skeel, Jr. (collectively, "Defendants"), alleges as follows:

## NATURE OF THIS ADVERSARY PROCEEDING

1.      Puerto Rico's bankruptcy represents a radical departure from all other restructuring proceedings, with severe and arbitrary consequences for Puerto Rico's creditors.  Congress singled out the Commonwealth and its instrumentalities for special treatment in bankruptcy in violation of the Constitution when it enacted the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), Pub. L. No. 114-187, 130 Stat. 549 (2016).  PROMESA discriminates against Puerto Rico's creditors—the only creditors of any territory, state, or municipality subject to its unique statutory provisions—in derogation of the "prime bankruptcy policy" to ensure "equality of distribution among creditors."  *Union Bank v. Wolas*, 502 U.S. 151, 161 (1991) (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 177-78 (1977)).  PROMESA has emboldened the Oversight Board, which believes its actions are unreviewable by any court, to claim sweeping and unprecedented power to willfully disregard creditors' pre-PROMESA property rights and to further arbitrarily discriminate between creditors in seeking adjustment of the Commonwealth's debts.   No creditor of any other territory, municipality, or governmental debtor faces such discriminatory treatment—and the Constitution requires uniform bankruptcy laws to guard against this result.  This action seeks to halt proceedings under the unconstitutional PROMESA statute to

prevent further discrimination against creditors like Ambac and to restore the uniformity the Constitution requires of all bankruptcy laws.

2.      The Bankruptcy Clause of the Constitution—the source of Congress's power to enact any bankruptcy legislation, including PROMESA—enshrines the principle of non-discrimination against creditors, authorizing Congress to promulgate "uniform Laws on the subject of Bankruptcies throughout the United States."  U.S. Const. Art. I, § 8, cl. 4.  The Bankruptcy Clause both empowers and restricts Congress:  Congress may legislate on the subject of bankruptcies, but all such laws must be "uniform."  The animating purpose of the uniformity requirement is to prevent Congress from discriminating against all creditors or particular classes of creditors by promulgating non-uniform laws governing a particular debtor's bankruptcy. *Railway Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 472 (1982).  To guard against such discrimination, the uniformity requirement prohibits "private bankruptcy laws," *id.* at 471-72, and laws that do not "apply equally to all creditors and all debtors" in a class that can be defined without reference to geography, *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 160 (1974) (quotations and citation omitted).

3.      Congress ignored these constitutional limits on its authority in enacting PROMESA.  PROMESA has all the characteristics of an impermissible "private bankruptcy law." *Gibbons*, 445 U.S. at 472.  It was enacted specifically for Puerto Rico and applies only to Puerto Rico and its instrumentalities and to no other territory or governmental debtor.  PROMESA further violates the constitutional requirement of geographic uniformity because it defines the debtor class subject to its provisions in specific geographic terms and it is not possible to define that class without reference to geography.  Under PROMESA, only Puerto Rico's creditors—and not

creditors of other territories or states—may have their rights impaired through a court-ordered discharge of debt.

4.       Armed with the unique unconstitutional provisions of PROMESA, the Oversight Board has run roughshod over creditors' rights, steering Puerto Rico's bankruptcy far afield from how other territorial debtors are permitted to engage with creditors to voluntarily adjust their debts and from how other municipal bankruptcies are conducted under Chapter 9 of the Bankruptcy Code.  The Board's conduct of Puerto Rico's bankruptcy demonstrates the harms that flow from enactment of a non-uniform bankruptcy law.  Invoking PROMESA's novel provisions, the Oversight Board has asserted that all territorial law inconsistent with the Board's declared fiscal and budgetary priorities is preempted, effectively arguing that PROMESA repealed the Puerto Rico statutes on which Ambac's and other creditors' claims are based, such that those claims should be disallowed in their entirety.  The Board has also asserted that under PROMESA the Commonwealth and its instrumentalities can obtain a discharge in bankruptcy without any meaningful judicial scrutiny of the assets available to service Puerto Rico's substantial debts or the proposed allocation of those assets among creditors.  In stark contrast to other bankruptcy laws, the Board has wielded PROMESA's unique and non-uniform provisions as an all-encompassing delegation of authority to discriminate against Puerto Rico's creditors writ large and to further arbitrarily distinguish between different classes of creditors.

5.       PROMESA has forced Ambac and other creditors to defend against unprecedented and unsupported discrimination and attacks by the Oversight Board on their property and legal rights contrary to the basic bankruptcy policy of equal distribution.  Under the Board's current proposed plan of adjustment, for example, the Commonwealth would pay pension claimants a recovery of no less than 91.5% on their claims and general obligation bondholders a recovery of

65-75% on their claims, while certain special revenue bondholders, including Ambac, would recover only 3.9% on their claims. No other territorial or municipal debtor could claim similar power to selectively and arbitrarily override creditors' pre-petition property rights; to pick and choose which creditors it prefers to pay in bankruptcy, honoring some priorities under pre-petition law while rejecting others with an equal claim under the law; and to obtain a discharge of debt without judicial review of critical inputs in the plan of adjustment. Absent the unique and unconstitutional provisions of PROMESA applicable only to Puerto Rico's bankruptcy, the Board would have no basis to make these unfounded assertions about its purported authority to dictate the terms of Puerto Rico's debt adjustment. The Oversight Board's invocation of power under PROMESA to pick the winners and losers in Puerto Rico's bankruptcy by making arbitrary distinctions among creditors that are unsupported in law and purportedly shielded from meaningful judicial review has upended expectations of how a bankruptcy should proceed.

6. PROMESA impermissibly subjects creditors' constitutional, statutory, and contractual rights to an unconstitutional, non-uniform bankruptcy process, and its continued implementation has already inflicted and further threatens Ambac with irreparable harm. By this action, Ambac accordingly seeks: (1) a declaration that Titles I, II, and III of PROMESA are unconstitutional and unenforceable on the ground that they violate the Bankruptcy Clause's uniformity requirement; and (2) an injunction prohibiting the Defendants from taking or causing to be taken any further action in connection with the implementation or effectuation of Titles I, II, and III of PROMESA.

## THE PARTIES

7.      Ambac is a Wisconsin-domiciled stock insurance corporation with its principal place of business at One World Trade Center, 41st Floor, New York, New York 10007.

8.      Ambac is a monoline insurer that provides financial guaranty insurance to the United States and global public finance, infrastructure, and structured finance markets.

9.      Ambac brings this action to protect and enforce its rights under the U.S. Constitution, as described below.

10.     Defendant Oversight Board is an entity established pursuant to PROMESA. PROMESA § 101(b).[2]  The Oversight Board has certified Fiscal Plans for the Commonwealth and its instrumentalities, exercised ongoing responsibility for the review and approval of budgets proposed by the Commonwealth, initiated Title III debt-adjustment proceedings for the Commonwealth and certain of its instrumentalities, and submitted a proposed plan of adjustment for the Commonwealth.

11.     Defendant José B. Carrión III is the Chairman of the Oversight Board.  Carrión has participated in the Oversight Board's certification of Fiscal Plans for the Commonwealth and its instrumentalities, the Board's exercise of ongoing responsibility for the review and approval of budgets proposed by the Commonwealth, the Board's initiation of Title III debt-adjustment proceedings for the Commonwealth and certain of its instrumentalities, and the Board's submission of a proposed plan of adjustment for the Commonwealth.  Ambac sues Carrión, and any successor thereto, in his official capacity.

12.     Defendant Andrew G. Biggs is a voting member of the Oversight Board.  Biggs has participated in the Oversight Board's certification of Fiscal Plans for the Commonwealth and its

---

[2] PROMESA is codified at 48 U.S.C. *et seq.*  References to PROMESA section numbers throughout are to the uncodified version of the legislation.

instrumentalities, the Board's exercise of ongoing responsibility for the review and approval of budgets proposed by the Commonwealth, the Board's initiation of Title III debt-adjustment proceedings for the Commonwealth and certain of its instrumentalities, and the Board's submission of a proposed plan of adjustment for the Commonwealth.  Ambac sues Biggs, and any successor thereto, in his official capacity.

13.     Defendant Carlos M. García is a voting member of the Oversight Board.  García has participated in the Oversight Board's certification of Fiscal Plans for the Commonwealth and its instrumentalities, the Board's exercise of ongoing responsibility for the review and approval of budgets proposed by the Commonwealth, the Board's initiation of Title III debt-adjustment proceedings for the Commonwealth and certain of its instrumentalities, and the Board's submission of a proposed plan of adjustment for the Commonwealth.  Ambac sues García, and any successor thereto, in his official capacity.

14.     Defendant Arthur J. González is a voting member of the Oversight Board.  Arthur González has participated in the Oversight Board's certification of Fiscal Plans for the Commonwealth and its instrumentalities, the Board's exercise of ongoing responsibility for the review and approval of budgets proposed by the Commonwealth, the Board's initiation of Title III debt-adjustment proceedings for the Commonwealth and certain of its instrumentalities, and the Board's submission of a proposed plan of adjustment for the Commonwealth.  Ambac sues Arthur González, and any successor thereto, in his official capacity.

15.     Defendant José R. González is a voting member of the Oversight Board.  José González has participated in the Oversight Board's certification of Fiscal Plans for the Commonwealth and its instrumentalities, the Board's exercise of ongoing responsibility for the review and approval of budgets proposed by the Commonwealth, the Board's initiation of Title III

debt-adjustment proceedings for the Commonwealth and certain of its instrumentalities, and the Board's submission of a proposed plan of adjustment for the Commonwealth.  Ambac sues José González, and any successor thereto, in his official capacity.

16.    Defendant Ana J. Matosantos is a voting member of the Oversight Board. Matosantos has participated in the Oversight Board's certification of Fiscal Plans for the Commonwealth and its instrumentalities, the Board's exercise of ongoing responsibility for the review and approval of budgets proposed by the Commonwealth, the Board's initiation of Title III debt-adjustment proceedings for the Commonwealth and certain of its instrumentalities, and the Board's submission of a proposed plan of adjustment for the Commonwealth.  Ambac sues Matosantos, and any successor thereto, in her official capacity.

17.    Defendant David A. Skeel, Jr. is a voting member of the Oversight Board.  Skeel has participated in the Oversight Board's certification of Fiscal Plans for the Commonwealth and its instrumentalities, the Board's exercise of ongoing responsibility for the review and approval of budgets proposed by the Commonwealth, the Board's initiation of Title III debt-adjustment proceedings for the Commonwealth and certain of its instrumentalities, and the Board's submission of a proposed plan of adjustment for the Commonwealth.  Ambac sues Skeel, and any successor thereto, in his official capacity.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case arises under the United States Constitution.  This Court also has subject matter jurisdiction under 28 U.S.C. § 1332, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.  Ambac seeks a declaration and related relief in this case of actual controversy pursuant to 28 U.S.C. §§ 2201 and 2202.

19.     This case presents an actual controversy that is ripe for adjudication.  As described below, through the Fiscal Plans and the Oversight Board's actions in the pending Title III proceedings, Defendants have caused injury-in-fact to Ambac by subjecting it to an unconstitutional bankruptcy process under a non-uniform bankruptcy law, including by implementing Fiscal Plans and proposing a plan of adjustment for the Commonwealth in violation of Ambac's constitutional, statutory, and contractual rights.

20.     Venue is proper in this District under 28 U.S.C. § 1391 because all or a substantial part of the events giving rise to these claims occurred in this District.  Venue is also proper under PROMESA section 307 because this adversary proceeding is brought in a Title III proceeding.

## BACKGROUND

### I.     Ambac Owns and Insures a Wide Variety of Commonwealth Debt Across Numerous Structures

21.     Ambac is a provider of financial guaranty insurance, whereby an insurer guarantees scheduled payments of principal and interest as and when due on a bond or other obligation. Ambac insures scheduled principal and interest payments when due on municipal, public infrastructure, and structured financings both in the United States and internationally.  Under relevant provisions of the applicable bond documents, bond insurance policies, and applicable law, payment by Ambac neither satisfies nor discharges an issuer's obligation to pay.  And to the extent Ambac makes such payments, it obtains assignments of rights from the bondholders, becomes an owner of the bonds, and/or becomes subrogated to the rights of bondholders and effectively steps into the shoes of such bondholders.

22.     Ambac owns and insures substantial Commonwealth debt across a variety of different structures, including as follows:

23.     Ambac has claims against the Commonwealth totaling approximately $66 million arising from Ambac's insurance of general obligation ("GO") bonds issued by the Commonwealth. The Commonwealth has defaulted on debt service payments due on GO bonds insured by Ambac. As of May 26, 2020, as a result of the continuing defaults, Ambac has already paid claims totaling $41,364,939 under its policies insuring the GO bonds and will be required to make further payments as the defaults continue.

24.     Ambac has claims against PBA and the Commonwealth totaling approximately $168 million arising from Ambac's insurance and holdings of bonds issued by PBA and guaranteed by the Commonwealth.  PBA has defaulted on debt service payments due on the PBA bonds insured by Ambac and bonds owned by Ambac.  As of May 26, 2020, as a result of the continuing defaults, Ambac has already paid claims totaling $83,764,363 under its policies insuring the PBA bonds and will be required to make further payments as the defaults continue.

25.     Ambac has claims against HTA and the Commonwealth totaling approximately $582.4 million arising from Ambac's insurance and holdings of bonds issued by HTA.  HTA has defaulted on debt service payments due on the HTA bonds insured by Ambac and bonds owned by Ambac.  As of May 26, 2020, as a result of the continuing defaults, Ambac has already paid claims totaling $149,138,045 under its policies insuring the HTA bonds and will be required to make further payments as the defaults continue.

26.     Ambac has claims against the Puerto Rico Infrastructure Financing Authority ("PRIFA") and the Commonwealth totaling approximately $724.3 million arising from Ambac's insurance and holdings of bonds issued by PRIFA.  PRIFA has defaulted on debt service payments due on the PRIFA bonds insured by Ambac and bonds owned by Ambac.  As of May 26, 2020, as a result of the continuing defaults, Ambac has already paid claims totaling $183,171,031 under its

policies insuring the PRIFA bonds and will be required to make further payments as the defaults continue.

27.    Ambac has claims against the Puerto Rico Convention Center District Authority ("CCDA") and the Commonwealth totaling approximately $151.7 million arising from Ambac's insurance and holdings of bonds issued by CCDA.  CCDA has defaulted on debt service payments due on the CCDA bonds insured by Ambac and bonds owned by Ambac.  As of May 26, 2020, as a result of the continuing defaults, Ambac has already paid claims totaling $51,743,148 under its policies insuring the CCDA bonds and will be required to make further payments as the defaults continue.

## II.    Congress Enacted PROMESA to Provide a Method for the Commonwealth Alone Among Territories to Obtain Restructuring Relief Through Procedures That Differ from Ordinary Bankruptcy Practice

28.    Although states may permit municipalities to adjust their debts under Chapter 9 of the Bankruptcy Code, 11 U.S.C. § 901, *et seq*., the Bankruptcy Code provides no means for states, territories, or territorial instrumentalities to obtain a judicial discharge of their debts.  Prior to 2016, the only way for any territory, territorial municipality, or other subordinate unit of a territorial government to restructure its debts was through voluntary negotiation and agreement with its creditors.

29.    In 2016, Congress enacted PROMESA specifically to provide a response to Puerto Rico's fiscal crisis, which had left the Commonwealth and its instrumentalities at risk of default on billions of dollars in government debt.  The statute's enactment followed shortly after Puerto Rico's efforts to enact its own putative restructuring statute and the Supreme Court's decision in *Commonwealth of Puerto Rico v. Franklin California Tax-Free Trust*, 136 S. Ct. 1938 (2016), striking down that Puerto Rico statute.  A central purpose of PROMESA was to provide Puerto Rico with "access to debt restructuring."  H.R. Rep. No. 114-602, pt. 1, at 41 (2016).

30.     PROMESA offers Puerto Rico alone—and no other territory—the ability to restructure its debts pursuant to federal bankruptcy law.  Although the statute frequently uses the general term "territory," defined to mean Puerto Rico, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the United States Virgin Islands, PROMESA § 5(20), the operative provisions of PROMESA, including those governing the availability of debt-restructuring relief, apply only to territories with an established Oversight Board.  *Id.* § 302(1) (to qualify as a "debtor" entitled to bankruptcy relief under PROMESA, an entity must have requested the establishment of an Oversight Board or had an Oversight Board established for it by Congress, or must be a covered instrumentality of such an entity).  Because Congress established an Oversight Board for Puerto Rico alone and provided no mechanism for other territories to request the establishment of an Oversight Board, PROMESA applies only to Puerto Rico.  Congress would have to pass a new law to apply PROMESA to any other territory.

### A.     PROMESA's Bankruptcy Provisions

31.     PROMESA provides that "[a] Financial Oversight and Management Board is hereby established for Puerto Rico."  PROMESA § 101(b)(1).

32.     Under PROMESA, the Oversight Board is vested with the power to develop and approve Fiscal Plans and budgets for the Commonwealth, including Commonwealth instrumentalities, PROMESA §§ 201-202, and to bring debt-adjustment proceedings to seek the discharge of debts on behalf of the Commonwealth and its instrumentalities, *id.* § 304.  The Board's Fiscal Plan authority and its authority over debt-adjustment proceedings form an integrated scheme because a court may not confirm a plan for debt adjustment unless it is consistent with the Fiscal Plan that the Board has approved.  *Id.* § 314(b)(7).

33.     A Fiscal Plan under PROMESA is intended to set forth a "method to achieve fiscal responsibility and access to capital markets" for the Commonwealth or its "covered territorial

instrumentalit[ies]."  PROMESA § 201(b)(1).  A covered territorial instrumentality is any "political subdivision, public agency, instrumentality . . . or public corporation" of the Commonwealth that the Oversight Board has designated, in its sole discretion, as subject to PROMESA.  *Id.* §§ 5(7), 5(19)(A), 101(d)(1).

34.    PROMESA section 201(b) prescribes requirements for the Fiscal Plan, including that it "ensure the funding of essential public services," PROMESA § 201(b)(1)(B), "provide adequate funding for the public pension systems," *id.* § 201(b)(1)(C), "include a debt sustainability analysis," *id.* § 201(b)(1)(I), "provide for capital expenditures . . . necessary to promote economic growth," *id.* § 201(b)(1)(J), and "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to [June 30, 2016,] the date of the enactment of [PROMESA]," *id.* § 201(b)(1)(N).  Terms such as "essential public services," "adequate funding," and "respect" for lawful liens and priorities are undefined in PROMESA.

35.    A Fiscal Plan becomes effective when the Oversight Board certifies that the plan complies with the requirements of PROMESA section 201(b).  PROMESA § 201(c)(3).  The Oversight Board approves a Fiscal Plan as compliant with PROMESA section 201(b) in its sole discretion, and PROMESA does not authorize judicial review by any United States District Court of the decision to certify.  *Id.* §§ 106(e), 201(c)(3).  Budgets for the Commonwealth and its instrumentalities must comply with the Fiscal Plan and must likewise be certified by the Oversight Board, with those certifications similarly exempted from judicial review by PROMESA.  *Id.* §§ 106(e), 201(c)-(e).

36.    PROMESA also gives the Oversight Board the exclusive power to commence proceedings to adjust Commonwealth debts.  PROMESA §§ 104(j), 302, 304(a), 315.  Only the

Oversight Board may commence debt-adjustment proceedings on behalf of the Commonwealth or its instrumentalities, *id.* § 304(a), and only the Board may file a proposed plan of adjustment or any modification thereto, *id.* §§ 312, 313.

37.     Eligibility for debt adjustment is governed by a further series of Oversight Board certification decisions which, like the Board's certification of a Fiscal Plan and budget, are made non-reviewable per the terms of PROMESA section 106(e).  The Board has the sole power to issue a restructuring certification qualifying Puerto Rico and its instrumentalities as a "debtor" entitled to invoke PROMESA's debt-adjustment provisions.  PROMESA §§ 206, 302.  The restructuring certification certifies the Board's determination that the Commonwealth has fulfilled legal prerequisites for restructuring, including being subject to a Fiscal Plan certified by the Board and attempting in good faith to achieve a consensual restructuring with creditors.  *Id.* § 206(a)(1)-(3).

38.     The Oversight Board's Fiscal Plan powers are incorporated into PROMESA's debt-adjustment process through PROMESA sections 104(j)(3) and 314(b)(7).  PROMESA section 104(j)(3) mandates that the Board may file a plan of adjustment only if it determines and certifies, in its sole discretion, that the plan of adjustment is consistent with the Fiscal Plan.  PROMESA section 314(b)(7) further provides that a plan of adjustment may be confirmed only if it is "consistent with the applicable Fiscal Plan certified by the Oversight Board under title II."

39.     In light of these various provisions of PROMESA, this Court has made significant decisions affecting creditors' rights based on the "central, discretionary role that Congress has assigned to the Oversight Board in the Title III debt adjustment process," embodied in the Board's "exclusive right to propose a Title III plan of adjustment that must be consistent with the applicable certified fiscal plan to be eligible for confirmation."  *Ambac Assur. Corp. v. Commonwealth of Puerto Rico*, 297 F. Supp. 3d 269, 283-84 (D.P.R. 2018).

40.     Under PROMESA section 3, Congress expressly provided that the invalidity of Titles I or II, which create the Board and specify its powers with respect to fiscal and budgetary matters as well as certain aspects of debt adjustment, would require the invalidation of Title III's debt-adjustment provisions, and vice versa.

**B.     PROMESA's Bankruptcy Provisions Are Different Than All Other Bankruptcy Laws, Including Chapter 9**

41.     Under PROMESA, Puerto Rico alone among territories and states may enter bankruptcy and obtain a court-ordered discharge of debt.  Creditors of all other territories and all states face no similar impairment of their contractual rights under bankruptcy law.   In this fundamental way, PROMESA creates a dramatically different scheme for Puerto Rico's creditors vis-à-vis other territories' and states' creditors.

42.     PROMESA's bankruptcy process is also fundamentally different than Title 11 and, in particular, Chapter 9, which provides restructuring relief to municipalities and is the only other bankruptcy law applicable to any governmental debtor.  Although PROMESA incorporates some Chapter 9 provisions, it does so selectively, and places those provisions in a novel statutory framework that results in substantially different proceedings than occur under Chapter 9.  Key differences between the statutes include the following:

43.     First, PROMESA vests the Oversight Board with unique control over debt adjustment for the Commonwealth and its instrumentalities.   As this Court has observed, PROMESA's requirement of "a single Oversight Board that will act as the sole statutory representative of a territory and each of its covered territorial instrumentalities in their Title III cases," is a significant feature of the "unique statutory scheme crafted by Congress to govern [Title III] proceedings." *Mem. Op. and Order Denying Renewed Mot. of Certain Secured Creditors of the Employees Ret. Sys. of the Govt. of the Commonwealth of Puerto Rico for Appointment as*

*Trustees Under 11 U.S.C. § 926*, ECF No. 9712.  Despite the fact that instrumentalities have separate legal rights and interests that may be adverse to the Commonwealth—which produces inherent conflicts of interest—this Court has further held that the Board must "necessarily" discharge its duties in a "holistic manner," and has granted deference to Board actions that subjugate the interests of instrumentalities and their creditors to the interests of the Commonwealth as a whole.  *Id.* at 8 ("The Oversight Board has been given the responsibility of balancing and prioritizing the relevant issues and concerns in developing fiscal arrangements and plans of adjustment, and it is entitled to a measure of deference in carrying out this responsibility.").  In the absence of PROMESA, instrumentalities of the Commonwealth could challenge the diversion of revenues the Commonwealth is statutorily required to pay over to them.  By vesting control in the Board, however, PROMESA interferes with instrumentalities' ability to contest such diversion and to protect revenue committed to the instrumentalities' creditors.  Centralizing power over the Commonwealth and its instrumentalities in the Board also produces differences in political accountability for restructuring decisions that, in the Chapter 9 context, would ultimately reside with local officials who would be responsible for addressing creditors' and citizens' concerns.  Unlike Chapter 9 debtors, the Board makes decisions with no accountability—whether to the electorate, the territorial government, or any federal authority.   Unlike Puerto Rico's instrumentalities, a governmental debtor under Chapter 9 retains the power to preserve its own assets against diversion without interference by a third party laboring under an inherent conflict of interest and is politically accountable for the decisions made during restructuring.

44.   Second, PROMESA limits judicial review of certain decisions of the Oversight Board, with resulting differences in the bankruptcy court's role.  PROMESA section 106(e)

provides that "[t]here shall be no jurisdiction in any United States district court to review

challenges to the Oversight Board's certification determinations under this Act."

45.     Third, PROMESA's plan-confirmation provisions differ from Chapter 9 and all

other bankruptcy laws.  Under PROMESA, a plan of adjustment cannot be proposed or confirmed

unless it is consistent with the Board-certified Fiscal Plan.  PROMESA §§ 104(j)(3), 314(b)(7).

PROMESA's Fiscal Plan provisions, in turn, establish unique requirements for allocating funding

among Commonwealth creditors that the Board interprets and applies in its discretion, with

statutory limitations on judicial review.  *See id.* §§ 106(e), 201(b)(1).

46.     The following table summarizes these principal differences between PROMESA

and Chapter 9:

## Table 1

## Key PROMESA Provisions, Their Chapter 9 Analogs, and Differences between Them

| PROMESA Provision and Function | Chapter 9 Analog and Difference(s) |
| --- | --- |
| PROMESA section 307<br><br>Vests jurisdiction in U.S. District Court for PROMESA Title III restructuring proceedings. | 28 U.S.C. § 1334(a); 28 U.S.C. § 157(a)<br><br>Permits Chapter 9 petitions to be referred to bankruptcy courts. |
| PROMESA section 101(b)<br><br>Creates a Financial Oversight and Management Board for Puerto Rico and its instrumentalities. | No Chapter 9 Analog. |
| PROMESA section 104 and 206<br><br>Sets forth the powers of the Oversight Board, including the exclusive power to issue a restructuring certification and commence proceedings to adjust Commonwealth and instrumentality debts. | No Chapter 9 Analog. |
| PROMESA sections 201 and 202<br><br>Vests the Oversight Board instead of the debtor with the ability to develop, approve, and certify Fiscal Plans and budgets in its sole discretion. | No Chapter 9 Analog. |

| PROMESA Provision and Function | Chapter 9 Analog and Difference(s) |
|---|---|
| PROMESA section 106(e)<br><br>Exempts the Oversight Board's certification decisions for Fiscal Plans, budgets, and commencement of debt-adjustment proceedings from judicial review by any U.S. District Court. | No Chapter 9 Analog. |
| PROMESA section 302<br><br>Provides that an entity is eligible to be a debtor under PROMESA if, *inter alia*, an Oversight Board has been established for it and has issued a restructuring certification under PROMESA section 206(b), with no requirement of a finding of insolvency for certification. | 11. U.S.C. § 109(c)<br><br>Provides that an entity is eligible to be a debtor under Chapter 9 if, *inter alia*, it is a municipality, it is insolvent, and it has negotiated in good faith with creditors before filing. |
| PROMESA section 304(b)<br><br>Governs a Title III debt-adjustment petition and proceedings relating to a petition.  A petition may be objected to only if it does not satisfy the requirements for a petition, but the Oversight Board's restructuring certification cannot be challenged in any U.S. District Court.  *Id.* §§ 106(e), 304(b).  Additionally, the petition cannot be objected to for 120 days after filing. *Id.* § 304(b). | 11 U.S.C. § 921(c)<br><br>Governs a Chapter 9 debt-adjustment petition and proceedings relating to a petition.  In contrast to PROMESA, a petition may be objected to immediately, and a court may dismiss the case on the ground that the petition was not filed in good faith or does not meet Chapter 9 requirements, including debtor-eligibility requirements. |
| PROMESA sections 304(a), 305, 312, 313, 315<br><br>Provides that the Oversight Board, not the debtor, commences a restructuring proceeding under Title III; can consent to interference with the assets and revenues of the debtor; and has authority to file a plan of adjustment and any modification thereto.  Provides that the Oversight Board may take any action necessary on behalf of the debtor to prosecute the case. | 11 U.S.C. §§ 921(a), 904, 941, and 942<br><br>Provides that the debtor, rather than any third party, commences a restructuring proceeding under Chapter 9; can consent to interference with the assets and revenues of the debtor; and has authority to file a plan of adjustment and any modification thereto. |
| PROMESA section 314<br><br>Governs the confirmation of a plan of adjustment in a Title III proceeding.  Notably, the court "shall confirm the plan if," among other things, the plan "is consistent with the applicable Fiscal Plan certified by the Oversight Board." | 11 U.S.C. § 943<br><br>Governs the confirmation of a plan of adjustment under Chapter 9.  In contrast to PROMESA, there is no requirement that a plan be consistent with a fiscal plan promulgated by an overseeing entity or by the debtor. |

## III.    PROMESA's Invalidity Under the Bankruptcy Clause

### A.    The Bankruptcy Clause's Uniformity Requirement

47.     Congress's power over bankruptcy matters is set forth in the Bankruptcy Clause of the United States Constitution, Art. I, § 8, cl. 4.  The Bankruptcy Clause provides that Congress shall have the power "to establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."  *Id.*  The Bankruptcy Clause thus "contains an affirmative limitation or restriction upon Congress' power," *Gibbons*, 455 U.S. at 468, by requiring that bankruptcy laws be "uniform," U.S. Const. Art. I, § 8, cl. 4.

48.     The Bankruptcy Clause's uniformity requirement applies to laws that address "the subject of the relations between an insolvent or nonpaying or fraudulent debtor and his creditors, extending to his and their relief."  *Gibbons*, 455 U.S. at 466 (quotations and citations omitted).  Included within this category are laws involving the "distribut[ion] [of] the property of the debtor among his creditors," and laws that "impair the obligation of contracts" and grant "the power to discharge the debtor from his contracts and legal liabilities."  *Id.* (quotations and citations omitted).

49.     When a law addresses the subject of bankruptcy, it represents an exercise of congressional power under the Bankruptcy Clause and triggers application of the uniformity requirement no matter whether other constitutional provisions arguably also authorize Congress to legislate.  *Gibbons*, 455 U.S. at 468-69.  For example, the Supreme Court has held that Congress may not avoid the uniformity requirement by "enact[ing] bankruptcy laws pursuant to its power under the Commerce Clause."  *Id.* at 468.  The Court reasoned that a "hold[ing] that Congress had the power to enact nonuniform bankruptcy laws pursuant to the Commerce Clause . . . would eradicate from the Constitution a limitation on the power of Congress to enact bankruptcy laws."  *Id.* at 469.

50.     The uniformity requirement prohibits Congress from establishing "bankruptcy laws that specifically apply to the affairs of only one named debtor" or are "nothing more than a private bill." *Gibbons*, 455 U.S. at 471.  Indeed, "the Bankruptcy Clause's uniformity requirement was drafted in order to prohibit Congress from enacting private bankruptcy laws," which historically had the effect of discriminating against particular creditors.  *Id.* at 472 (citing H. Black, Constitutional Prohibitions 6 (1887)); *see also id.* at 471 ("A law can hardly be said to be uniform throughout the country if it applies only to one debtor and can be enforced only by the one bankruptcy court having jurisdiction over that debtor.").

51.     Separate from the prohibition on private legislation, the uniformity requirement further "requires that [a bankruptcy law] apply equally to all creditors and all debtors" in a defined class, without "restrict[ing] the right of any creditor wheresoever located to obtain relief because of regionalism." *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 160 (1974) (quotations and citation omitted).  Thus, while Congress may respond to geographically isolated problems, the prohibition on regionalism means that the class of debtors (and their creditors) subject to a bankruptcy regulation must be capable of definition without reference to geography.  *See id.* at 159-60 (upholding a railroad bankruptcy law that operated in a statutorily defined region against a uniformity challenge because no railroad reorganization proceeding "was pending outside that defined region on the effective date of the Act or during the 180-day period following the statute's effective date," such that Court could conclude that the Act "in fact operates uniformly upon all bankrupt railroads then operating in the United States and uniformly with respect to all creditors of each of these railroads").

### B. PROMESA Is Subject To The Constitution's Uniformity Requirement

52.     The Bankruptcy Clause applies to Puerto Rico and the uniformity requirement protects the interests of Puerto Rico's creditors, including bondholders located throughout the United States.

53.     Titles I, II, and III of PROMESA, among other provisions of the statute, constitute an exercise of Congress's power under the Bankruptcy Clause and are subject to that Clause's limitations.  These provisions of PROMESA work together to govern "the relations between an insolvent or nonpaying . . . debtor"—the Commonwealth and its instrumentalities—and "creditors." *Gibbons*, 455 U.S. at 466 (quotations and citation omitted).  The provisions provide the mechanism for the Oversight Board to propose a plan of adjustment of the Commonwealth's and its instrumentalities' debts and obtain a discharge of those debts.  *See* PROMESA §§ 104(j), 206, 312, 314.

54.     Although Congress cited its authority under the Territory Clause in enacting PROMESA, PROMESA § 101(b), the Territory Clause, like the Commerce Clause, does not provide Congress with power to enact non-uniform bankruptcy laws.  The Territory Clause provides that Congress "shall have power to dispose of and make all needful rules and regulations respecting the Territory or other Property belonging to the United States," U.S. Const. Art. IV, § 3, cl. 2, but it does not directly address the subject of bankruptcy, which broadly affects the rights of creditors outside the territories.  Because "the Bankruptcy Clause itself contains an affirmative limitation or restriction upon Congress's power," it controls the scope of Congress's authority to enact *all* bankruptcy laws, no matter whether those laws concern the territories, affect interstate commerce, or implicate other sources of congressional power.  *Gibbons*, 455 U.S. at 468-69. Because Titles I, II, and III of PROMESA constitute bankruptcy laws, they must conform to the requirements of the Bankruptcy Clause.

### C.    PROMESA Violates The Constitution's Uniformity Requirement

55.    PROMESA violates the Bankruptcy Clause's uniformity requirement because it applies only to Puerto Rico—the Commonwealth and its instrumentalities—and not to any other territory, state, or governmental debtor.   PROMESA's debt-adjustment process requires the establishment of an Oversight Board, but PROMESA establishes an Oversight Board only for Puerto Rico and provides no mechanism for the establishment of an Oversight Board for any other territory.   PROMESA §§ 101(b)(1), 302(1)-(2).   Earlier versions of the statute authorized territories to establish Oversight Boards through resolutions, but Congress removed those provisions before enacting PROMESA, demonstrating Congress's intent for Puerto Rico to be the sole territory with access to PROMESA's debt-adjustment procedures.   *Compare* PROMESA § 101(b), *with* H.R. 4900 § 101, 114th Cong., 2d Sess.   Congress would need to pass a new law establishing an Oversight Board for any territory other than Puerto Rico.   Thus, by its terms and by intentional design, PROMESA applies only to Puerto Rico, excluding all other prospective debtors.

56.    Other aspects of PROMESA underscore that it is a bankruptcy law singularly focused on the Commonwealth.   The title of the Act calls out Puerto Rico by name.   PROMESA § 1(a) ("This Act may be cited as the 'Puerto Rico Oversight, Management, and Economic Stability Act' or 'PROMESA.'").   Several provisions of the statute apply only in Puerto Rico.   *See, e.g.*, PROMESA § 402 (stating that "[n]othing in this Act shall be interpreted to restrict Puerto Rico's right to determine its future political status"); *id.* § 405(b) (creating an automatic stay of certain actions "against the Government of Puerto Rico" or "property of the Government of Puerto Rico"); *id.* § 407(a) (providing creditors with certain protections against transfers of "property of any territorial instrumentality of Puerto Rico" and rights of recovery against the transferee).   And the

statute contains congressional findings and a statement of congressional purpose focused on Puerto Rico and its fiscal emergency to justify an automatic stay of actions against Puerto Rico and its instrumentalities for default on governmental debt. *Id.* § 405(m)-(n).

57.     The history surrounding PROMESA's enactment further demonstrates that the statute is intended to provide private bankruptcy relief to Puerto Rico and no other debtor. Congress enacted PROMESA specifically in response to Puerto Rico's fiscal crisis and on the heels of the Supreme Court's determination that Puerto Rico's effort to enact a territorial law permitting municipal debt adjustment was preempted by the Bankruptcy Code.  And legislators emphasized that PROMESA was focused on providing bankruptcy relief to Puerto Rico. *E.g.*, 162 Cong. Rec. H3609 (daily ed. June 9, 2016) (statement of Rep. Ryan) ("What this bill will do is allow Puerto Rico to restructure its debts and set up an oversight board that will oversee this process.").

58.     Congress provided Puerto Rico alone with access to the unique debt restructuring process in PROMESA, notwithstanding that it was not the only territory facing a fiscal crisis and notwithstanding that other municipalities are subject to Chapter 9's different procedural and substantive standards.  *E.g.*, GAO, Report to Congressional Committees, U.S. Territories Public Debt Outlook—2019 Update, at 25 (June 2019) (U.S. Virgin Islands has "not been able to access capital markets" or "issue[] any new bonds since before January 2017").  PROMESA treats the Commonwealth and its instrumentalities differently than all other territories and all other governmental debtors subject to Chapter 9.  PROMESA accordingly resembles exactly the sort of "private bill" directed at a particular debtor and its creditors that the Supreme Court condemned in *Gibbons* as a non-uniform law in excess of Congress's power under the Bankruptcy Clause.  *See Gibbons*, 455 U.S. at 471.

59.     PROMESA further violates the separate uniformity requirement that a bankruptcy law must apply to all debtors and creditors in a defined class without reference to geography. PROMESA enables only the Commonwealth and its instrumentalities to obtain bankruptcy relief, and thereby defines the debtor class in specific geographic terms.  Nor is it possible to define that class without reference to geography.  Unlike the railroad bankruptcy law at issue in the *Reg'l Rail Reorganization Act Cases*, PROMESA does not apply to all governmental debtors that sought bankruptcy protection in the period prior to its enactment, or even to some subset of governmental debtors that can be defined as a class without reference to geography.  Because PROMESA restricts the right of Puerto Rico's creditors to obtain relief based on debtor status defined by geography, the statute further contravenes the restrictions on Congress's power under the Bankruptcy Clause.

60.     In PROMESA's severability clause, Congress affirmatively acknowledged that PROMESA was a non-uniform bankruptcy law at risk of invalidation.  PROMESA § 3(b).  In a provision titled "Uniformity," Congress recognized that a court might "hold[] invalid . . . provision[s] of th[e] Act or the application thereof on the ground that the provision[s] fail[] to treat similarly situated territories uniformly."  *Id.*

### C.     Titles I, II, and III of PROMESA Must Be Invalidated

61.     As noted above, PROMESA's severability clause confirms that Congress knowingly enacted a non-uniform private bankruptcy law applicable to a geographically-defined debtor in violation of the Bankruptcy Clause's uniformity requirement.  In recognition of the uniformity problem and the consequent risk that PROMESA would be invalidated, Congress specifically invited a court to instead rewrite the statute, providing that "[i]f a court holds invalid any provision of this Act or the application thereof" based on non-uniformity, "then the court shall,

in granting a remedy, order that the provision of this Act or the application thereof be extended to any other similarly situated territory, provided that the legislature of that territory adopts a resolution signed by the territory's governor requesting the establishment and organization of a Financial Oversight and Management Board."  PROMESA § 3(b).

62.     That severability provision is ineffective and unenforceable.  A severability clause is an "aid in determining the legislative intent, but is not an inexorable command."  *R.R. Ret. Bd. v. Alton R. Co.*, 295 U.S. 330, 362 (1935).  Here, the severability provision impermissibly invites courts to rewrite the statute, necessitates legislative determinations for its implementation, and does not in any event cure the uniformity problem.

63.     First, any attempt to extend PROMESA to other territories would require legislative action—either wholesale revision of the statute or enactment of a new statute.  If instead a court endeavored to effect this change, the court would have to determine how to extend the various PROMESA provisions that are specific to Puerto Rico to other territories and would have to rewrite various statutory provisions to achieve that extension.  But courts have no authority to "rewrite a statute and give it an effect altogether different from that sought by the measure viewed as a whole," *Alton R. Co.*, 295 U.S. at 362—even when invited to do so by Congress.  Because courts cannot "rewrite a . . . law to conform it to constitutional requirements," *Reno v. Am. Civil Lib. Union*, 521 U.S. 844, 884 (1997) (quotations and citation omitted), the severability clause cannot be applied to address PROMESA's invalidity as a non-uniform bankruptcy law.

64.     Second, Congress cannot cure the uniformity problem by directing a court to extend PROMESA to other territories that *may* request the establishment of an Oversight Board but, unlike Puerto Rico, are not *required* to have one.  Even if a court could rewrite the statute in that manner (and it cannot), the uniformity violation would remain because PROMESA would still

treat Puerto Rico differently from all other territories.  Congress mandated the creation of an

Oversight Board for Puerto Rico, PROMESA § 101(b)(1), whereas enforcement of the severability

provision would create a different opt-in regime for other territories, which would retain autonomy

to choose whether to become subject to PROMESA.  That difference would continue to render

PROMESA non-uniform.

65.     Third, by providing that a court should extend PROMESA only to "any other

*similarly situated* territory," PROMESA § 3(b) (emphasis added), Congress impermissibly sought

to have a court engage in a quintessentially legislative task.  To implement such a provision, a

court would have to decide under what circumstances and criteria a territory is sufficiently

"similarly situated" to Puerto Rico that it should be subject to PROMESA.  *Id.*   But "[a]

severability clause is not grounds for a court to devise a judicial remedy . . . that entail[s]

quintessentially legislative work."  *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2319

(2016) (quotations and citation omitted).

66.     Fourth, even if a court could permissibly discern how to extend PROMESA to

"similarly situated territories," a uniformity problem would persist because PROMESA would

provide territories and territorial municipalities with the unique PROMESA debt-adjustment

process, while states would have no access to any debt-adjustment process and state municipalities

would have the fundamentally different process provided by Chapter 9.

67.     The ultimate significance of PROMESA's severability provision is to highlight the

law's non-uniformity—not to save PROMESA from invalidation.  Despite recognizing that

PROMESA was non-uniform and therefore vulnerable to constitutional challenge, Congress

decided to enact a law for Puerto Rico alone.  Congress's action provides the clearest possible

evidence that it was enacting a private bankruptcy bill in contravention of the Bankruptcy Clause's

uniformity requirement.  Nothing precludes Congress from enacting constitutional legislation to provide Puerto Rico with a process to restructure its debts.  But Congress would need to do that legislative work itself through debates, findings, and drafting of constitutionally uniform legislation.  Congress cannot undo the constitutional wrong in enacting a bankruptcy law just for Puerto Rico—with its attendant risk of discrimination against Puerto Rico's creditors—by directing courts to rewrite the law.

**IV.    The Oversight Board's Conduct of Puerto Rico's Bankruptcy Demonstrates the Harms Produced by Congress's Violation of the Uniformity Requirement**

68.    In practice, the differences between PROMESA and constitutional bankruptcy law have affected the entire course of Puerto Rico's restructuring proceedings, upending market expectations of how debt adjustment should proceed, distorting the balance of power between debtor and creditor, and threatening fundamental bankruptcy policies.

69.    Under the authority granted by PROMESA, the Oversight Board has promulgated and approved Fiscal Plans and budgets for the Commonwealth and certain of its instrumentalities, commenced Title III debt-adjustment proceedings on behalf of the Commonwealth and certain of its instrumentalities, and has proposed a Plan of Adjustment ("POA") for the Commonwealth.

70.    Title III debt-adjustment proceedings that are currently pending include those brought by the Oversight Board on behalf of the Commonwealth (Case No. 17 BK 3283-LTS), commenced May 9, 2017; HTA (Case No. 17 BK 3567-LTS), commenced May 21, 2017; and PBA (Case No. 19 BK 5223-LTS), commenced September 27, 2019.

71.    Ambac has property interests in certain of the pending Title III proceedings, as detailed above, as an insurer and owner of bonds issued by certain Title III debtors.  Ambac has suffered, and continues to suffer constitutional injury from being subject to the automatic stay, ongoing debt-adjustment proceedings, and adjudication of its constitutional, statutory, contractual,

and property rights in those proceedings under a constitutionally invalid statute. Ambac has expended substantial resources to defend its rights in the ongoing, constitutionally invalid Title III debt-adjustment proceedings.

72. Ambac has also suffered other financial injuries as a result of PROMESA's enactment and the Board's actions under PROMESA. The Fiscal Plans and budgets certified by the Board under PROMESA, which have been implemented through Commonwealth legislation including the Fiscal Plan Compliance Act, H.B. 938, 18th Leg. Assemb. (P.R. 2017), interfere with payments on bonds insured and owned by Ambac. Those Fiscal Plans and budgets upend typical municipal bond priorities and contradict established Puerto Rico law and constitutional provisions relied upon by investors, citizens, and other stakeholders. The Fiscal Plans and budgets treat the payment of principal and interest on the revenue bonds insured or owned by Ambac significantly worse than Commonwealth GO debt and unsecured pensions, and also improperly divert specific revenues to the Commonwealth treasury that were already committed to service payment of PBA, HTA, PRIFA and CCDA bonds owned and insured by Ambac. *See, e.g., Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et. al.*, ECF No. 11946; Fiscal Plan for Puerto Rico, March 13, 2017, *available at* http://www.aafaf.pr.gov/assets/planfiscal13demarzo2017.pdf. The resulting interruption of payments due under those bonds has required Ambac to pay substantial sums as a bond insurer as detailed above, ¶¶ 23-27. Ambac has suffered and will continue to suffer defaults and claim payments on the bonds it insures, which have caused and will continue to cause ongoing significant, material, and irreparable harm.

73. The Oversight Board's interpretation of its authority under PROMESA and its conduct in these cases further illustrate the harm that has resulted from the unconstitutional

enactment of a special bankruptcy law for Puerto Rico. The Oversight Board has taken expansive views of its powers under the unconstitutional private bankruptcy law for Puerto Rico in an attempt to eliminate creditors' rights and the authority of courts to vindicate those rights.

74.     Neither creditors of other territories nor creditors of other municipalities are required to face anything akin to the treatment of Puerto Rico's creditors under PROMESA. In multiple disputes with bondholders and insurers, the Oversight Board has invoked its unique Fiscal Plan and budgetary authority under PROMESA as a basis for the purported preemption of all pre-PROMESA territorial law that is inconsistent with the Board's Fiscal Plan and budget certifications. The Board has relied on this purported preemption rationale in an effort to preclude select creditors from establishing that they have certain property rights entitled to recognition in the Title III proceedings. *See, e.g., Opp. to Urgent Mot. of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company*, ECF No. 10958, ¶ 20 ("Any prepetition obligations to pay are inconsistent with PROMESA's priorities in Title III and PROMESA's grant to the Oversight Board of power over uses of the Debtor's revenues in Title II"); *Supp. Opp. to Amended PRIFA Bondholder Mot. to Lift Automatic Stay*, ECF No. 10611, at 34-38 ("[E]ven if there were a Commonwealth statute that required transfer of monies to [an instrumentality] and granted [creditors or insurers] a security interest . . . , such statute would be preempted by PROMESA").

75.     The Oversight Board contends that its unique Fiscal Plan and budgetary authority further provides a basis for preemption of all pre-PROMESA territorial law in the Commonwealth's debt-adjustment proceedings, where the Board similarly seeks to use PROMESA to arbitrarily discriminate among creditors in derogation of their pre-PROMESA legal

rights.   For example, in its disclosure statement for the amended proposed POA for the Commonwealth, the Oversight Board proposes a recovery of at least 91.5% for pension claimants and a recovery of between 65-75% for GO bondholders, while revenue bond creditors would receive a recovery of only 3.9%.   ECF No. 11947 at 17, 26 (describing an 8.5% reduction to retirement benefits); *id.* at 15-17 (recoveries ranging from approximately 65%-75% for GO bond claims, classes 11-38); *id.* at 17-18 (recovery of 3.9% for revenue bondholders, classes 42-44). The Board's stated rationale for discriminating against revenue bond creditors is that PROMESA preempts priorities afforded to their claims and the obligation to transfer pledged monies under pre-PROMESA territorial law.  *Id.* at 44 ("The Oversight Board believes PROMESA section 4 preempts inconsistent Commonwealth laws, which includes laws enacted prior to PROMESA that historically conditionally appropriated certain Commonwealth monies to its instrumentalities."). But the Board has also contended that it can apply that rationale in a selective manner to pick and choose which creditors to favor under PROMESA.   GO bondholders, like revenue bondholders, have claims based on pre-PROMESA territorial law—and if PROMESA preempts any of those priorities, it does so equally as to each type of claim, which should place all such creditors on an equal legal footing.

76.    While the Oversight Board has vigorously opposed all efforts of revenue bondholders to establish priority, the Board has made no attempt to litigate the priority of GO bonds, instead purporting to settle claims of the GO bondholders and successfully deferring examination of the merits of settlement.  *See Response of Financial Oversight and Management Board for Puerto Rico to Amended Report and Recommendation of Mediation Team*, ECF No. 11492 at 3–5 (supporting the mediation team's recommendation to stay the GO Bond Litigation until plan confirmation under the rationale of "promoting settlement"); *Final Order Regarding (A)*

*Stay Period, (B) Mandatory Mediation, and (C) Certain Deadlines Related Thereto*, ECF No. 12189 at 3 (staying the contested matters and adversary proceedings addressed in or filed in response to the Interim GO/PBA Order pending the Court's decision regarding confirmation of the Amended Plan).  The POA further entrenches this arbitrary discrimination between creditors, with the Board invoking purported authority under PROMESA to set vastly different recoveries for these two classes of bondholders without any foundation in a principled application of preemption principles.

77.    Even where provisions of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure are expressly incorporated into PROMESA, the Oversight Board has maintained that the meaning of those provisions is transformed by the Board's role and authority under PROMESA.  For example, the Official Committee of Unsecured Creditors, joined by certain secured creditors including Ambac, has moved under Bankruptcy Rule 3013 and 11 U.S.C. § 1122 for reclassification of the claims of certain pension holders that the Board has given preferential treatment in the POA.  *See Mot. of Official Committee of Unsecured Creditors Pursuant to Fed. R. Bankr. P. 3013*, ECF No. 11989; *Ambac's Partial Joinder to Mot.*, ECF No. 12691.  Under the POA, while general unsecured claims would receive an estimated recovery of only 3.9%, pension claims will receive a recovery of at least 91.5%, and approximately 75% of claimants will face no reduction at all in their pensions.  *Disclosure Statement for the Amended Title III Joint Plain of Adjustment of the Commonwealth of Puerto Rico*, ECF No. 11947 at 17, 26.  In response to the motion for reclassification, the Oversight Board has maintained that, notwithstanding PROMESA's express incorporation of Rule 3013 and 11 U.S.C. § 1122, PROMESA gives the Board unilateral authority to design a proposed plan of adjustment, that no other party may seek to modify the proposed plan, and that the Court has no power to reclassify groups of creditors prior

to plan confirmation except in the event that the Board itself requests the Court's intervention.  *See Oversight Board's Opp. to Mot.*, ECF No. 12726 ¶¶ 3-4, 26, 40.

78.     The Oversight Board has further taken the over-reaching position that under PROMESA it has unreviewable authority to allocate the Commonwealth's revenues among creditors that cannot be reviewed at plan confirmation.  PROMESA empowers the Oversight Board to approve Fiscal Plans, PROMESA § 106(e), and requires that a plan of adjustment may not be confirmed unless it "is consistent with the applicable Fiscal Plan certified by the Oversight Board under title II."  PROMESA § 314(b)(7).  These provisions of PROMESA are uniquely available only to Puerto Rico and have emboldened the Oversight Board to contend that it may discriminate against creditors in a Fiscal Plan based on an unconstitutional statute and then shield that discrimination from review at plan confirmation.  If this were correct, it would mean that critical inputs in the plan of adjustment that are subject to judicial scrutiny in any other bankruptcy, including municipal bankruptcies under Chapter 9, would be committed entirely to the Board's discretion under PROMESA.  For example, in the Disclosure Statement for the current Commonwealth Plan of Adjustment, the Board has maintained with respect to its provision for funding of "essential public services":

> Title II of PROMESA requires that a fiscal plan "ensure the funding of essential public services."  This language sets a minimum floor on spending, meaning that the fiscal plan must fund essential services.  At confirmation, the Title III Court considers the Plan [of Adjustment].  The fiscal plan's certification is outside the subject matter jurisdiction of the Title III Court pursuant to PROMESA section 106(e).  *PROMESA section 314(b)(7) requires that the Plan be consistent with the fiscal plan, but imposes no testing of the fiscal plan.*  Therefore, essential services are not in issue.

*Disclosure Statement for the Amended Title III Joint Plain of Adjustment of the Commonwealth of Puerto Rico*, ECF No. 11947, at 129 (emphasis added).  In short, the Oversight Board has taken the position that, under PROMESA, the Title III Court should order the discharge of

Commonwealth debts without ever evaluating the costs of "essential" services—and thus without ever determining how much money the Commonwealth can expend to service its debts or other allocations of funding in the Fiscal Plan.  No creditor of any other governmental entity faces such claims that patently discriminate against creditors based on a private bankruptcy statute for Puerto Rico.

79.    PROMESA's departure from ordinary bankruptcy law not only threatens non-uniform results with respect to court-ordered discharge of debt, but also has distorted the relative bargaining positions of the Oversight Board and creditors and the resulting terms of voluntary restructuring agreements.  Based on the unique provisions of PROMESA, the Board has felt free to strategically pick and choose which creditors to favor, without regard for their pre-existing legal rights, in order to recruit creditor support for the Board's proposed POA.

80.    The Oversight Board's contentions regarding the scope of its powers under PROMESA are disputed by multiple parties in the ongoing Title III cases, including Ambac.  But they illustrate how PROMESA's unique provisions have already skewed the bankruptcy process to the detriment of Commonwealth creditors, requiring creditors to defend against unprecedented incursions on their property and other legal rights.  No other territory, governmental entity, or Chapter 9 debtor could threaten creditors with putative powers to dictate priorities in contravention of state or territorial law, to pick and choose which creditors to pay with impunity while obtaining a discharge, or to impose allocations of assets and available funding for debt service without judicial scrutiny.  No matter the ultimate outcome of the various disputes about the Board's authority under PROMESA, these disputes illustrate how PROMESA, as administered by the Oversight Board, departs from ordinary debt-adjustment proceedings, with consequences that have

already caused significant, material, and irreparable harm and have become ever more injurious to creditors as the cases proceed.

### FIRST CLAIM FOR RELIEF
**(Declaratory Relief Against All Defendants Pursuant to 28 U.S.C. §§ 2201 and 2202 for Violations of the Bankruptcy Clause's Uniformity Requirement)**

81.     Ambac repeats and realleges the allegations contained in paragraphs 1 through 80 hereof, as if fully set forth herein.

82.     Titles I, II, and III of PROMESA are invalid under the Bankruptcy Clause's Uniformity Requirement.

83.     Defendants' actions under Titles I, II, and III of PROMESA are harming and will continue to harm Ambac irreparably, including by making its rights as a creditor subject to a novel, non-uniform, and constitutionally invalid bankruptcy law.

84.     An actual justiciable controversy exists between the parties.

85.     Ambac is entitled to an order declaring that Titles I, II, and III of PROMESA are unconstitutional and cannot be enforced on the ground that they violate the Bankruptcy Clause's uniformity requirement.

86.     Ambac respectfully requests any further necessary and proper relief under 28 U.S.C. § 2202, including dismissal of the pending Title III petitions.

### SECOND CLAIM FOR RELIEF
**(Injunctive Relief Against All Defendants for Violations of the Bankruptcy Clause's Uniformity Requirement)**

87.     Ambac repeats and realleges the allegations contained in paragraphs 1 through 86 hereof, as if fully set forth herein.

88.     Titles I, II, and III of PROMESA are invalid under the Bankruptcy Clause's Uniformity Requirement.

89.     Defendants' actions under Titles I, II, and III of PROMESA are harming and will continue to harm Ambac irreparably, including by making its rights as a creditor subject to a novel, non-uniform, and constitutionally invalid bankruptcy law.

90.     If Titles I, II, and III of PROMESA continue to be implemented and enforced and Defendants continue to take action pursuant to those provisions, Ambac will suffer irreparable constitutional injury through adjudication of its rights as a creditor pursuant to a novel, non-uniform, and constitutionally invalid bankruptcy law.

91.     Ambac is entitled to an injunction prohibiting the Defendants from taking or causing to be taken any further action whatsoever in connection with the implementation or effectuation of Titles I, II, and III of PROMESA.

## **PRAYER FOR RELIEF**

WHEREFORE Ambac respectfully requests that the Court enter judgment against Defendants as follows:

(a)     Declare that Titles I, II, and III of PROMESA are unconstitutional and unenforceable on the ground that they violate the Bankruptcy Clause's uniformity requirement.

(b)     Enjoin Defendants from taking or causing to be taken any further action whatsoever in connection with the implementation or effectuation of Titles I, II, and III of PROMESA.

(c)     Dismiss the pending Title III petitions.

(d)     Grant Ambac such other and further relief as this Court may deem just and proper.

Dated:  May 26, 2020

**FERRAIUOLI LLC**

By: */s/ Roberto Cámara-Fuertes*
     Roberto Cámara-Fuertes (USDC-PR No. 219002)
     Sonia Colón (USDC-PR No. 213809)
     221 Ponce de León Avenue, 5th Floor
     San Juan, PR 00917
     Telephone: (787) 766-7000
     Facsimile: (787) 766-7001
     Email: rcamara@ferraiuoli.com
          scolon@ferraiuoli.com

**COOLEY LLP**

By: */s/ Elizabeth B. Prelogar*
     Elizabeth B. Prelogar (*pro hac vice*
     forthcoming)
     1299 Pennsylvania Ave. NW, Suite 700
     Washington, DC 20004
     Telephone: (202) 842-7800
     Facsimile: (787) 766-7001
     Email:  eprelogar@cooley.com

     Reed Smith (*pro hac vice* forthcoming)
     55 Hudson Yards
     New York, New York 10001-2157
     Telephone: (212) 479-6000
     Facsimile: (212) 479-6275
     Email:  reed.smith@cooley.com

**MILBANK LLP**

By: */s/ Atara Miller*
     Dennis F. Dunne (admitted *pro hac vice*)
     Atara Miller (admitted *pro hac vice*)
     Grant R. Mainland (admitted *pro hac vice*)
     John J. Hughes, III (admitted *pro hac vice*)
     Jonathan Ohring (admitted *pro hac vice*)
     55 Hudson Yards
     New York, NY 10001
     Telephone: (212) 530-5000
     Facsimile:  (212) 530-5219
     Email: ddunne@milbank.com
     amiller@milbank.com
     gmainland@milbank.com
     jhughes2@milbank.com
     johring@milbank.com