# EXHIBIT A

**(Proposed Motion to Dismiss)**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| AMBAC ASSURANCE CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO; JOSÉ B. CARRIÓN III; ANDREW G. BIGGS; CARLOS M. GARCÍA; ARTHUR J. GONZÁLEZ; JOSÉ R. GONZALEZ; ANA J. MATOSANTOS; DAVID A. SKEEL, JR.,<br><br>    Defendants. | Adv. Proc. No. 20-00068-LTS |

## PROPOSED MOTION TO DISMISS OF INTERVENOR-DEFENDANT OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF <u>THE COMMONWEALTH OF PUERTO RICO</u>

---

[1] The Debtors in these jointly administered PROMESA title III cases (these "Title III Cases"), along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and ); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Proposed Intervenor-Defendant Official Committee of Retired Employees of the Commonwealth of Puerto Rico respectfully moves to dismiss the complaint of Ambac Assurance Corporation [Adv. Dkt. 1; Case No. 17-3283, Dkt. 13231] for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A memorandum in support of the motion and a proposed order are attached.

Dated: June 25, 2020

Respectfully submitted,

**JENNER & BLOCK LLP**

By:
/s/ Robert Gordon
Robert Gordon (admitted *pro hac vice*)
919 Third Ave
New York, NY 10022-3908
rgordon@jenner.com
212-891-1600 (telephone)
212-891-1699 (facsimile)

Catherine Steege (admitted *pro hac vice*)
Melissa Root (admitted *pro hac vice*)
Landon Raiford (admitted *pro hac vice*)
353 N. Clark Street
Chicago, IL 60654
csteege@jenner.com
mroot@jenner.com
lraiford@jenner.com
312-222-9350 (telephone)
312-239-5199 (facsimile)

Ian Heath Gershengorn (admitted *pro hac vice*)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
igershengorn@jenner.com
202-639-6000 (telephone)
202-639-6066 (facsimile)

**BENNAZAR, GARCÍA & MILIÁN, C.S.P.**

By:
/s/ A. J. Bennazar-Zequeira
A. J. Bennazar-Zequeira
Héctor M. Mayol Kauffmann
Edificio Union Plaza
1701 Avenida Ponce de León #416
Hato Rey, San Juan, PR 00918
ajb@bennazar.org
hector.mayol@bennazar.org
787-754-9191 (telephone)
787-764-3101 (facsimile)

*Counsel for The Official Committee of Retired Employees of Puerto Rico*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>      as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>      Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| AMBAC ASSURANCE CORPORATION,<br><br>      Plaintiff,<br><br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO; JOSÉ B. CARRIÓN III; ANDREW G. BIGGS; CARLOS M. GARCÍA; ARTHUR J. GONZÁLEZ; JOSÉ R. GONZALEZ; ANA J. MATOSANTOS; DAVID A. SKEEL, JR.,<br><br>      Defendants. | Adv. Proc. No. 20-00068-LTS |

## MEMORANDUM OF LAW IN SUPPORT OF PROPOSED MOTION TO DISMISS FILED BY INTERVENOR-DEFENDANT OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF PUERTO RICO

---

[1] The Debtors in these jointly administered PROMESA title III cases (these "Title III Cases"), along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and ); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .......................................................................................................... 1

FACTS ......................................................................................................................... 3

ARGUMENT ................................................................................................................. 4

I.      Standard of Review ............................................................................................ 4

II.     The Uniformity Term of the Article I Bankruptcy Clause Does Not Apply to
        PROMESA ......................................................................................................... 5

        A.      Congress has plenary power to legislate for the territories under Article
                IV. ....................................................................................................... 5

        B.      The uniformity terms of Article I, Section 8 do not apply when Congress
                invokes its Article IV powers to legislate for territorial purposes. ......... 9

        C.      Non-uniformity is the hallmark and purpose of Congress's plenary power
                under Article IV. ................................................................................. 12

III.    PROMESA Meets the Requirements of Uniformity as Intended by the Framers and
        as Interpreted by the Supreme Court. ............................................................... 14

IV.     Ambac's Claims for Equitable Relief Should Be Rejected Due to Its Inexcusable
        Delay. .............................................................................................................. 19

CONCLUSION ........................................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

*American Insurance Co. v. Canter*, 26 U.S. (1 Pet.) 511 (1828)...................................................12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...........................................................................................4

*Binns v. United States*, 194 U.S. 486 (1904) ................................................................................8, 9

*Blanchette v. Connecticut General Insurance Corps.*, 419 U.S. 102 (1974)..............11, 16, 17, 18

*Califano v. Torres*, 435 U.S. 1 (1978) ...........................................................................................13

*Cincinnati Soap Co. v. United States*, 301 U.S. 308 (1937)............................................................6

*Commonwealth of Puerto Rico v. Franklin California Tax-Free Trust*, 136 S. Ct. 1938
        (2016)....................................................................................................................................3

*Downing v. Globe Direct LLC*, 682 F.3d 18 (1st Cir. 2012) ............................................................4

*Eche v. Holder*, 694 F.3d 1026 (9th Cir. 2012) .............................................................................10

*Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33 (1st Cir. 2013)............................4

*Examining Board of Engineers, Architects, & Surveyors v. Flores de Otero*, 426 U.S. 572
        (1976)....................................................................................................................................6

*Financial Oversight and Management Board for Puerto Rico v. Aurelius Investment, LLC*,
        140 S. Ct. 1649 (2020).........................................................................................1, 2, 5, 7, 10

*Government of Puerto Rico v. Carpenter Co.*, No. CV-18-1987 (GAG), __ F. Supp. 3d __,
        2020 WL 962931 (D.P.R. Feb. 27, 2020)..........................................................................19

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)......................................................................................5

*Hanover National Bank v. Moyses*, 186 U.S. 181 (1902)..................................................16, 17, 21

*Harris v. Rosario*, 446 U.S. 651 (1980)........................................................................................13

*Hornbuckle v. Toombs*, 85 U.S. (18 Wall.) 648 (1873) ..................................................................6

*New Era Publications International, ApS v. Henry Holt & Co.*, 873 F.2d 576 (2d Cir.
        1989)...................................................................................................................................20

*Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863 (2016) .............................................................2, 12

*Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014).....................................................19

*Railway Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457 (1982) ............................7, 14, 16, 17

*Schultz v. United States*, 529 F.3d 343 (6th Cir. 2008)..........................................................15, 16

*Stellwagen v. Clum*, 245 U.S. 605 (1918)........................................................................................16

*Torres v. Commonwealth of Puerto Rico*, 442 U.S. 465 (1979)....................................................10

*Tuaua v. United States*, 788 F.3d 300 (D.C. Cir. 2015)..................................................................11

*United States v. Heinszen*, 206 U.S. 370 (1907)..............................................................................12

*United States v. Rivera Torres*, 826 F.2d 151 (1st Cir. 1987) .......................................................12

*United States v. Trinidad Coal & Coking Co.*, 137 U.S. 160 (1890) ............................................20

*Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156 (1946)................................16

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. art. I, § 8, cl. 1...............................................................................................................9

U.S. Const. art. I, § 8, cl. 4...........................................................................................................1, 8

U.S. Const. art. IV, § 3, cl. 2............................................................................................................5

U.S. Const. amend. X.........................................................................................................................5

U.S. Const. amend. XI .......................................................................................................................5

48 U.S.C. § 2102(b) .........................................................................................................................19

48 U.S.C. § 2104 ..............................................................................................................................18

48 U.S.C. § 2162 ..............................................................................................................................18

Act of Apr. 12, 1900, 31 Stat. 77 ....................................................................................................11

Act of Apr. 30, 1900, 31 Stat. 141 ..................................................................................................10

Act of Aug. 1, 1950, 64 Stat. 384 ...................................................................................................11

Nationality Act of 1940, 54 Stat. 1137 ...........................................................................................11

## OTHER AUTHORITIES

Judith Schenk Koffler, *The Bankruptcy Clause and Exemption Laws: A Reexamination of
the Doctrine of Geographic Uniformity*, 58 N.Y.U. L. Rev. 22 (1983) ..................................15

F. Regis Noel, *A History of the Bankruptcy Clause of the Constitution of the United States of America* (1918) ................................................................................................................14

Charles Jordan Tabb, *The History of the Bankruptcy Laws in the United States*, 3 Am. Bankr. Inst. L. Rev. 5 (1995) ..........................................................................................14, 15

Charles Warren, *Bankruptcy in United States History* (1935)................................................14, 15

## INTRODUCTION

Four years after the enactment of Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), four years after the appointment of the Financial Management Oversight Board (the "Board"), three years after the commencement of these proceedings, and nearly three years after PROMESA's constitutionality was first challenged before this Court, Ambac Assurance Corporation ("Ambac") now files a new complaint raising an additional constitutional objection to the statute.  ECF No. 13231.  In the last round of litigation on PROMESA's constitutionality, parties disappointed with the results of the Board's decisions attempted to unravel years of these proceedings by arguing the Board's members were appointed in violation of the executive's authority under Article II, Section 2 of the U.S. Constitution.  The Supreme Court unanimously rejected this challenge earlier this month.  *See Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 140 S. Ct. 1649 (2020).

This time around, Ambac tries an Article I challenge.  Its complaint asserts, for the first time, that PROMESA is facially impermissible under Article I, Section 8, which grants Congress the authority to "establish a uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States."  U.S. Const. art. I, § 8, cl. 4.  This belated follow-up challenge to PROMESA's constitutionality fares no better than the last.

First, there is no uniformity requirement applicable here.  As the Supreme Court recently made clear in *Aurelius*, Congress enacted PROMESA pursuant to its Article IV powers to "make all needful Rules and Regulations respecting the Territory … belonging to the United States."  *Aurelius*, 140 S. Ct. at 1656 (quoting U.S. Const. art. IV, § 3, cl. 2).  The dispositive point is thus quite straightforward:  The text of Article IV contains no uniformity limitation, so the existence of any such limitation on Congress's Article I authority is simply beside the point.  Congress

"expressly invoked a constitutional provision allowing it to make local debt-related law (Article IV)." *Aurelieus*, 140 S. Ct. at 1664-65. Ambac's efforts to saddle that "local debt-related law" with restrictions that apply to federal bankruptcy legislation have no basis in the Constitution's text.

Reinforcing what the text makes plain, for well over a century, the Supreme Court has declined to apply the "uniformity" requirements contained in parallel provisions of Article I when Congress enacts territorial legislation pursuant to Article IV. The Court has held, for example, that "uniformity" restrictions that limit the grant of Article I authority regarding taxation and naturalization do not apply to legislation enacted under the Territories Clause. The same result applies here.

For good reason. The Framers well understood that they could not possibly anticipate the unique local histories and needs of all territories the new Nation might acquire. The Framers thus wrote the Territory Clause to give Congress broad leeway in its exercise of the full measure of legislative authority over these lands, freed from limitations that might constrain Congress's exercise of legislative authority over the States. As the Supreme Court has put it, the Constitution gives Congress "broad latitude to develop innovative approaches to territorial governance" consistent with the need for "inventive statesmanship" for the territories. *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1876 (2016). The enactment of PROMESA to meet the emergency conditions in Puerto Rico shows the wisdom of that approach.

That said, even if the Bankruptcy Clause did apply to Article IV territorial legislation, Ambac still would not prevail because PROMESA meets the requirements of that provision. The Supreme Court has long recognized that "uniformity" does not require uniform results for creditors

2

like Ambac, and that Congress may enact bankruptcy legislation to address specific or regional problems.  That is exactly what Congress did in PROMESA.

Finally, even setting aside the baselessness of Ambac's claims on the merits, this Court should dismiss Ambac's claims for equitable relief on the basis of Ambac's unjustifiable and inequitable delay.  Ambac has participated in these proceedings for more than three years, and the facts and theories Ambac invokes to support its claims have existed and been known to Ambac the entire time.  There is no reason for this Court to entertain Ambac's efforts to undo years of proceedings and to unsettle powerful reliance interests with this belated complaint.  It should be dismissed.

## FACTS

Ambac spills much ink complaining of purportedly unfair treatment of creditors at the hands of the Board over the years.  However, few of these allegations have much relationship to the complaint's actual asserted claims for equitable relief under Article I of the Constitution.

As is relevant to Ambac's current constitutional challenge, in 2016, Puerto Rico was suffering a debt crisis.  Compl. ¶ 29.  Puerto Rico attempted to address the crisis by enacting its own restructuring statute, which the U.S. Supreme Court struck down in *Commonwealth of Puerto Rico v. Franklin California Tax-Free Trust*, 136 S. Ct. 1938 (2016).  Compl. ¶ 29.  Congress then enacted PROMESA, which provides a bankruptcy relief process to any territory or instrumentality of a territory that has requested, or has received, the establishment of an oversight board to supervise the PROMESA process for that territory.  *Id.* ¶ 30.  A court may confirm a PROMESA plan for debt adjustment for a territory or a territorial instrumentality if that plan is consistent with fiscal plan approved by such an oversight board.  *Id.* ¶ 32.  The statutory text of PROMESA defines

3

"territory" to mean not just Puerto Rico, but also Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the U.S. Virgin Islands.  *Id.* ¶ 30.

The PROMESA Board commenced this action with a petition on May 3, 2017, ECF No. 1, and Ambac appeared and filed objections to the Board's petition less than two weeks later.  *See* ECF No. 113 (filed May 15, 2017).  Following three years of this Court's "significant decisions affecting creditors' rights" under PROMESA, Ambac filed its present complaint on May 26, 2020, ECF No. 13231, alleging violations of the Article I Bankruptcy Clause for the first time.  *See* Compl. ¶ 39 (citing *Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, 297 F. Supp. 3d 269, 283-84 (D.P.R. 2018)).  The complaint asserts two claims for relief: First, for a declaratory judgment that Titles I, II, and III of PROMESA are invalid and unenforceable under the Bankruptcy Clause's uniformity requirement, and second, for an injunction against the Board preventing it from taking further action pursuant to PROMESA.  Compl. ¶¶ 81-91.

## ARGUMENT

### I.    Standard of Review.

When reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, a court "accept[s] as true all well-pled facts alleged in the complaint and draw all reasonable inferences in [the plaintiff's] favor."  *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 36 (1st Cir. 2013).  A complaint will be dismissed if it does not plead "enough facts to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)).  Because the facts alleged by Ambac, even if true, do not make out a violation of the Bankruptcy Clause, the complaint must be dismissed.  *See Downing v. Globe Direct LLC*, 682 F.3d 18, 22 (1st Cir. 2012).

## II.     The Uniformity Term of the Article I Bankruptcy Clause Does Not Apply to PROMESA.

Ambac has failed to state a claim on the merits because PROMESA, as "local debt-related law" enacted pursuant to the Territories Clause of Article IV, is not subject to the limitations of the Bankruptcy Clause of Article I.

### A.     Congress has plenary power to legislate for the territories under Article IV.

Under the Framers' design, the States enter the Union as sovereigns subject only to limited, enumerated powers of Congress; the powers not granted to Congress are "reserved to the States respectively, or to the people." U.S. Const. amend. X; *see also id.* amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."). In "our federal system, the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991) (quotation marks omitted). As a result, Congress may legislate for the States only pursuant to express grants of power in Article I and subject to the limitations therein, including the uniformity requirement of the Bankruptcy Clause

Not so for the territories. The Territories Clause of Article IV empowers Congress to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. In contrast to States, territories and possessions do not enjoy the "preservation … and maintenance of their governments" by "the design and care of the Constitution" that results in Congress possessing only limited powers when legislating upon the States. *Gregory*, 501 U.S. at 457; *see also Aurelius*, 140 S. Ct. at 1658 (The Territories Clause "give[s] Congress the power to legislate for those localities in ways 'that would exceed its powers, or at least would be very unusual' in other contexts."); *id.* at 1660-61 ("[O]ur precedents[] have

5

long acknowledged that Congress may structure local governments under Article IV … in ways that do not precisely mirror the constitutional blueprint for the National Government.").

With federalism off the table, there was little need for Congress to specifically enumerate and demarcate Congress's authority vis-à-vis the territories.  Whereas Congress's authority to legislate under Article I is restricted to protect state sovereignty, its authority to legislate for the territories is "practically unlimited," *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 317 (1937); *see also Examining Bd. of Eng'rs, Architects, & Surveyors v. Flores de Otero*, 426 U.S. 572, 586 n.16 (1976). "[t]he powers vested in Congress … to govern Territories are broad.").

Instead, over a territory, "the nation possesses the sovereign powers of the general government *plus* the powers of a local or state government."  *Cincinnati Soap*, 301 U.S. at 317 (emphasis added); *see also Hornbuckle v. Toombs*, 85 U.S. (18 Wall.) 648, 655 (1873) (noting the "plenary municipal authority which Congress has over the District of Columbia and the Territories of the United States").  It is irrelevant that, as Ambac asserts, the Territories Clause "does not directly address the subject of bankruptcy."  *See* Compl. ¶ 54.  Congress is not limited to specific enumerated powers when it acts pursuant to the Territories Clause, and that is by design.[2]

Article I and Article IV are, in short, distinct sources of lawmaking authority, with distinct limitations.  Each of the Constitution's three references to uniformity appear in Article I, Section 8, including the authorization for Congress to issue "uniform" bankruptcy laws, while no such limitations appear in Article IV.  When the text or "legislative history" of a bankruptcy statute "indicat[es] that Congress was exercising its powers under the Bankruptcy Clause," it is subject to

---

[2] Indeed, Congress has used its Article IV authority to legislate on the subject of municipal debt in Puerto Rico for over a century.  For example, in the Jones-Shafroth Act of 1917, Congress limited the "public indebtedness of Porto Rico or any municipal government therein" to seven percent of the assessed value of Puerto Rico property.  *See* 39 Stat. 953.  Notably, the Jones-Shafroth Act also explicitly provided that "the rule of taxation in Porto Rico shall be uniform" without adding any such uniformity requirement for bankruptcy, indicating that in the absence of such affirmative territorial legislation, Article I's uniformity provisions do not apply.  *See* 39 Stat. 952.

that Clause's uniformity limitations.  *See Ry. Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 467-68 (1982); *see also id.* ("Unlike the Commerce Clause, the Bankruptcy Clause itself contains an affirmative limitation or restriction upon Congress' power: bankruptcy laws must be uniform throughout the United States.").  Thus, when Congress legislates on "the subject of bankruptcies" within the fifty states pursuant to Article I, the "uniformity" term acts as "a limitation on the power of Congress to enact bankruptcy laws."  *Id.* at 469.

But Congress did not issue PROMESA pursuant to the Bankruptcy Clause, and the uniformity requirement therefore does not apply.[3]  Ambac does not—and cannot—dispute that Congress enacted PROMESA pursuant to its plenary Article IV authority to legislate for the territories.  Indeed, the Supreme Court has so held.  Rather, Ambac presents the novel argument that because some of PROMESA's effects may be felt outside Puerto Rico, the limitations of the Article I Bankruptcy Clause should nonetheless be grafted onto Congress's exercise of Article IV powers.  *See* Compl. ¶ 54.

This position is untenable under Supreme Court precedent, both fresh and longstanding.  As the Court explained just weeks ago, "[t]he Board is an entity within the territorial government, created pursuant to article IV, section 3 of the Constitution of the United States, and funded by the Territory."  *Aurelius*, 140 S. Ct. at 1670 (Thomas, J., concurring) (internal citations and quotation marks omitted).  Thus, the Board "exercise[s] the power of the local government, not the Federal Government," and as such "the Appointments Clause says nothing about them."  *Id.* at 1658-59.

By the same reasoning, the Bankruptcy Clause says nothing about Congress's power to enact PROMESA.  If the effects of the Board's decisions outside Puerto Rico—indisputably

---

[3] Any distinctions between limited grants of authority under Article I (such as the Bankruptcy Clause), on one hand, and affirmative prohibitions on congressional action, on the other, are not at issue in this case and need not be reached by the Court.

known to the Court when it handed down its decision earlier this month—were sufficient to transform Congress's plenary authority under Article IV into its more limited authority when legislating over the States, *Aurelius* would have come out the other way.   Simply put, if the Supreme Court in *Aurelius* is right, then Ambac must be wrong.  *Cf. Binns v. United States*, 194 U.S. 486, 491 (1904) (holding that a uniformity requirement under Article I, Section 8 did not apply to a territorial tax even though the revenue was sent to and accounted for by the U.S. Treasury, not the territorial government).

Moreover, Ambac's approach would lead to absurd results.  According to the complaint, because bankruptcy is not an enumerated power under the Territories Clause, and because bankruptcy "broadly affects the rights of creditors outside the territories," Congress's otherwise plenary power must be exercised uniformly in the territories in the same manner as in the States. Compl. ¶ 54.  But *none* of the powers Congress exercises under the Territories Clause are enumerated—as discussed above, there is no state sovereignty to protect in the territories, and thus there was no need for the Framers to specify affirmative, limited grants of authority when drafting Article IV.  By Ambac's reasoning, then, nearly any exercise of necessarily unenumerated power under the Territories Clause that has effects "outside the territories," Compl. ¶ 54, would be subject to the same constitutional restrictions as if it were exercised over the states.  Moreover, if the Bankruptcy Clause applies equally to territorial bankruptcy legislation as it does to that affecting States, as Ambac argues, it is unclear why Congress would not be required to apply PROMESA equally to the States as to the territories, as a matter of constitutional uniformity.  This would render the difference between Congress's "broad" powers over the territories and its limited powers over the States essentially meaningless, contradicting centuries of Supreme Court precedent and historical practice.

**B.     The uniformity terms of Article I, Section 8 do not apply when Congress invokes its Article IV powers to legislate for territorial purposes.**

The inapplicability of the "uniformity" provision of the Bankruptcy Clause when Congress acts for local, territorial purposes pursuant to Article IV is further illustrated by the lack of such a uniformity requirement for taxation and naturalization in the territories.  The Constitution provides that three categories of federal legislation be "uniform" "throughout the United States": a "uniform Rule of Naturalization;" "uniform Laws on the subject of Bankruptc[y]" and "all Duties, Imposts, and Excises," which "shall be uniform."  *See* U.S. Const., art. I, § 8, cl. 1; *id.* § 8, cl. 4.  The term "uniform" in the Bankruptcy Clause follows in the same breath as naturalization: "The Congress shall have Power … To establish a[] uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States."  *Id.* § 8, cl. 4.

As the Supreme Court has explained, the uniformity requirement for excises does not apply to taxes imposed pursuant to the Territories Clause because "the form of government [Congress] shall establish" for territories "is not prescribed" by the Constitution, "and may not necessarily be the same in all the territories."  *Binns*, 194 U.S. at 491.  In *Binns*, the plaintiff challenged a license tax in the then-territory of Alaska as violating the uniformity requirements of Article I, Section 8, regarding excises.  The Supreme Court disagreed, concluding that because Congress enacted the license taxes for "local purposes" and in support of the "territorial government," the Article I requirement of that "excises shall be uniform" was irrelevant.  *Id.* at 487, 493.  This was true even though the exact same license tax might violate the uniformity requirement for taxation under Article I if the "revenue [were] for the benefit of the nation" as a whole instead of for local, territorial purposes.  *Id.* at 496.  This is because, the Court explained, the requirement of "uniform" taxation does not apply when Congress legislates for the territories.  Rather, "[i]n the exercise of this power Congress" acts "like any state legislature unrestricted by constitutional provisions,"

9

including the uniformity provisions.  *See id.* at 492.  And if there were any doubt as to the irrelevance of taxation uniformity when Congress legislates for the territories, three-quarters of a century later the Court reiterated that the Article I's requirement of "uniform[ity]…was not applicable to the island" of Puerto Rico.  *Torres v. Commonwealth of Puerto Rico*, 442 U.S. 465, 468-69 (1979).

The "uniformity" requirement of the Naturalization Clause is equally inapplicable to Congress's legislation for the territories.  For example, the Ninth Circuit recently rejected such a uniformity challenge to a naturalization requirement that applied different to residents of the Northern Mariana Islands as compared to residents of a State, explaining that "[t]he Naturalization Clause does not apply of its own force" in unincorporated territories.  *Eche v. Holder*, 694 F.3d 1026, 1031 (9th Cir. 2012).  Although Congress had extended "certain clauses of the United States Constitution to the [Northern Marianas], the Naturalization Clause" and its uniformity requirement "is not among them."  *Id.* at 1030.  Thus, because the Naturalization Clause did not apply in the territories, its uniformity requirement was no bar to Congress's differential treatment of residents of the Northern Marianas for naturalization purposes.

The inapplicability of Article I's requirement of "uniform rules of naturalization" to territorial legislation is further confirmed by historical practice.  *See Aurelius*, 140 S. Ct. at 1659 ("[S]ubsequent history" of how Congress has exercised authority in the territories "illuminates the text's meaning.").  As with taxation, Congress has consistently exercised its Article IV plenary power to make non-uniform laws regarding the naturalization of residents of different U.S. territories and possessions.  Puerto Rico became a U.S. territory in 1898 simultaneously with the United States' acquisition of Hawaii, Guam, and the Philippines; however, Congress has never treated residents of these territories and possessions uniformly for the purposes of naturalization to

10

U.S. citizenship. Although Congress granted citizenship to nearly all Hawaiians in 1900, Congress did not confer full U.S. citizenship on all Puerto Ricans until many years later. *Compare* Act of Apr. 30, 1900, 31 Stat. 141 ("[A]ll persons who were citizens of the Republic of Hawaii on August [12, 1898], are hereby declared to be citizens of the United States and citizens of the Territory of Hawaii."), *with* Act of Apr. 12, 1900, 31 Stat. 77 (omitting any grant of U.S. citizenship to Puerto Rico residents), Jones-Shafroth Act, 39 Stat. 951, 953 (Mar. 2, 1917) (granting voluntary U.S. citizenship to most residents of Puerto Rico), *and* Nationality Act of 1940, 54 Stat. 1137, 1139 (granting birthright U.S. citizenship to "[a]ll persons born in Puerto Rico on or after April 11, 1899" and "residing on the effective date of this Act in Puerto Rico"). Guamanians were granted citizenship fifty years after Hawaiians, *see* Act of Aug. 1, 1950, 64 Stat. 384, and residents of American Samoa, which became a U.S. possession only two years after Puerto Rico, have never been granted automatic U.S. citizenship by Congress. *See Tuaua v. United States*, 788 F.3d 300, 302 (D.C. Cir. 2015) ("Unlike those born in the United States' other current territorial possessions—who are statutorily deemed American citizens at birth—section 308(1) of the Immigration and Nationality Act of 1952 designates persons born in American Samoa as non-citizen nationals.").

Whether non-uniform treatment of the territories for taxation or naturalization purposes is fair, wise, or necessary in any particular circumstance, longstanding congressional practice and decisions of the Supreme Court are clear that such non-uniformity is constitutionally permissible notwithstanding the uniformity requirements of Article I. Just so for the uniformity term of the Bankruptcy Clause. As the Supreme Court has explained, it has "construct[ed]…the Bankruptcy Clause's uniformity provision" so that it "comports with [its] construction of other 'uniform' provisions of the Constitution." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 160 (1974)

(interpreting the Bankruptcy Clause in light of previous interpretations of "uniform" under taxation clause). There is no reason in the constitutional text or historical practice to treat the word "uniform" in the Bankruptcy Clause any differently from its meaning in the tax or naturalization contexts, and Ambac offers none—indeed, Ambac does not even mention the Constitution's other "uniformity" requirements. This Court should reject Ambac's ahistorical and atextual interpretation.

### C. Non-uniformity is the hallmark and purpose of Congress's plenary power under Article IV.

Applying Article I's uniformity provisions to Congress's Article IV authority would defeat the Framers' purpose to provide Congress flexibility to govern the territories in a non-uniform manner, and according to territory-specific needs.

As the Supreme Court has repeatedly recognized, the Territories Clause grants Congress "broad latitude to develop innovative approaches to territorial governance" and to employ "inventive statesmanship" that is responsive to the unique local histories and needs of the territories. *Sanchez Valle*, 136 S. Ct. at 1876; *see also United States v. Heinszen*, 206 U.S. 370 (1907) (holding that when Congress acts in the territories, constitutional limitations its authority to delegate its powers do not apply); *Am. Ins. Co. v. Canter*, 26 U.S. (1 Pet.) 511, 546 (1828) (holding that territorial courts "are legislative Courts" and that Article III's "limitation[s] do[] not extend to the territories"). Non-uniformity is, in fact, a frequent feature of congressional legislation for the territories, and courts have generally deferred to this approach. *See United States v. Rivera Torres*, 826 F.2d 151, 154 (1st Cir. 1987) ("Congress can, pursuant to the plenary powers conferred by the Territorial Clause, legislate as to Puerto Rico in a manner different from the rest

of the United States."). Under Article IV, territories need not be treated the same as States—and need not be treated the same as each other.

In addition to the Supreme Court's refusal to apply the Constitution's express uniformity requirements to territorial legislation, it has also declined to apply statutes or other provisions of the Constitution to territories in a uniform manner that might otherwise be required for States. For example, in *Harris v. Rosario*, the Supreme Court rejected a Fifth Amendment equal protection challenge to the fact that "Puerto Rico receives less assistance than do the States" under certain welfare programs. 446 U.S. 651, 651-52 (1980). The Court explained that when legislating "under the Territory Clause of the Constitution," Congress "may treat Puerto Rico differently from States so long as there is a rational basis for its actions." *Id.* at 651-52. Similarly, in *Califano v. Torres*, the Court turned aside a constitutional right-to-travel challenge by citizens whose social security benefits were discontinued when they moved from a State to Puerto Rico, as Puerto Rico was statutorily excluded from this "uniform program." 435 U.S. 1, 1 (1978). Regardless of the wisdom or desirability of such non-uniformity, the Supreme Court has recognized it is a policy choice that the Constitution places in the hands of Congress when legislating for the territories.

The Territories Clause is therefore effectively a constitutional *non-uniformity* provision, and must remain so in order to perform its constitutional function of freeing Congress to legislate as necessary in diverse and unpredictable circumstances. It would therefore be especially perverse and contrary to the Framer's intent to apply Article I *uniformity* requirements to legislation enacted for territorial purposes. Yet Ambac would have this Court manufacture a Bankruptcy Clause uniformity claim in the area of congressional action—territorial legislation—perhaps least suited to a uniformity requirement, and in contradiction of the Territories Clause's text, purpose, and historical practice. This Court should decline.

**III.     PROMESA Meets the Requirements of Uniformity as Intended by the Framers and as Interpreted by the Supreme Court.**

Even if the Bankruptcy Clauses' uniformity term applied to PROMESA—and it does not—the statute meets the requirements of that provision.

There is little discussion of bankruptcy issues from the Constitutional Convention itself, as the Bankruptcy Clause was "adopted with practically no debate." *See* Charles Warren, *Bankruptcy in United States History* 4-5 (1935).  However, it is well established that the Framers were particularly concerned with the wide variation among state laws regarding bankruptcies of merchants and insolvencies of individuals.  This patchwork created uncertainty for both creditors and debtors, impeding commerce.  *See* F. Regis Noel, *A History of the Bankruptcy Clause of the Constitution of the United States of America* 72-75 (1918) (discussing how state bankruptcy and insolvency laws under the Articles of Confederation contributed to "[c]ommerce and trade throughout but a few of the States [being] at lowest ebb in 1786"); Charles Jordan Tabb, *The History of the Bankruptcy Laws in the United States*, 3 Am. Bankr. Inst. L. Rev. 5, 43 (1995) ("The need for a federal bankruptcy law was believed to stem from potential interstate commerce problems.  Without a federal law, the ability of nonresident creditors to collect their debts might be impaired, thereby hindering interstate commerce to the detriment of the nation.").  These problematic, pre-Constitution laws also included private bankruptcy bills, which raised questions "as to whether one State had to recognize the relief given to a debtor by another State," making it "not surprising that the Bankruptcy Clause was introduced [at the Convention] during  discussion of the Full Faith and Credit Clause." *Gibbons*, 455 U.S. at 472.

Thus, as James Madison explained in Federalist No. 42, "The power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different

States, that the expediency of it seems not likely to be drawn into question."  In "using th[e] phraseology" of "uniform laws on the subject of bankruptcies," "the founders of the Nation … clearly understood that 'they were not building a straight-jacket to restrain the growth and shackle the spirits of their descendants for all time to come; they were devising a political instrument which, while firm, was nevertheless to be flexible enough to serve the varying social needs of changing generations."  Warren, History of Bankruptcy at 4; *see also* Tabb, *supra* at 14 ("Each instance of federal [bankruptcy] legislation followed a major financial disaster: the Act of 1800 followed the Panic of 1797; the Act of 1841 came after the Panic of 1837; the 1867 Act followed the Panic of 1857 and the Civil War; and finally the 1898 Act was passed in the wake of the Panic of 1893.").

The uniformity requirement also addressed the concerns of some at the Convention that empowering Congress to pass bankruptcy legislation—as was necessary for interstate commerce after the chaos of the Articles of Confederation—could result in a national government favoring one State "to the economic detriment of another."  Judith Schenk Koffler, *The Bankruptcy Clause and Exemption Laws: A Reexamination of the Doctrine of Geographic Uniformity*, 58 N.Y.U. L. Rev. 22, 37 (1983) (citing 1 *The Records of the Federal Convention of 1878*, at 462-63 (Max Farrand, ed., 1966)); *see also* Warren, History of Bankruptcy at 13 (noting that during congressional debate over a 1798 bankruptcy bill, "at this early point in our history it is to be noted that the lines of division were largely geographical and sectional").  The uniformity requirement of the Bankruptcy Clause, then, was not intended to protect fairness to creditors, as Ambac would have it.  *See* Compl. ¶ 2 (anachronistically asserting that "The Bankruptcy Clause of the Constitution … enshrines the principle of non-discrimination against creditors," a concept arising from twentieth-century bankruptcy statutes).  Rather, it was intended to facilitate economic growth

in a large and diverse new country, and to ensure that the new federal government acted in an evenhanded way towards the still-sovereign States.

As a result, it is unsurprising that the Supreme Court has interpreted the uniformity requirement in a flexible and practical manner, allowing Congress to address fiscal crises as they arose while preserving state prerogatives around issues like exemptions and fraudulent conveyances. *See, e.g.*, *Blanchette*, 419 U.S. at 156-61. As the Court has explained, "[t]he uniformity requirement is not a straightjacket that forbids Congress to distinguish among classes of debtors, nor does it prohibit Congress from recognizing that state laws do not treat commercial transactions in a uniform manner." *Gibbons*, 455 U.S. at 469. "[F]lexibility" is an inherent in the constitutional provision," as it is necessary to the "capacity of the bankruptcy clause to meet new conditions as they have been disclosed as a result of the tremendous growth of business and development of human activities from 1800 to the present day." *Blanchette*, 419 U.S. at 158-59 (quoting *Cont'l Ill. Nat'l Bank & Trust Co. v. Chicago, R.I. & P.R. Co.*, 294 U.S. 648, 671 (1935)).

Indeed, the sole form of uniformity the Court has recognized under the Bankruptcy Clause is geographic, not personal, uniformity. *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 188 (1902). Even then, a bankruptcy law need not yield uniform results for creditors regardless of a debtor's geography. *See Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 172 (1946) (Frankfurter, J., concurring) ("To establish uniform laws of bankruptcy does not mean wiping out the differences among the forty-eight States in their laws governing commercial transactions."). Instead, a bankruptcy law "may recognize the laws of the state in certain particulars, although such recognition may lead to different results in different states." *Stellwagen v. Clum*, 245 U.S. 605, 613 (1918). The geographic uniformity requirement is also not particularly constricting: the Supreme Court has also "held that Congress may enact non-uniform laws to deal with

16

geographically isolated problems as long as the law operates uniformly upon a given class of creditors and debtors." *Schultz*, 529 F.3d at 351 (citing *Blanchette*, 419 U.S. at 159-60).

This flexibility makes good sense in light of the fact that "uniformity" was intended to be a protection for commerce and for fairness *to the States*, not to create "uniform" outcomes for creditors like Ambac. The only time the Court has ever invalidated a federal bankruptcy law as insufficiently "uniform" was when the statute applied only to a single private company, with specific provisions directing how benefits were to be paid to that particular company's employees. *See Gibbons*, 455 U.S. at 462-63, 467; *id.* at 469 ("Prior to today, this Court has never invalidated a bankruptcy law for lack of uniformity."). Striking down such an individualized statute for a private company (as opposed to a government and its public instrumentalities) also comports with the intent of the Framers to address the problem of States passing private bankruptcy bills for individuals under the Articles of Confederation. *Gibbons*, 455 U.S. at 471 ("[B]ankruptcy laws that specifically apply to the affairs of only one named debtor" are "nothing more than a private bill."). It says little, however, about legislation like PROMESA that sets out a process available to multiple territorial jurisdictions and applicable to multiple public entities within Puerto Rico.

Under the weight of this history, Ambac's complaint falls flat. Ambac complains that creditors under PROMESA are treated differently from creditors under other bankruptcy statutes. *See* Compl. ¶¶ 72-73. Yet the Supreme Court has long recognized that the Bankruptcy Code may provide creditors different rights to collect in different States, depending on the variability of state law, without violating uniformity. *See Hanover Nat'l Bank v. Moyses*, 186 U.S. 181 (1902). It is therefore irrelevant to the Bankruptcy Clause if the Board's decisions lead to "non-uniform results"

or "unprecedented incursions on [creditors'] property and other legal rights," as Ambac alleges. *See* Compl. ¶¶ 78-80.

Ambac also complains that PROMESA is not sufficiently geographically uniform because an oversight board currently exists only for Puerto Rico and for various Puerto Rican public entities, and because PROMESA's legislative history shows that Congress was particularly concerned by the fiscal crisis in Puerto Rico. *See* Compl. ¶¶ 55-57. These assertions also fail to state a violation of the Bankruptcy Clause, for multiple reasons. First, the Supreme Court has upheld bankruptcy legislation affecting only one region of States (never mind territories), explaining that "The uniformity provision does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve geographically isolated problems," such as Puerto Rico's fiscal crisis. *Blanchette*, 419 U.S. at 159. Requiring Congress to legislate for all territories if it legislates for any denies Congress the flexibility to implement practical, tailored policies that the Supreme Court has protected under both the Bankruptcy and Territories Clauses.

Second, PROMESA is not defined to apply only to Puerto Rico, nor is it, like the statute in *Gibbons*, a private bill for a single, private debtor. As Ambac acknowledges, PROMESA defines "territory" to include not just Puerto Rico and its instrumentalities, but also Guam, American Samoa, the Northern Marianas, and the U.S. Virgin Islands. *See* 48 U.S.C. § 2104. Ambac attempts to make hay of the fact that of these territories and possessions, only Puerto Rico currently has an oversight board. But this is not materially different from the circumstances in *Blanchette*, in which the Supreme Court approved of a geographically limited bankruptcy statute because it "operate[d] uniformly upon all bankrupt railroads," even though only one railroad, in one region, met that statutory definition at the time. *See* 419 U.S. at 158-60. Nor does the fact that PROMESA

18

proactively establishes an oversight board for Puerto Rico restrict the statute's reach to Puerto Rico and its creditors, as Ambac asserts.  Instead, PROMESA expressly provides that "[a]n entity may be a debtor under this subchapter if" it is "a territory that has requested the establishment of an Oversight Board," or an instrumentality thereof.  48 U.S.C. § 2162.

Thus, Ambac's construction of the Bankruptcy Clause cannot be squared with judicial precedent, historical practice, or the plain terms of the PROMESA statute.  To the contrary, PROMESA falls squarely within the categories of bankruptcy laws that the Supreme Court has upheld against uniformity challenges.

## IV.   Ambac's Claims for Equitable Relief Should Be Rejected Due to Is Inexcusable Delay.

Regardless of the Court's view of the merits, Ambac's complaint should be dismissed due to its inexcusable and inequitable delay in bringing its equitable claims.  A plaintiff who seeks the "total destruction" of an ongoing project, long known to the plaintiff, will be denied such injunctive relief as it "would 'work an unjust hardship' upon the defendants and third parties."  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 686 (2014) (quoting *Chirco v. Crosswinds Cmtys., Inc.*, 474 F.3d 227, 236 (6th Cir. 2007)).   In such "extraordinary circumstances," "the consequences of a delay in commencing suit may be of sufficient magnitude to warrant, at the very outset of litigation, curtailment of the relief equitably awardable," even if the statute of limitations has not yet run.  *Id.* at 685-86.

Such extraordinary circumstances exist here.  Nothing prevented Ambac or any other party from seeking this declaratory and injunctive relief at the outset of these proceedings—or even immediately upon enactment of the statute.  If PROMESA is invalid under the Bankruptcy Clause—and it is not—that is so on the face of the statute and was reasonably known to Ambac years ago.  *See Gov't of Puerto Rico v. Carpenter Co.*, No. CV-18-1987 (GAG), __ F. Supp. 3d

19

__, 2020 WL 962931, at *7 (D.P.R. Feb. 27, 2020) ("The doctrine of laches '[] penalizes a litigant for negligent or willful failure to assert his rights," and applies "'where the plaintiff knew or should have known of the'" offending conduct (quoting *Valmor Prods. Co. v. Standard Prods. Corp.*, 464 F.2d 200, 204 (1st Cir. 1972)).   Indeed, Congress itself was aware of potential uniformity challenges to the statute and included a severability clause precisely in anticipation of arguments now presented in this belated complaint.  *See* 48 U.S.C. § 2102(b) (providing a remedy in the event "a court holds invalid any provision of this chapter or the application thereof on the ground that the provision fails to treat similarly situated territories uniformly").

Ambac, which filed its first objections to the Board's petition over three years ago, was well aware of the PROMESA process and all facts necessary to support its current claims for declaratory and injunctive relief.  Instead, Ambac sat on its rights and watched as this Court, the Board, and hundreds of others engaged in the PROMESA process, incurring reliance interests not only for participants in this proceeding but for innumerable innocent third parties affected by the decisions of the Board and of this Court.  Ambac also watched as other similarly situated plaintiffs pressed their constitutional claims in a timely and very public manner all the way to the Supreme Court.  *Cf. New Era Pubs. Int'l, ApS v. Henry Holt & Co.*, 873 F.2d 576, 584-85 (2d Cir. 1989) (denying an injunction that would result in "total destruction" of a known project because of the plaintiff's three-year delay, despite knowledge of other timely commenced lawsuits seeking the same relief).

Now that the Appointments Clause challenge has failed to undo the Board's decisions, Ambac is pursuing Plan B: enjoin PROMESA on uniformity grounds.  But it is the longstanding "rule that one who seeks equity must do equity."  *United States v. Trinidad Coal & Coking Co.*,

137 U.S. 160, 171 (1890).  This Court should not reward such strategic delay by allowing the complaint to proceed.  Ambac's claims are too little, too late.

## CONCLUSION

The fact that Ambac, after several years of litigation, feels ill-treated by the Board does not give rise to a claim under the Bankruptcy Clause.  The uniformity Ambac seeks is personal, not geographical.  *See* Compl. ¶ 1 ("This action seeks to halt proceedings under the unconstitutional PROMESA statute to prevent further discrimination against creditors like Ambac"), *cf. Hanover Bank*, 186 U.S. at 188 ("[U]niformity is geographical, and not personal.").  Assuming all facts in the complaint to be true, it fails to state a claim upon which relief can be granted.  It must be dismissed.

Dated: June 25, 2020

**JENNER & BLOCK LLP**

By:
*/s/ Robert Gordon*
Robert Gordon (admitted *pro hac vice*)
919 Third Ave
New York, NY 10022-3908
rgordon@jenner.com
212-891-1600 (telephone)
212-891-1699 (facsimile)

Catherine Steege (admitted *pro hac vice*)
Melissa Root (admitted *pro hac vice*)
Landon Raiford (admitted *pro hac vice*)
353 N. Clark Street
Chicago, IL 60654
csteege@jenner.com
mroot@jenner.com
lraiford@jenner.com
312-222-9350 (telephone)
312-239-5199 (facsimile)

Ian Heath Gershengorn (admitted *pro hac vice*)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
igershengorn@jenner.com
202-639-6000 (telephone)
202-639-6066 (facsimile)

Respectfully submitted,

**BENNAZAR, GARCÍA & MILIÁN, C.S.P.**

By:
*/s/ A. J. Bennazar-Zequeira*
A. J. Bennazar-Zequeira
Héctor M. Mayol Kauffmann
Edificio Union Plaza
1701 Avenida Ponce de León #416
Hato Rey, San Juan, PR 00918
ajb@bennazar.org
hector.mayol@bennazar.org
787-754-9191 (telephone)
787-764-3101 (facsimile)

*Counsel for The Official Committee of Retired Employees of Puerto Rico*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

|  |  |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>     Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| AMBAC ASSURANCE CORPORATION,<br><br>     Plaintiff,<br><br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO; JOSÉ B. CARRIÓN III; ANDREW G. BIGGS; CARLOS M. GARCÍA; ARTHUR J. GONZÁLEZ; JOSÉ R. GONZALEZ; ANA J. MATOSANTOS; DAVID A. SKEEL, JR.,<br><br>     Defendants. | Adv. Proc. No. 20-00068-LTS |

**[PROPOSED] ORDER GRANTING MOTION TO DISMISS OF INTERVENOR-
DEFENDANT OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE
<u>COMMONWEALTH OF PUERTO RICO</u>**

---

[1] The Debtors in these jointly administered PROMESA title III cases (these "Title III Cases"), along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and ); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Upon consideration of the Motion to Dismiss submitted by Intervenor-Defendant Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "Committee") it is hereby

ORDERED that the complaint of Ambac Assurance Corporation [Adv. Dkt. 1; Case No. 17-3283, Dkt. 13231] is dismissed with prejudice for the reasons set forth in the Committee's Memorandum of Law in support of its Motion.


Dated: _____, 2020
       San Juan, Puerto Rico

                                        _____
                                         Honorable Laura Taylor Swain
                                         United States District Judge