## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>        Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| AMBAC ASSURANCE CORPORATION,<br><br>        Plaintiff,<br><br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO; JOSÉ B. CARRIÓN III; ANDREW G. BIGGS; CARLOS M. GARCÍA; ARTHUR J. GONZÁLEZ; JOSÉ R. GONZALEZ; ANA J. MATOSANTOS; DAVID A. SKEEL, JR.,<br><br>        Defendants. | Adv. Proc. No. 20-00068-LTS |

**PLAINTIFF AMBAC ASSURANCE CORPORATION'S OPPOSITION
TO MOTION TO DISMISS PLAINTIFF'S COMPLAINT
PURSUANT TO FED. R. CIV. P. 12(b)(6)**

*Caption Continued on Following Page*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**FERRAIUOLI LLC**

221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone:     (787) 766-7000
Facsimile:     (787) 766-7001

**COOLEY LLP**

1299 Pennsylvania Ave. NW, Suite 700
Washington, DC 20004
Telephone:     (202) 842-7800
Facsimile:     (787) 766-7001

**MILBANK LLP**

55 Hudson Yards
New York, NY 10001
Telephone:     (212) 530-5000
Facsimile:     (212) 530-5219

*Attorneys for Ambac Assurance Corporation*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ....................................................................................................... 5

   I.      Congress Singled Out Puerto Rico When It Passed PROMESA................................. 5

   II.     PROMESA Is Unlike Any Other Bankruptcy Law. ..................................................... 7

   III.    PROMESA's Effect On Ambac.................................................................................... 9

ARGUMENT ........................................................................................................... 11

   I.      MOTION TO DISMISS STANDARD............................................................... 11

   II.     PROMESA IS SUBJECT TO THE BANKRUPTCY CLAUSE'S UNIFORMITY
          REQUIREMENT. .............................................................................................. 11

     A.     A Functional Analysis—Rather Than Any Bright-Line Rule—Applies To
          Determine Whether PROMESA Is Subject To The Uniformity Requirement..... 12

     B.     A Functional Analysis Establishes That The Bankruptcy Uniformity
          Requirement Applies To PROMESA. .................................................................. 14

        1.    The purpose of the uniformity requirement—to protect creditors and national
             commerce—applies to Puerto Rico as it does to the States. ................................ 14

        2.    No practical obstacles would arise from applying the bankruptcy uniformity
             requirement to PROMESA. ................................................................................. 17

        3.    The discredited *Insular Cases* and precedent involving other uniformity
             requirements that serve different purposes do not control whether bankruptcy
             uniformity applies to Puerto Rico. ...................................................................... 18

     C.     PROMESA Is A National—Not A "Local"—Bankruptcy Law............................ 21

        1.    PROMESA does not qualify as a "local" bankruptcy law.................................... 22

        2.    No precedent supports the claim that PROMESA is a local law.......................... 25

   III.    PROMESA VIOLATES THE UNIFORMITY REQUIREMENT............................. 28

     A.     PROMESA Violates The Uniformity Requirement Because It Constitutes A
          Private Bankruptcy Bill That Discriminates On The Basis Of Geography. ......... 28

     B.     Arguments That PROMESA Is A Uniform Law Lack Merit. .............................. 31

        1.    PROMESA is unconstitutional under the analysis in *Gibbons*............................ 31

        2.    PROMESA is not a constitutionally permissible response to a geographically
             isolated problem.................................................................................................. 35

        3.    PROMESA cannot be upheld on grounds that it is sufficiently similar to
             Chapter 9.............................................................................................................. 39

## TABLE OF CONTENTS
### Continued

Page

IV.    PROMESA'S SEVERABILITY CLAUSE IS NOT ENFORCEABLE AND CANNOT CURE THE STATUTE'S NON-UNIFORMITY. ...................................... 43

    A.    Implementing Section 3(b) Would Impermissibly Require Courts To Make Legislative Judgments About Which Territories PROMESA Should Cover. ...... 43

    B.    Enforcing Section 3(b) Would Require The Court To Impermissibly Insert New Words Into The Statute. ........................................................................... 46

    C.    Implementing Section 3(b) Would Not Cure PROMESA's Non-Uniformity. ...... 48

V.    NO PROCEDURAL BAR PREVENTS CONSIDERATION OF THE UNIFORMITY CHALLENGE. ............................................................. 50

    A.    Ambac Is Not Constitutionally Estopped From Challenging PROMESA. .......... 50

    B.    Ambac Is Not Judicially Estopped From Challenging PROMESA..................... 53

    C.    Ambac Is Not Contractually Barred From Challenging PROMESA. ................. 56

        1.    The COFINA PSA terminated and has no force and effect.................................. 56

        2.    Ambac's uniformity challenge does not breach the COFINA PSA. ................... 57

    D.    Ambac's Complaint Is Not Barred By Laches. .................................................. 59

        1.    Laches does not bar prospective relief for Ambac's ongoing injury. .................. 59

        2.    The Oversight Board cannot establish that any delay was unreasonable. ............ 61

        3.    The Oversight Board cannot establish that it has been prejudiced by any delay.. 63

CONCLUSION................................................................................................................. 65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abie State Bank v. Weaver,*
    282 U.S. 765 (1931).................................................................................51, 52

*Ackerley Commc'ns of Mass., Inc. v. City of Cambridge,*
    135 F.3d 210 (1st Cir. 1998)...............................................................44

*Alt. Sys. Concepts, Inc. v. Synopsis, Inc.,*
    374 F.3d 23 (1st Cir. 2004)................................................................54

*Ambac Assur. Corp. v. Puerto Rico,*
    297 F. Supp. 3d 269 (D.P.R. 2018).....................................................41

*American Ins. Co. v. 365 Bales of Cotton,*
    26 U.S. 511 (1826).............................................................................27

*Andalusian Global Designed Activity Co., et al., v. Fin. Oversight and Mgm't Bd.*
    *for P.R.,*
    954 F.3d 1 (1st Cir. 2020)..................................................................33

*Arnett v. Kennedy,*
    416 U.S. 134 (1974)...........................................................................51

*Associated Press v. Meltwater U.S. Holdings, Inc.,*
    931 F. Supp. 2d 537 (S.D.N.Y. 2013) ...............................................59

*In re Atrium Med. Corp.,*
    299 F. Supp. 3d 324 (D.N.H. 2017)....................................................56

*Aurelius Inv., LLC v. Puerto Rico,*
    915 F.3d 838 (1st Cir. 2019)...............................................................18

*Ayotte v. Planned Parenthood of N. New England,*
    546 U.S. 320 (2006).................................................................43, 45, 46

*Baldwin v. Hale,*
    68 U.S. 223 (1863).......................................................................24, 25

*Barr v. Am. Ass'n of Political Consultants, Inc.,*
    140 S. Ct. 2335 (2020)......................................................................48

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 570 (2007)...........................................................................11

## TABLE OF AUTHORITIES
### Continued

**Page(s)**

*Binns v. United States*,
    194 U.S. 486 (1904) ........................................................................................... *passim*

*Blanchette v. Connecticut Gen. Ins. Corps.*,
    419 U.S. 102 (1974) ........................................................................................... *passim*

*Blankenship v. Buenger*,
    653 F. App'x 330 (5th Cir. 2016) ..................................................................... 55

*Booth Fisheries Co. v. Indus. Comm'n of Wis.*,
    271 U.S. 208 (1926) ........................................................................................... 51

*Boumediene v. Bush*,
    553 U.S. 723 (2008) ...........................................................................13, 14, 17, 19

*Cent. Va. Comm. College v. Katz*,
    546 U.S. 356 (2006) ........................................................................................... 15

*Chicot Cty. Drainage Dist. v. Baxter State Bank*,
    308 U.S. 371 (1940) ........................................................................................... 58

*Chirco v. Crosswinds Cmtys., Inc.*,
    474 F.3d 227 (6th Cir. 2007) ........................................................................... 65

*Chretian v. Exxon Co., U.S.A.*,
    701 F. Supp. 266 (D.N.H. 1988) ..................................................................... 61

*Cincinnati Soap Co. v. United States*,
    301 U.S. 308 (1937) .....................................................................................22, 23

*Puerto Rico v. Franklin Cal. Tax-Free Trust*,
    136 S. Ct. 1938 (2016) ...............................................................................4, 6, 20, 23

*Cruz v. Hauck*,
    762 F.2d 1230 (5th Cir. 1985) ......................................................................... 64

*Democratic Exec. Comm. of Fla. v. Detzner*,
    347 F. Supp. 3d 1017 (N.D. Fla. 2018) ........................................................... 60

*Denny v. Bennett*,
    128 U.S. 489 (1888) ........................................................................................... 24

*Doty v. Love*,
    295 U.S. 64 (1935) ............................................................................................. 25

## TABLE OF AUTHORITIES
### Continued

**Page(s)**

*Downes v. Bidwell,*
182 U.S. 244 (1901) ......................................................................................19, 20

*Eche v. Holder,*
694 F.3d 1026 (9th Cir. 2012) .............................................................................19

*El Paso & N.E. Ry. Co. v. Gutierrez,*
215 U.S. 87 (1909)...............................................................................................13

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.,*
459 U.S. 400 (1983).............................................................................................24

*Fahey v. Mallonee,*
332 U.S. 245 (1947).............................................................................................50

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC,*
140 S. Ct. 1649 (2020)................................................................................ *passim*

*In re Fin. Oversight and Mgm't Bd. for P.R.,*
432 F. Supp.3d 25 (D.P.R. 2020)......................................................................8, 32

*First Nat. Bank v. Yankton,*
101 U.S. 129 (1879).............................................................................................22

*Franklin California Tax-Free Tr. v. Puerto Rico,*
805 F.3d 322 (1st Cir. 2015) ..........................................................................17, 18

*García-Catalán v. United States,*
734 F.3d 100 (1st Cir. 2013)................................................................................11

*Garza v. Cty. of Los Angeles,*
918 F.2d 763 (9th Cir. 1990) ..........................................................................60, 62

*Gay Men's Health Crisis v. Sullivan,*
733 F. Supp. 619 (S.D.N.Y. 1989) ......................................................................61

*Gibbons v. District of Columbia,*
116 U.S. 404 (1886).............................................................................................22

*Gliden Co. v. Zdaanok,*
370 U.S. 530 (1962).............................................................................................27

*Hanover Nat. Bank v. Moyses,*
186 U.S. 181 (1902).............................................................................................29

## TABLE OF AUTHORITIES
### Continued

**Page(s)**

*Head Money Cases*,
  112 U.S. 580 (1884).................................................................................36

*Heckler v. Mathews*,
  465 U.S. 728 (1984).................................................................................48

*Hedges v. Dixon Cty.*,
  150 U.S. 182 (1893).................................................................................65

*Hill v. Wallace*,
  259 U.S. 44 (1922).............................................................................47, 48

*Hormel v. Helvering*,
  312 U.S. 552 (1941).................................................................................58

*In New Era Publ'ns Int'l v. Henry Holt & Co.*,
  873 F.2d 576 (2d Cir. 1989)...................................................................65

*K-Mart Corp. v. Oriental Plaza, Inc.*,
  875 F.2d 907 (1st Cir. 1989)..................................................................59

*Kadrmas v. Dickinson Pub. Schools*,
  487 U.S. 450 (1988).........................................................................51, 53

*Liberty Mutual Fire Ins. Co. v. Woolman*,
  913 F.3d 977 (10th Cir. 2019) ...............................................................56

*Lydon v. Boston Sand & Gravel Co.*,
  175 F.3d 6 (1st Cir. 1999)......................................................................54

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*,
  243 F.3d 789 (4th Cir. 2001) .................................................................59

*Maloy v. Ballori-Lage*,
  744 F.3d 250 (1st Cir. 2014)..................................................................11

*Mark Bric Display Corp. v. Joseph Struhl Co.*,
  No. 98-532, 2003 WL 21696318 (D.R.I. July 9, 2003)....................61, 62

*Murphy v. Timberlane Reg'l School Dist.*,
  973 F.2d 13 (1st Cir. 1992).........................................................61, 63, 64

*Neblett v. Carpenter*,
  305 U.S. 297 (1938).................................................................................25

## TABLE OF AUTHORITIES
### Continued

**Page(s)**

*Ocasio-Hernández v. Fortuño-Burset,*
    640 F.3d 1 (1st Cir. 2011)...........................................................................................11

*Ogden v. Saunders,*
    25 U.S. 213 (1827)........................................................................................................24

*In re Oparaii,*
    698 F.3d 231 (5th Cir. 2012) .......................................................................................55

*Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Credito Oriental,*
    698 F.3d 9 (1st Cir. 2012)............................................................................................59

*Palmore v. United States,*
    411 U.S. 389 (1973)......................................................................................................22

*Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l,*
    533 F.3d 1287 (11th Cir. 2008) ...................................................................................59

*Puerto Rican-American Ins. Co. v. Benjamin Shipping Co. Ltd.,*
    829 F.2d 281 (1st Cir. 1987)........................................................................................64

*Railway Labor Executives' Ass'n v. Gibbons,*
    455 U.S. 457 (1992)............................................................................................ *passim*

*Randle v. Crawford,*
    604 F.3d 1047 (9th Cir. 2010) .....................................................................................56

*Reedco, Inc. v. Hoffman-La Roche, Inc.,*
    667 F. Supp. 1072 (D.N.J. 1987) ................................................................................62

*Matter of Reese,*
    91 F.3d 37 (7th Cir. 1996) ....................................................................................15, 34

*Reid v. Covert,*
    354 U.S. 1 (1957).........................................................................................................18

*Reno v. Am. Civil Liberties Union,*
    521 U.S. 844 (1997).........................................................................................44, 45, 48

*RFF Family P'Ship, LP v. Ross,*
    814 F.3d 520 (1st Cir. 2016).............................................................................54, 55, 56

*In re Richmond Unified Sch. Dist.,*
    133 B.R. 221 (Bankr. N.D. Cal. 1991) .......................................................................24

# TABLE OF AUTHORITIES
## Continued

**Page(s)**

*Robertson v. Fed. Election Comm'n,*
45 F.3d 486 (D.C. Cir. 1995) ................................................................................50, 53

*Sch. Union No. 37 v. Ms. C.,*
518 F.3d 31 (1st Cir. 2008) ............................................................................................62

*Schultz v. United States,*
529 F.3d 343 (6th Cir. 2008) .........................................................................................20

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
140 S. Ct. 2183 (2020) ............................................................................................43, 44

*In re Shea & Gould,*
214 B.R. 739 (Bankr. S.D.N.Y. 1997) ..........................................................................62

*Shouse v. Pierce Cty.,*
559 F.2d 1142 (9th Cir. 1977) .......................................................................................64

*Soules v. Kauaians for Nukolii Campaign Comm.,*
849 F.2d 1176 (9th Cir. 1988) .......................................................................................61

*Southside Fair Hous. Comm. v. City of New York,*
928 F.2d 1336 (2d Cir. 1991) ........................................................................................61

*St. Angelo v. Victoria Farms, Inc.,*
38 F.3d 1525 (9th Cir. 1994) ................................................................................. *passim*

*Sw. Voter Registration Educ. Project v. Shelley,*
344 F.3d 882 (9th Cir. 2003) .........................................................................................64

*In re Swift Energy Co.,*
No. 15-12670 (MFW), 2016 WL 3566962 (D. Del. June 29, 2016) ..............................58

*Teragram Corp. v. Marketwatch.com, Inc.,*
444 F.3d 1 (1st Cir. 2006) ..............................................................................................57

*Trailer Marine Transp. Corp. v. Rivera Vazquez,*
977 F.2d 1 (1st Cir. 1992) ........................................................................................14, 16

*Transp. Workers Union of Am., Local 100, AFL-CIO v. N.Y.C. Transit Auth.,*
341 F. Supp. 2d 432 (S.D.N.Y. 2004) .....................................................................59, 60

*Travelers Ins. Co. v. Cuomo,*
14 F.3d 708 (2d Cir. 1993) ............................................................................................63

## TABLE OF AUTHORITIES
### Continued

**Page(s)**

*Tuaua v. United States,*
788 F.3d 300 (D.C. Cir. 2015) ............................................................17

*U.S. Tr. Co. of N.Y. v. New Jersey,*
431 U.S. 1 (1977) .............................................................................24

*Union Pac. R. Co. v. Pub. Serv. Comm'n of Mo.,*
248 U.S. 67 (1918) ...........................................................................52

*United States v. Nat'l Treasury Emps. Union,*
513 U.S. 454 (1995) ..........................................................................45

*United States v. Ptasynski,*
462 U.S. 74 (1983) ...........................................................................36

*United States v. Reese,*
92 U.S. 214 (1875) .......................................................................45, 47

*United States v. Stevens,*
559 U.S. 460 (2010) ..........................................................................43

*Vaquería Tres Monjitas, Inc. v. Irizarry,*
587 F.3d 464 (1st Cir. 2009) ...............................................................63

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Sagardí a-De Jesús,*
634 F.3d 3 (1st Cir. 2011) ..............................................................61, 63

*Whole Woman's Health v. Hellerstedt,*
136 S. Ct. 2292 (2016) ..................................................................44, 63

**Statutes**

11 U.S.C.
§ 101..........................................................................................6, 17
§ 109....................................................................................6, 26, 44
§ 921..............................................................................................26
§ 943..............................................................................................8

30 Stat. 544
§ 1...............................................................................................17

Case:20-00068-LTS   Doc#:49   Filed:10/23/20   Entered:10/23/20 21:58:51   Desc: Main
Document   Page 12 of 80

# TABLE OF AUTHORITIES
## Continued

**Page(s)**

PROMESA (48 U.S.C. § 2101 *et seq.*)

§ 1....................................................................................................30
§ 3...............................................................................................*passim*
§ 5........................................................................................6, 7, 31, 34
§ 101............................................................................................*passim*
§ 104.......................................................................................7, 8, 41
§ 106...........................................................................................8, 40
§ 201.................................................................................7, 8, 40, 41
§ 202.........................................................................................7, 41
§ 206.............................................................................................7
§ 301............................................................................................24
§ 302............................................................................................*passim*
§ 306............................................................................................24
§ 312.............................................................................................7
§ 313.............................................................................................7
§ 314.................................................................................10, 41, 42
§ 402............................................................................................30
§ 405........................................................................................30, 47
§ 407........................................................................................30, 47

Puerto Rico Corporation Debt Recovery Act ...................................................23

U.S. Const.
Art. I, § 8 ..................................................................................1, 11
Art. IV, § 3 ..............................................................................12, 19

**Rules**

Fed. R. Civ. P. 12......................................................................1, 11

Fed. R. Bankr. P. 7004.....................................................................24

**Other Authorities**

162 Cong. Rec. H3609 (daily ed. June 9, 2016)......................................40, 41

162 Cong. Rec. H3627 (daily ed. June 9, 2016)..........................................7

162 Cong. Rec. H3630 (daily ed. June 9, 2016)........................................37

27A Am. Jur. 2d Equity § 119 ............................................................60

The Federalist No. 42 (Alexander Hamilton) .......................................15, 16

H.R. 4900 § 101, 114th Cong., 2d Sess. .................................................34

## TABLE OF AUTHORITIES
### Continued

**Page(s)**

H.R. Rep. No. 79-2246 (1946)..................................................................................16, 39

H.R. Rep. No. 114-602 (2016)........................................................................................7

H. Black, Constitutional Prohibitions 6 (1887) .........................................................15

José A. Cabranes, *Citizenship and the American Empire*,
   127 U. Pa. L. Rev. 391 (1978) ...............................................................................18

Michael T. Hertz, *Limits to the Naturalization Power*,
   64 Geo. L. J. 1007 (1976) ......................................................................................20

Oversight Board, *2020 Fiscal Plan for Puerto Rico* (May 27, 2020)...........................32

Oversight Board, *FY21 Certified Budget for the Commonwealth of Puerto Rico*
   (June 30, 2020)........................................................................................................32

*Puerto Rico Oversight, Management, and Economic Stability Act: Hearing on*
   *H.R. 4900 Before the H. Comm. on Nat. Resources*, 114th Cong. 83 (2016) ........37

Robin Respaut, *Shunned from bond markets, U.S. Virgin Islands faces cash crisis*,
   Reuters (Aug. 2, 2017)............................................................................................38

Juan R. Torruella, *The Insular Cases: The Establishment of A Regime of Political*
   *Apartheid*
   29 U. Pa. J. Int'l L. 283 (2007) .........................................................................18, 19

U.S. Gov't Accountability Off., GAO-18-160, *U.S. Territories Public Debt*
   *Outlook* (Oct. 2017) .......................................................................................6, 37, 38

U.S. Gov't Accountability Off., GAO-19-525, *U.S. Territories Public Debt*
   *Outlook—2019 Update* (June 2019) .................................................................37, 38

Plaintiff Ambac Assurance Corporation ("Ambac") respectfully submits this Opposition to Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. No. 37, the "Motion" or "Mot.").[2]

## PRELIMINARY STATEMENT

Congress enacted a private bankruptcy bill for Puerto Rico alone when it passed the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), Pub. L. No. 114-187, 130 Stat. 549 (2016). And armed with PROMESA's unique provisions that depart from all other bankruptcy laws, the Financial Oversight and Management Board for Puerto Rico ("Oversight Board" or "Board") has claimed sweeping power in Puerto Rico's bankruptcy to willfully disregard creditors' pre-PROMESA property rights and to arbitrarily discriminate among creditors in seeking adjustment of the Commonwealth's debts. As set forth in detail in the Complaint (Dkt. No. 1, hereinafter cited by "¶ _"), no other debtor could claim similar authority to selectively and arbitrarily override creditors' pre-petition property rights; to pick and choose which creditors it prefers to pay in bankruptcy, honoring some priorities under pre-petition law while rejecting others with an equal claim under the law; and to obtain a discharge without judicial review of critical inputs in the plan of adjustment. PROMESA's unique provisions have emboldened the Oversight Board to steer Puerto Rico's bankruptcy far afield from the normal operation of bankruptcy law, with consequences that have become ever more injurious to creditors as the cases proceed.

As Congress recognized when it enacted PROMESA, its creation of this special bankruptcy regime only for Puerto Rico violates the Bankruptcy Clause of the Constitution, which requires that congressionally enacted bankruptcy laws be "uniform . . . throughout the United States." U.S.

---

[2] Briefs in support of the Motion were filed by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") (Dkt. No. 39, "AAFAF Br."), the Official Committee of Retired Employees of the Commonwealth ("Retiree Committee") (Dkt. No. 38, "Ret. Br."), and the United States (Dkt. No. 45, "U.S. Br."). This Opposition responds to all briefs supporting the Motion.

Const. art. I, § 8, cl. 4; *see* PROMESA § 3(b) (acknowledging courts could "hold[] invalid . . . provision[s] of th[e] Act" based on its non-uniformity).  The Framers required such uniformity to protect creditors from discrimination and to safeguard national commerce.  *Railway Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 472 (1992).  The uniformity requirement thus prevents Congress from enacting private bankruptcy bills or discriminating on the basis of geography.  *Id.* at 473; *Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 160 (1974).  PROMESA—a private bankruptcy bill for a geographically defined debtor—violates both restrictions.  And the Oversight Board's invocation of PROMESA to unilaterally pick the winners and losers in Puerto Rico's bankruptcy by making arbitrary, purportedly unreviewable distinctions among creditors threatens the very discrimination and economic disruption the Framers sought to prevent.

Recognizing PROMESA's constitutional vulnerability as a non-uniform bankruptcy law—which PROMESA's severability clause specifically contemplates, PROMESA § 3(b)—the Oversight Board, AAFAF, and the Retiree Committee now seek to shift the narrative and attack Ambac for its prior participation in the Title III proceedings and the timing of this suit.  But their arguments fundamentally mischaracterize those prior proceedings.  Ambac did not "reap[]" a windfall by recovering "over a billion dollars" on the COFINA bonds it owns and insures (Mot. at 1).  It took a *loss* relative to its rights to payment prior to PROMESA—and a bankruptcy statute that authorizes the discharge of debt and impairs the obligation of contracts cannot be said to benefit creditors so long as they experience only a partial, not total, economic loss.

In criticizing the timing of this suit, moreover, the Oversight Board ignores how its own actions since PROMESA's enactment have clarified the scope and extent of the injury to creditors enabled by PROMESA's non-uniformity.  As the Title III cases have progressed, the Board has claimed increasingly expansive authority to discriminate among creditors.  In the most recent

proposed plan of adjustment for the Commonwealth, the Board proposed to pay pension claimants no less than 91.5% on their claims and general obligation ("GO") bondholders no less than 65-75%, while certain special revenue bondholders, such as Ambac, recovered only 3.9% on their claims.  (¶ 5.)  In subsequent negotiations, the Board has further increased these unwarranted disparities with a purported settlement for GO bondholders that would provide them with virtually *all* consideration under the plan—approximately $11 billion—while reducing the recovery for other bondholders to $50 million, or *less than 1%* on their claims.  *See* Case No. 17-3283, ECF 14444-2, at 4 (D.P.R. Oct. 1, 2020).  That discrimination was threatened when Congress enacted PROMESA's non-uniform provisions, but has now been actualized—requiring litigation to restrain this continuing constitutional violation.

Aside from its flawed atmospheric arguments, the Oversight Board seeks to insulate PROMESA from constitutional scrutiny and justify the statute's non-uniformity by arguing that: (1) Congress has unbounded authority to disregard constitutional limits on its powers when it legislates for Puerto Rico; (2) Congress permissibly singled out Puerto Rico for special treatment in bankruptcy notwithstanding the uniformity requirement; (3) this Court could remedy PROMESA's non-uniformity by rewriting the statute to extend it to other territories; and (4) various procedural bars should prevent any adjudication of PROMESA's constitutionality.  None of these arguments withstands scrutiny, and the Motion should be denied for the following reasons.

***The Uniformity Requirement Applies To PROMESA***.  Supreme Court precedent forecloses the argument that Congress is categorically exempt from constitutional constraints on its authority, such as bankruptcy uniformity, when it invokes its Article IV powers.  Rather, particular constitutional provisions apply in the territories based on their purpose and practical effect—a functional analysis exemplified by the Supreme Court's recent decision resolving the

Appointments Clause challenge to PROMESA itself.  *See Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649 (2020).   Under this functional analysis, the uniformity requirement applies to PROMESA:  the purpose of requiring uniformity to prevent discrimination against disfavored creditors and protect national commerce has equal application to Puerto Rico, and no practical problems would arise from requiring bankruptcy uniformity in the territories.

The Oversight Board cannot avoid that conclusion by characterizing PROMESA as a "local law."  Although Congress may act as a local legislature for the territories, that is not what it did when it passed PROMESA—not least because the Supreme Court has already ruled that there is no local authority to pass such a law.  *See Puerto Rico v. Franklin Cal. Tax-Free Trust*, 136 S. Ct. 1938 (2016).  More broadly, no local law could—as PROMESA does—authorize federal courts to discharge debt held by creditors nationwide.  And no precedent supports the Oversight Board's notion that enactments under Article IV are, by definition, local laws.

***PROMESA Violates The Uniformity Requirement***.  The uniformity requirement prohibits Congress from enacting private bankruptcy bills or discriminating based on geography—and PROMESA contravenes both limits by creating a special bankruptcy regime only for Puerto Rico.  The argument that PROMESA applies to multiple debtors—the Commonwealth and its instrumentalities—ignores the relationship between these entities.  Indeed, PROMESA treats them as part of the same governmental entity; the Oversight Board employs a "holistic" approach in acting as the single statutory representative for them all; and this Court has recognized the Commonwealth's control over the instrumentalities' assets.  PROMESA thus produces all the same harms as a private bankruptcy bill.  Nor can the Board justify Congress's action in singling out Puerto Rico by minimizing the differences between PROMESA and all other bankruptcy laws or by asserting—contrary to the facts—that the Commonwealth's fiscal problems were unique.

4

*This Court Lacks Authority To Cure The Constitutional Violation By Extending PROMESA To Other Territories The Court Deems Similar To Puerto Rico.*  PROMESA's severability clause—which directs courts to extend PROMESA to "similarly situated" territories to cure the statute's non-uniformity, PROMESA § 3(b)—is unenforceable and ineffective.  Section 3(b) impermissibly requires courts to determine the criteria that make other territories "similar[]" to Puerto Rico and to rewrite the statute to extend PROMESA to those territories.  And even if Section 3(b) could be implemented, it does not provide a constitutional cure:  the statute would continue to be non-uniform by providing a unique opt-in regime for other territories different from Puerto Rico, which is the only territory that Congress mandated must be subject to PROMESA.

*No Procedural Bar Prevents Adjudication Of The Uniformity Challenge.*  Constitutional estoppel cannot apply because Ambac had no choice but to participate in the Title III proceedings in an effort to protect its rights and interests and because the court-ordered discharge of debt under PROMESA does not constitute a benefit to creditors.  Judicial estoppel is inapplicable because Ambac has never taken the position that PROMESA is exempt from or satisfies the uniformity requirement—let alone asked this Court to rely on such a position.  This challenge does not violate the COFINA Plan Support Agreement ("PSA") because the COFINA Plan has been consummated, the PSA has automatically terminated, the relevant PSA provision has no continuing effect, and this suit cannot delay or impede the COFINA Plan's implementation and so would not violate the PSA if it were still in effect.  Finally, the laches doctrine does not bar relief from the continuing constitutional injury produced by PROMESA's lack of uniformity.

## **BACKGROUND**

## I.   **CONGRESS SINGLED OUT PUERTO RICO WHEN IT PASSED PROMESA.**

In 2016, Congress enacted PROMESA in response to Puerto Rico's fiscal crisis, which had left it at risk of default on billions of dollars in government debt.  (¶ 29.)  At that time, Puerto Rico

was not alone:  several territories, including the United States Virgin Islands ("USVI") and Guam

had amassed substantial government debt and faced fiscal issues in funding pension plans and

navigating significant economic uncertainty.  (¶ 58.)[3]  Yet, until PROMESA's enactment, no U.S.

territory could access bankruptcy proceedings, requiring territories to instead restructure their

debts only through voluntary negotiation and agreement with creditors.  (¶ 28.)  Specifically, while

"municipalities" may be debtors under Chapter 9 of the Bankruptcy Code, 11 U.S.C. § 109(c),

Congress excluded territorial municipalities.  *See id.* § 101(40) (defining "municipality" to mean

any "political subdivision or public agency or instrumentality of a State"); *see also id.* § 101(52)

(defining "State" to include Puerto Rico, except for purposes of being eligible to be a debtor under

Chapter 9).  And the Supreme Court had further clarified that Chapter 9 preempted restructuring

statutes under territorial law, striking down a Puerto Rico statute purporting to authorize the

discharge of debt.  *Franklin Cal. Tax-Free Trust*, 136 S. Ct. 1938.

Instead of uniformly legislating with respect to the territories or more broadly, Congress

enacted PROMESA to extend federal bankruptcy protection to Puerto Rico alone.  Although

PROMESA frequently uses the general term "territory," defined to mean Puerto Rico, Guam,

American Samoa, the Commonwealth of the Northern Mariana Islands, and the USVI, PROMESA

§ 5(20), the operative provisions of the statute—including those governing the availability of debt-

restructuring relief—apply only to Puerto Rico.  (¶ 30.)  Specifically, PROMESA requires a

territory to have an Oversight Board to qualify as a debtor capable of accessing Title III

proceedings, PROMESA § 302(1), but Congress established an Oversight Board only for Puerto

Rico and provided no mechanism for other territories to request the establishment of one, *see id.*

---

[3] For example, the debt-to-GDP ratio in the USVI grew to 72% by 2015, with "economic uncertainty and looming
government pension fund insolvency" creating concerns about debt repayment.  *See* U.S. Gov't Accountability Off.,
GAO-18-160, *U.S. Territories Public Debt Outlook,* at Highlights (Oct. 2017).  Guam's debt-to-GDP ratio reached
44% in the same timeframe, with "risk[s]" presented by "large unfunded pension[s] and other . . . liabilities."  *Id.*

§ 101(b).  Indeed, Congress specifically deleted a provision from a draft bill that would have permitted other territories to request the establishment of an Oversight Board and access PROMESA's debt-adjustment procedures.  *See* H.R. Rep. No. 114-602, at 4 (2016) (bill containing provision authorizing other territories to establish an Oversight Board); *id.* at 121 (Statement of Rep. Grijalva) (recognizing that draft statute would give other territories the ability "to restructure their bond debts"); 162 Cong. Rec. 90, H3627 (proposing to delete that provision and replace it with text establishing an Oversight Board for Puerto Rico alone).

In making that change, Congress recognized that a court might "hold[] invalid . . . provision[s] of [PROMESA] or the application thereof on the ground that the provision[s] fail[] to treat similarly situated territories uniformly."  PROMESA § 3(b).  Rather than fix that problem itself, however, Congress included a severability clause purporting to direct a court to extend the statute to "similarly situated" territories that request the establishment of an Oversight Board.  *Id.*

## II.    PROMESA IS UNLIKE ANY OTHER BANKRUPTCY LAW.

PROMESA creates a unique bankruptcy scheme for Puerto Rico that differs from all other bankruptcy laws.  (¶¶ 41-46.)  While PROMESA incorporates certain provisions from Chapter 9, which provides restructuring relief to municipalities, Congress selectively incorporated those provisions and placed them in a novel framework.  (¶ 42.)  The result is a bankruptcy process that fundamentally differs from the restructuring available to other governmental debtors—or to any other debtor.  (¶¶ 43-46 (summarizing principal differences between PROMESA and Chapter 9).)

For example, PROMESA vests the Oversight Board with unique control over debt adjustment for the Commonwealth and its instrumentalities—authorizing the Board to commence Title III proceedings, PROMESA §§ 104, 206; to develop, approve, and certify Fiscal Plans and budgets, *id.* §§ 201, 202; and to file and modify plans of adjustment, *id.* §§ 312, 313.  (¶¶ 43, 46.)  The Oversight Board acts as the single statutory representative of the Commonwealth and its

instrumentalities and discharges those duties in a "holistic" manner, *In re Fin. Oversight and Mgm't Bd. for P.R.*, 432 F. Supp.3d 25, 30 (D.P.R. 2020)—despite the inherent conflicts of interest that exist. (¶ 43.)  Under PROMESA, the Board has claimed power to subjugate instrumentalities' interests to the Commonwealth's interests, preventing instrumentalities from challenging the non-payment of revenues the Commonwealth is statutorily required to pay them.  (*Id.*)  Centralizing that power in the Board also produces differences in political accountability for restructuring decisions that, in the Chapter 9 context, would ultimately reside with local officials who would be responsible for addressing creditors' and citizens' concerns.  (¶¶ 43, 46.)

PROMESA further limits judicial review of certain decisions of the Oversight Board, impinging on the bankruptcy court's normal role and resulting in unfairness to creditors.  (¶ 44.)  PROMESA exempts the Oversight Board's certification decisions for Fiscal Plans, budgets, and commencement of debt-adjustment proceedings from judicial review by any U.S. District Court, PROMESA § 106(e)—a provision with no analog in Chapter 9.  (¶¶ 44, 46.)

PROMESA's plan-confirmation provisions also differ from Chapter 9 and all other bankruptcy laws.  (¶ 45.)  Under PROMESA, a plan of adjustment cannot be proposed or confirmed unless it is consistent with the Board-certified Fiscal Plan.  PROMESA §§ 104(j)(3), 314(b)(7).  PROMESA's Fiscal Plan provisions, in turn, establish distinctive requirements for allocating funding among Commonwealth creditors that the Board interprets and applies in its discretion, with unique statutory limitations on judicial review.  *See id.* §§ 106(e), 201(b)(1).  In contrast to PROMESA, Chapter 9 contains no requirements that a plan be consistent with a purportedly unreviewable fiscal plan promulgated by the debtor or an overseeing entity.  (¶ 46; *see* 11 U.S.C. § 943.)  PROMESA's unique provisions thus create distinctive requirements for the allocation of funds that affect creditors' rights and appear nowhere else in the Bankruptcy Code.

8

III.    PROMESA'S EFFECT ON AMBAC

The Oversight Board has commenced Title III debt-adjustment proceedings for the Commonwealth and certain of its instrumentalities under PROMESA. (¶ 69.) Those proceedings have affected Ambac, which owns and insures substantial Commonwealth debt across a variety of different structures, with significant investment in Puerto Rico long pre-dating PROMESA's enactment. (¶¶ 22-27.) Following defaults by the Commonwealth and its instrumentalities, Ambac has paid claims totaling more than $400 million under its policies insuring GO bonds and bonds issued by the Puerto Rico Public Building Authority, Puerto Rico Highways and Transportation Authority ("HTA"), Puerto Rico Infrastructure Financing Authority, and Puerto Rico Convention Center District Authority. (*Id.*) To protect its rights and interests, Ambac has participated in the Title III proceedings for the Commonwealth and certain of its instrumentalities and has challenged various actions of the Oversight Board that violate creditors' rights.

As the Title III cases have progressed, the Oversight Board has taken increasingly expansive views of its power under PROMESA in an attempt to eliminate creditors' rights and the authority of courts to vindicate those rights. (¶ 73.) In multiple disputes with bondholders and insurers, for example, the Oversight Board has invoked its unique Fiscal Plan and budgetary authority under PROMESA as a basis for purported preemption of pre-PROMESA territorial law, which the Board has asserted precludes creditors from establishing that they have certain property rights entitled to recognition in the Title III proceedings. (¶¶ 74-75.)

While the Oversight Board's flawed theory would preempt all priorities of creditors under territorial law and place them on an equal legal footing, the Board has further contended that it can selectively apply the preemption rationale to pick and choose which creditors to favor under PROMESA. (*Id.*) At the time the Complaint was filed, the proposed plan of adjustment ("POA") for the Commonwealth reflected the Board's arbitrary discrimination between creditors, proposing

9

a recovery of at least 92.5% for pension claimants and a recovery of between 65-75% for GO bondholders, while revenue bond creditors would receive a recovery of only 3.9%. (¶ 75.)  Since then, the Board has exacerbated these unwarranted disparities through a proposed settlement with GO bondholders that would provide them with approximately $11 billion—virtually all plan consideration—while further reducing the recovery for other bondholders to $50 million, or less than 1% on their claims.  *See* Case No. 17-3283, ECF 14444-2, at 4 (D.P.R. Oct. 1, 2020).  But GO bondholders, like revenue bondholders, have claims based on pre-PROMESA territorial law— and if PROMESA preempts any of those priorities, it does so equally as to each type of claim. (¶ 75.)  No reasoned justification exists for the Board's discrimination among creditors when exercising its claimed powers under PROMESA.

The Oversight Board has further taken the over-reaching position that under PROMESA it has authority to allocate the Commonwealth's revenues among creditors that cannot be reviewed at plan confirmation.  (¶ 78.)  PROMESA uniquely provides that a plan of adjustment may not be confirmed unless it "is consistent with the applicable Fiscal Plan certified by the Oversight Board under title II," PROMESA § 314(b)(7), and the Board has contended that allocations of funding and determinations about how much money the Commonwealth can expend to service its debts in the Fiscal Plan are committed to the Board's unreviewable discretion.  (¶ 78.)  If this were correct, it would mean that critical inputs in the plan of adjustment that are subject to judicial scrutiny in other bankruptcy proceedings, including municipal bankruptcies under Chapter 9, would be shielded from meaningful judicial review under PROMESA.  (*Id.*)

The Oversight Board's actions under PROMESA have not only threatened non-uniform results with respect to court-ordered discharge of debt, but have also distorted the relative bargaining positions of the Oversight Board and creditors and the resulting terms of voluntary

restructuring agreements. (¶ 79.) Based on the unique provisions of PROMESA, the Board has felt free to strategically favor some creditors over others, without regard for their pre-existing legal rights, in order to recruit creditor support for the Board's proposed POA. (*Id.*)

Throughout the Title III proceedings, Ambac has sought to defend its interests, including by negotiating with the Oversight Board regarding the scope of its authority. But given the Board's latest position that its unreviewable Fiscal Plan and budgetary powers allow it to eliminate (not just impair) creditors' pre-PROMESA rights and to arbitrarily and unfairly distinguish among creditors in the Commonwealth's proposed POA—laying bare the harms caused by PROMESA's non-uniform, radical departure from bankruptcy law—Ambac filed this adversary proceeding.

## ARGUMENT

### I.    MOTION TO DISMISS STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) must be denied if the complaint "satisfies Rule 8(a)(2)'s requirement of 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11–12 (1st Cir. 2011). In assessing a motion to dismiss, a court must consider "whether the complaint 'state[s] a claim to relief that is plausible on its face,' . . . drawing all reasonable inferences in the plaintiff's favor." *Maloy v. Ballori-Lage*, 744 F.3d 250, 252 (1st Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 570 (2007)). At the pleading stage, "the plaintiff need not demonstrate that [it] is likely to prevail," and must only establish that its claims are plausible. *García-Catalán v. United States*, 734 F.3d 100, 102 (1st Cir. 2013).

### II.   PROMESA IS SUBJECT TO THE BANKRUPTCY CLAUSE'S UNIFORMITY REQUIREMENT.

PROMESA is subject to the Bankruptcy Clause's requirement that all bankruptcy laws enacted by Congress be "uniform." U.S. Const. art. I, § 8, cl. 4. The Oversight Board seeks to

11

exempt PROMESA from this constitutional limit, contending that the uniformity requirement is categorically inapplicable because Congress enacted the statute pursuant to its Article IV authority to "make all needful Rules and Regulations respecting the Territor[ies]," U.S. Const. art. IV, § 3, cl. 2. But Supreme Court and First Circuit precedent—most recently, in *Aurelius* itself—rejects such categorical claims and requires a functional analysis to determine whether particular constitutional provisions apply in the territories. Under the relevant test focused on a provision's purpose and practical effect, the uniformity requirement plainly applies to PROMESA to protect national commerce and creditors' rights by ensuring predictable and fair commercial regulation.

Nor can PROMESA qualify as a "local law" exempt from constitutional constraints. PROMESA constitutes a federal bankruptcy law because no State or locality has authority to promulgate a bankruptcy statute vesting a federal court with nationwide jurisdiction to order the discharge of debts. The Oversight Board's effort to characterize PROMESA as a local law simply because it governs bankruptcy for a territory lacks merit.

### A. A Functional Analysis—Rather Than Any Bright-Line Rule—Applies To Determine Whether PROMESA Is Subject To The Uniformity Requirement.

Taking snippets of Supreme Court decisions out of context, the Oversight Board, Retiree Committee, and United States assert a sweeping claim that Congress need not comply with constitutional limits on its authority so long as it enacts a statute under Article IV. (Mot. at 14-15 (stating that because PROMESA was enacted under Article IV, "[t]hat should be the end of the matter"); U.S Br. at 5 (characterizing Congress's Article IV authority as "broad," "plenary," and "without limitation") (citations omitted); Ret. Br. at 6 (asserting Congress's Article IV power is "practically unlimited") (citation omitted).) But a century of Supreme Court precedent proves that argument wrong. *Binns v. United States*, 194 U.S. 486, 491 (1904) ("Congress, in the government of the territories . . . , has plenary power, *save as controlled by the provisions of the Constitution*.")

12

(emphasis added); *El Paso & N.E. Ry. Co. v. Gutierrez*, 215 U.S. 87, 93 (1909) (Congress's "plenary power . . . under the Constitution over the territories" is "subject . . . to certain limitations and prohibitions").  As the Supreme Court has explained, "[t]he Constitution grants Congress and the President the power to acquire, dispose of, and govern territory, not the power to decide when and where its terms apply." *Boumediene v. Bush,* 553 U.S. 723, 765 (2008).  Far from embracing a *per se* rule, the Supreme Court determines whether specific constitutional provisions apply to territories based on a "functional approach" that examines each provision's purpose and effect—thus "turn[ing] on objective factors and practical concerns, not formalism." *Id.* at 763-64.

This Court need look no further than the Supreme Court's recent decision in *Aurelius* to reject the categorical constitutional exemption urged here.  In *Aurelius*, the Court recognized that Article IV was the basis for PROMESA's enactment, but that was just the beginning of the analysis.  The Court then applied a functional approach and determined that the Appointments Clause restricts Congress's authority in enacting legislation for the territories, notwithstanding Article IV.  140 S. Ct. at 1656.  Specifically, the Court looked to the purpose of "ensur[ing] political accountability," as well as historical practice demonstrating that no practical concerns would arise from compliance in the territories, and "conclude[d] that the Appointments Clause constrains the appointments power as to all 'Officers of the United States,' even when those officers exercise power in or related to Puerto Rico." *Id.* at 1657-58.  Although the Court concluded no Appointments Clause violation had occurred because members of the Oversight Board qualify as local officers, *id.* at 1662-63, the Court rejected an argument identical to the one the Board raises here:  "that the Appointments Clause simply does not apply in the context of Puerto Rico" because Congress enacted PROMESA pursuant to its Article IV powers, *id.* at 1656.

13

For purposes of determining whether PROMESA is subject to the bankruptcy uniformity requirement, therefore, the relevant analysis turns not on Congress's invocation of Article IV authority but rather on the "functional approach" required by the Supreme Court: whether the purposes of uniformity are served by applying that constitutional constraint to bankruptcy laws for the territories and whether practical concerns would arise from that application. *See, e.g.*, *Boumediene*, 553 U.S. at 770 (holding that the Article I Suspension Clause constrained Congress's authority to suspend the writ of habeas corpus at Guantanamo Bay because "few practical barriers" would arise from that extraterritorial application); *see also, e.g., Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 7-9 (1st Cir. 1992) (holding that the Dormant Commerce Clause applies in Puerto Rico because the "central rationale" of that restriction "to foster economic integration and prevent local interference with the flow of the nation's commerce" applies "with equal force" in Puerto Rico). The required functional analysis forecloses the Oversight Board's argument that PROMESA is categorically exempt from the uniformity requirement.

## B. A Functional Analysis Establishes That The Bankruptcy Uniformity Requirement Applies To PROMESA.

The functional analysis required by Supreme Court precedent confirms that PROMESA is subject to the Bankruptcy Clause's uniformity requirement because that application would advance the purposes of uniformity and would raise no concerns based on history or practice.

### 1. The purpose of the uniformity requirement—to protect creditors and national commerce—applies to Puerto Rico as it does to the States.

The primary function of the Bankruptcy Clause's uniformity requirement is to protect creditors from potential discrimination in order to promote and protect national commerce. *Gibbons*, 455 U.S. at 472. In *Gibbons*, the Supreme Court highlighted that "States had discriminated against British creditors" in the years following the Revolutionary War to explain the genesis of the uniformity requirement. *Id.* at 472 (citing H. Black, Constitutional Prohibitions

14

6 (1887)).  The Court then relied specifically on this concern for creditor protection to hold that the uniformity requirement prohibits any bankruptcy law akin to a private bill that singles out a debtor for non-uniform treatment and thereby enables discrimination against or between that debtor's creditors.  *Id.* at 470-72; *see id.* at 470 (emphasizing that "[o]nly [one debtor's] creditors are affected by [the statute's] employee protection provisions and *only* employees [of the debtor] may take benefit of the arrangement"); *see also, e.g.*, *Matter of Reese*, 91 F.3d 37, 39 (7th Cir. 1996) ("Requiring uniformity so defined [in *Gibbons*] protects creditors, which was a major objective of the framers of the Constitution.").[4]

The Framers were concerned with protecting creditors from non-uniform bankruptcy laws because of the adverse effect those potentially discriminatory laws would have on national commerce.  Prior to adoption of the Bankruptcy Clause, "wildly divergent schemes for discharging debtors and their debts" existed among the States.  *Cent. Va. Comm. College v. Katz*, 546 U.S. 356, 365-66 (2006).  In at least four states, discharge was a matter of legislative grace, implemented through "private Acts to relieve individual debtors," *Gibbons,* 455 U.S. at 472, and States "refus[ed] to respect one another's discharge orders," *Katz*, 546 U.S. at 377.

The Framers' solution was to empower Congress to enact uniform laws preempting the local variation in bankruptcy practice that had sowed this discord.  *Gibbons*, 455 U.S. at 472; *see also Katz*, 546 U.S. at 369 (citing historical evidence of the "general agreement on the importance of authorizing a uniform federal response").  The Framers recognized that preventing the discrimination against creditors threatened by non-uniform laws would protect commerce, as James Madison summarized in the Federalist:   "The power of establishing uniform laws of

---

[4] The Retiree Committee's claim that the Bankruptcy Clause "was not intended to protect fairness to creditors," (Ret. Br. at 15), contravenes the Supreme Court's decision in *Gibbons*, which recognized that the Framers sought to "prohibit Congress from enacting private bankruptcy laws" because that "practice . . . was subject to abuse"— specifically including discrimination against particular classes of creditors.  455 U.S. at 472.

bankruptcy is so intimately connected with the regulation of commerce, and will prevent many frauds where the parties or property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question." The Federalist No. 42, at 237 (James Madison).

The constitutional function of bankruptcy uniformity—to protect creditors and national commerce—equally applies to bankruptcy laws for the territories generally and Puerto Rico specifically. The Commonwealth and its instrumentalities long participated in a national market for municipal debt, issuing many billions of dollars in bonds held by creditors throughout the United States. The Commonwealth's current effort to obtain a discharge of those obligations in these proceedings will affect the interests of investors across the nation—creditors that the Framers intended to protect through the uniformity requirement. *Gibbons,* 455 U.S. at 472; *cf.* H.R. Rep. No. 79-2246, at 4 (1946) (observing that "a bankruptcy law under which bondholders of a municipality are required to surrender or cancel their obligations should be uniform throughout the 48 States, as the bonds of almost every municipality are widely held").

Exempting PROMESA from the uniformity requirement, moreover, would harm national commerce by undermining the predictability and fairness of commercial regulation, with consequences for the very debt markets Puerto Rico wishes to once again access. It cannot be denied that "[f]ull economic integration is as important to Puerto Rico as to any state in the Union." *Trailer Marine*, 977 F.2d at 8 (holding that the Dormant Commerce Clause applied to Puerto Rico because it is a full participant in national markets). Indeed, Congress prohibited trade barriers between Puerto Rico and the continental United States more than a century ago, shortly after acquiring Puerto Rico as a territory. *See id* (citing relevant statutory authority). Puerto Rico's bankruptcy is the largest restructuring of municipal debt in U.S. history and will have significant ramifications on commerce throughout the nation. "The objectives advanced" by the uniformity

16

requirement thus "counsel strongly in favor of" applying that constitutional restriction to *all* bankruptcy laws—including those that "relate to Puerto Rico or other Article IV entities." *Aurelius*, 140 S. Ct. at 1657; *see Franklin California Tax-Free Tr. v. Puerto Rico*, 805 F.3d 322, 346–47 (1st Cir. 2015) (Torruella, J. concurring) ("It would be absurd to argue that the exclusion of Puerto Rico from the protection of the Bankruptcy Code . . . is not prohibited by the unequivocal language of the Bankruptcy Clause of the Constitution").

### 2. No practical obstacles would arise from applying the bankruptcy uniformity requirement to PROMESA.

Puerto Rico's status as a territory presents no practical obstacles to bankruptcy uniformity. Courts have recognized practical concerns when, for example, litigants sought jury-trial rights under the Constitution in a long-established civil law jurisdiction, *see Boumediene*, 553 U.S. at 757, or when extension of the Citizenship Clause would override the majoritarian will of a territory whose inhabitants opposed citizenship, *see Tuaua v. United States,* 788 F.3d 300 (D.C. Cir. 2015). But no similar concerns exist here: Nothing about territorial status suggests that Congress had any practical need to single out Puerto Rico and its creditors for differential treatment in bankruptcy.

Indeed, history and practice confirm that there would be no impracticality or anomaly in applying the uniformity requirement to Puerto Rico.  *See Aurelius*, 140 S. Ct. at 1659-61 (reviewing history and practice of appointment of territorial and Puerto Rican officials in finding the Appointments Clause applicable to PROMESA).  When it became a territory in 1898, Puerto Rico was defined as a "State" under uniform federal bankruptcy law, and it is so defined today. *See* An Act to Establish a Uniform System of Bankruptcy Throughout the United States,  30 Stat. 544 § 1(24) ("'States' shall include the Territories"); 11 U.S.C. § 101(52) (defining "State" to include Puerto Rico, except for having access to Chapter 9).  And from the adoption of the Bankruptcy Code in 1937 until an unexplained amendment of the law in 1984, Puerto Rico's

17

municipalities were eligible to restructure under Chapter 9.  *See Franklin California Tax-Free Tr.*, 805 F.3d at 346–47, 350-53 (Torruella, J. concurring) (summarizing history).  Uniform bankruptcy laws thus previously applied without incident in Puerto Rico for many decades.[5]

### 3.     The discredited *Insular Cases* and precedent involving other uniformity requirements that serve different purposes do not control whether bankruptcy uniformity applies to Puerto Rico.

In the end, the argument that Congress's invocation of Article IV authority automatically exempts PROMESA from the uniformity requirement requires an extension of the discredited *Insular Cases* and should be rejected for that reason alone.  It is well established that "neither the [*Insular*] cases nor their reasoning should be given any further expansion."  *Reid v. Covert,* 354 U.S. 1, 14 (1957) (plurality decision).  Indeed, the Supreme Court and the First Circuit in *Aurelius* specifically declined to extend the *Insular Cases* in evaluating a constitutional challenge to PROMESA itself.  *See* 140 S. Ct. at 1665; *Aurelius Inv., LLC v. Puerto Rico*, 915 F.3d 838, 854-55 (1st Cir. 2019); *see also* AAFAF Br. at 2 ("expressly reject[ing] the reasoning and rationale of any arguments relying on the racist and colonial underpinnings of doctrines from bygone eras").

And for good reason: the *Insular Cases* rest on the racist rationale that Puerto Rico's people—themselves United States citizens—are "aliens[,] and a belief that the United States ought not to try to deal with them as though they were Americans."  José A. Cabranes, *Citizenship and the American Empire*, 127 U. Pa. L. Rev. 391, 436-442 (1978); *e.g.*, Juan R. Torruella, *The Insular Cases: The Establishment of A Regime of Political Apartheid*, 29 U. Pa. J. Int'l L. 283, 286 (2007) (explaining "skewed outcome" of the *Insular Cases* "was strongly influenced by racially motivated

---

[5] Given this history, the United States is simply wrong to assert that no "historical precedent . . . suggest[s] that the uniformity requirement . . . applies to bankruptcy laws in the territories."  (U.S. Br. at 7.)  Just as the Supreme Court in *Aurelius* deemed it significant that Congress's prior action related to Puerto Rico had complied with the Appointments Clause, 140 S. Ct. at 1657, so too is it significant that Congress's prior action related to bankruptcy for Puerto Rico complied with the uniformity requirement.  PROMESA represents a significant departure from that historical practice.

biases and by colonial governance theories"); *Downes v. Bidwell*, 182 U.S. 244, 380 (1901) (Harlan, J., dissenting) (criticizing judgment for "engraft[ing] upon our republican institutions a colonial system such as exists under monarchical governments").  Decisions relying on the *Insular Cases*—including those from the tax and naturalization uniformity contexts—should carry no weight in determining whether bankruptcy uniformity applies to PROMESA.  *See id.* at 287 (opinion of Brown, J.) (holding tax uniformity does not apply to Puerto Rico because its people are an "alien race[]" differing from other Americans in "religion, customs, laws, methods of taxation, and modes of thought"); *Eche v. Holder*, 694 F.3d 1026 (9th Cir. 2012) (relying on *Insular Cases* to hold that naturalization uniformity requirement does not extend to the territories).[6]

That result is all the more warranted given the fundamental differences between the purposes served by the uniform bankruptcy requirement as compared to naturalization and tax legislation.  The Naturalization Clause's uniformity requirement—which provides a uniform rule of naturalization for immigrants to the United States—could not be applied to the territories without overriding all differences in their political relationships with the United States.  Congress may intend to "dispose" of a territory rather than integrate it more closely with the Nation, U.S. Const. art. IV, § 3, and the territory's inhabitants may aspire to independence, not closer relations, *see Boumediene*, 553 U.S. at 757 (discussing intent to grant independence to the Philippine Islands as relevant to the applicability of particular constitutional provisions).  To ensure appropriate territorial governance, Congress must have discretion to decide how, when, and whether the inhabitants of different territories may become citizens—as the Retiree Committee's examples

---

[6] In apparent recognition that the *Insular Cases* should not be extended, PROMESA's defenders purport to disavow those cases.  (Mot. at 19 n.27; U.S. Br. at 9.)  But the argument that any invocation of Article IV authority exempts Congress from other constitutional constraints repeats and perpetuates the analysis in the *Insular Cases*.  Indeed, the United States invokes the discredited rationale in *Downes* that "Puerto Rico is not part of 'the United States'" for purposes of tax uniformity, (U.S. Br. at 9), even though that conclusion turned on the view that inhabitants of territories are an "alien race" who necessarily have different "methods of taxation."  182 U.S. at 287 (opinion of Brown, J.).

illustrate.  (Ret. Br. at 11 (citing different naturalization rules that apply based on differing political relationships).)  None of these considerations applies in the context of bankruptcy uniformity—which serves a different purpose and would create no similar practical difficulties in application.[7]

Tax uniformity also serves different purposes than bankruptcy uniformity.  "[T]he text and the background of the Taxing Power is wholly inapposite to that of the Bankruptcy Clause" because "uniformity of taxes and duties served to assure the states that Congress would not discriminate in favor of or against a particular locality, whereas uniformity in the bankruptcy context was viewed as a grant of power to standardize creditor relief across the nation, notwithstanding varying obtrusive state laws." *Schultz v. United States*, 529 F.3d 343, 355-56 (6th Cir. 2008).  Congress's taxing power does not exist to preempt state authority with a uniform federal response; wide variation exists among state and local tax schemes; and Congress can enact non-uniform local taxes in its exercise of Article IV authority because "any state legislature" could pass the same law. *Binns,* 194 U.S. at 492.  In contrast, bankruptcy uniformity serves the different purpose of supplanting local variation in state discharge schemes and "prevent[ing] discrimination against [particular] creditors," *Gibbons*, 455 U.S. at 472, with the result that no State or locality could enact a law like PROMESA, *see, e.g.*, *Franklin Cal. Tax-Free Trust*, 136 S. Ct. 1938, pp. 22-25, *infra*.  Given these differences, the tax uniformity analysis in *Downes*—which turned on discredited reasoning—should not be expanded to this different constitutional context, where PROMESA functions as a national bankruptcy law affecting creditors throughout the country.

---

[7] The Retiree Committee observes that the Naturalization Clause and the Bankruptcy Clause appear "in the same breath"—as though their placement in the same clause of the Constitution resolves whether they have equal application to the territories, despite addressing fundamentally different subject matters.  (Ret. Br. at 9.)  But the provisions were drafted and debated separately, and were eventually placed in the same clause by the Convention's Committee on Style presumably only because they happen to have a common structure.  *See* Michael T. Hertz, *Limits to the Naturalization Power*, 64 Geo. L. J. 1007, 1011-12 (1976) (recounting the drafting history).

Indeed, the contrary position would produce absurd results at odds with the constitutional function of bankruptcy uniformity. If Congress were simply exempt from complying with that requirement when enacting bankruptcy legislation for Puerto Rico, it could pass a statute identical to the one invalidated in *Gibbons* for any debtor in Puerto Rico merely by invoking its Article IV authority. Different classes of creditors could face non-uniform and unwarranted discrimination otherwise prohibited by the Constitution based on the debtor's location in Puerto Rico—or based on which instrumentality in Puerto Rico issued their bonds. And the statute—which would constitute an unconstitutional private bankruptcy bill in all other circumstances—would be valid for no other reason than the debtor's residency in Puerto Rico. *See Gibbons,* 455 U.S. at 470-71. That result makes no sense: "[w]hy should it be different" simply because the bankruptcy law "relate[s] to Puerto Rico or other Article IV entities?" *Aurelius*, 140 S. Ct. at 1657. PROMESA's defenders offer no answer—because there is none.

### C.    PROMESA Is A National—Not A "Local"—Bankruptcy Law.

The Oversight Board appears to concede that the uniformity requirement applies when Congress "enact[s] a national bankruptcy statute in its capacity as the national legislature," (Mot. at 18), no matter the source of Congress's authority to enact the law. *See Gibbons*, 455 U.S. at 469 (uniformity requirement applies even if Congress enacted a bankruptcy law pursuant to the Commerce Clause rather than the Bankruptcy Clause to avoid "eradicat[ing] from the Constitution a limitation on the power of Congress to enact bankruptcy laws"). The Board insists, however, that PROMESA is a "local bankruptcy law" that Congress could permissibly enact free from uniformity constraints pursuant to its "Article IV authority to act in the manner of a state government in legislating for a territory." (Mot. at 16.) But PROMESA—which authorizes the discharge of debt held by creditors nationwide—does not qualify as "local" law. Neither Puerto

Rico's legislature nor any State has the power to enact a bankruptcy law like it, and the notion that

PROMESA is a local law merely because Congress relied on Article IV to enact it lacks merit.

### 1.    PROMESA does not qualify as a "local" bankruptcy law.

The Oversight Board devotes the bulk of its argument to a point not in dispute: Congress

has authority under Article IV to exercise the "broad police power that a State exercises when it

legislates for its municipalities." (Mot. at 15.) But the Board does not grapple with the key factor

the Supreme Court considers to determine whether particular legislation qualifies as "local" law

despite being enacted by Congress: *whether a State has power to enact a similar law*. *See, e.g.*,

*Binns*, 194 U.S. at 492 (holding that Congress has power under Article IV to levy taxes "in like

manner as the legislature of a state may tax the people of a state for state purposes") (quoting

*Gibbons v. District of Columbia*, 116 U.S. 404, 407 (1886)). That limitation follows from the

Court's recognition that Congress plays a gap-filling role in this context, stepping into the shoes

of a local legislature with authority to promulgate laws for the territories "as a State does, for its

municipal organizations." *First Nat. Bank v. Yankton,* 101 U.S. 129, 133 (1879). So long as "any

state legislature" could have enacted a similar law, Congress may properly be deemed to have

exercised local police powers rather than uniquely federal authority. *Binns,* 194 U.S. at 492.

But while Congress may "exercise all the police and regulatory powers which a state

legislature or municipal government would have in legislating for . . . local purposes," *Palmore v.*

*United States*, 411 U.S. 389, 397 (1973), the Supreme Court has never held that Congress may

exercise powers that state governments do ***not*** have, and deem the legislation "local" and free from

constitutional constraints merely because it relates to the territories. *E.g.*, *Cincinnati Soap Co. v.*

*United States*, 301 U.S. 308, 318 (1937) (Congress has the "***equivalent*** power of a state in

comparable circumstances" when legislating for territories) (emphasis added). The Oversight

Board accordingly errs in contending that Congress can enact an ostensibly "local bankruptcy

statute," yet rely on its unique federal powers to ignore the limitations that would prevent a State from enacting similar legislation.  (Mot. at 15-17.)  If PROMESA's validity depends on Congress's federal powers—and it does—then PROMESA cannot be the type of "local" law that Congress may enact under Article IV to legislate for the territories as a State would for its municipalities.

The Supreme Court has conclusively resolved that the Puerto Rico legislature lacks authority to pass a bankruptcy law like PROMESA, thus making clear that PROMESA cannot be valid "local" legislation.  *Franklin California Tax-Free Tr.,* 136 S. Ct. at 1942–43, 1949.  In *Franklin*, the Supreme Court struck down the Puerto Rico Corporation Debt Recovery Act enacted by the territorial legislature, which provided a process to adjust the debts of Puerto Rico's public corporations—the same entities now authorized to restructure under PROMESA.  The Supreme Court held that Chapter 9 of the Bankruptcy Code preempted the statute and prevented the territorial legislature from promulgating a local bankruptcy law in this manner.  *Id.*

Although *Franklin* is dispositive, it bears emphasis that the Oversight Board admits that *no* State could enact a bankruptcy law like PROMESA as "local law" because it "would be preempted by the national Bankruptcy Code."  (Mot. at 20 n.29.)  The Board observes that "Congress's enactments," unlike those of any State, "are not subject to preemption by other federal statutes," (*id.*), but that misses the point:  if a State would be forbidden from enacting local law in the relevant area, Congress cannot be exercising "equivalent power of a state." *Cincinnati Soap*, 301 U.S. at 318.  The limits of state power confirm that Congress exercised unique federal authority in enacting PROMESA—and thus was subject to other constitutional constraints, including the bankruptcy uniformity requirement.

Even absent preemption, moreover, no State would have authority to enact a law like PROMESA given the Contracts Clause, which limits state interference in private contractual rights

23

and further prevents a State or municipality from modifying its own contractual obligations. *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 413 n.14 (1983) ("When a State itself enters into a contract, it cannot simply walk away from its financial obligations."); *U.S. Tr. Co. of N.Y. v. New Jersey,* 431 U.S. 1, 32 (1977) (holding that state law repealing municipal debt covenants was invalid under the Contracts Clause).  In a series of cases decided before the establishment of federal bankruptcy laws, the Supreme Court repeatedly confirmed that States lack authority to enact local bankruptcy laws that discharge debts nationwide.  *Denny v. Bennett*, 128 U.S. 489, 498 (1888) (holding that state bankruptcy laws have no extraterritorial effect and "cannot, like the bankrupt law passed by congress under its constitutional grant of power, release all debtors from the obligation of the debt"); *Ogden v. Saunders*, 25 U.S. 213, 368 (1827) ("the discharge under a State law [is] incompetent to discharge a debt due a citizen of another State"); *Baldwin v. Hale,* 68 U.S. 223, 233-34 (1863) (claims of Vermont citizen against Massachusetts citizen not barred by a discharge obtained under New York insolvency law).

As these cases show, state "police power" to enact local laws does not encompass the power to enact a statute like PROMESA that authorizes federal courts to exercise nationwide personal jurisdiction and provides for the discharge of debts held by creditors around the country. PROMESA § 306(a) and (c) ("[T]he district court . . . shall have jurisdiction over any person or entity"); *see also id.* § 301(d) (applying the Rules of Bankruptcy Procedure to PROMESA proceedings); Bank. R. 7004(d), (f) (providing for nationwide service of process and personal jurisdiction).  Because States may not impair the obligation of contract, "any legislation that would permit municipalities to scale down their debts without the consent of each affected creditor must be federal."  *In re Richmond Unified Sch. Dist.,* 133 B.R. 221, 224 (Bankr. N.D. Cal. 1991). Indeed, the Supreme Court observed in *Aurelius* that PROMESA allows Puerto Rico "to file for

*federal bankruptcy protection*."  140 S. Ct. at 1655 (emphasis added).  Accordingly, PROMESA

was—and must be—an exercise of Congress's unique federal power to enact bankruptcy laws.

In arguing to the contrary, the Oversight Board relies on cases involving local laws that did

not authorize the discharge of debt nationwide and are thus wholly unlike PROMESA.  In *Neblett*

*v. Carpenter*, 305 U.S. 297, 305 (1938), and *Doty v. Love*, 295 U.S. 64, 70 (1935), the Supreme

Court upheld state laws governing the method of liquidation of insolvent companies, which would

not result in the elimination of the companies' debt.  And in *Baldwin*, the Court emphasized the

limits of state authority to enact laws relating to bankruptcy, observing that States may not pass

local laws that "impair the obligation of contracts."  68 U.S. at 228.  The Oversight Board's

response that "States retain police power under the Constitution to enact local bankruptcy statutes

that do not impair contractual obligations" in no way establishes that PROMESA is a local

bankruptcy statute given that it *does* impair contractual obligations.  (Mot. at 16.)

### 2.    No precedent supports the claim that PROMESA is a local law.

The Oversight Board, the Retiree Committee, and the United States cite a variety of cases

as examples of Congress's ostensibly unconstrained power to legislate in relation to the territories.

But the cases are fully consistent with the Supreme Court's functional analysis of the limitations

on Congress's power—and in fact further confirm that PROMESA cannot qualify as a local law.

Distorting the decision in *Aurelius*, the Oversight Board contends that the Supreme Court

ruled that PROMESA is a local law.  (Mot. at 20-21; *see* Ret. Br. at 7-8; U.S. Br. at 7.)  But the

Court did no such thing.  As just noted, the Court stated that PROMESA authorizes Puerto Rico

to file for "*federal* bankruptcy protection."  140 S. Ct. at 1655 (emphasis added).  And the Court's

extended analysis of whether the Appointments Clause applies when Congress exercises Article

IV power would have been wholly unnecessary if PROMESA qualifies as a local law, since state

legislatures are not bound by that constitutional constraint when enacting local legislation.

The Oversight Board mistakenly relies on the Supreme Court's holding in *Aurelius* that "Board members have primarily local powers and duties" and so qualify as territorial officers who need not be appointed in conformance with the Appointments Clause. *Id*. at 1661. While the Court observed that Article IV authorizes Congress to "make local debt-related law," that statement clearly referred to Congress's creation of territorial officers exercising local power in debt-related proceedings. *Id.* at 1665. The Court emphasized that, in initiating and administering bankruptcy proceedings for the Commonwealth under PROMESA, "[t]he Board . . . acts as a local government that might take precisely the same actions" under Chapter 9 of the Bankruptcy Code. *Id.* at 1662 (citing 11 U.S.C. §§ 109(c), 921). But that does not establish that "the Title III bankruptcy procedures the Oversight Board administers are themselves local in nature," (Mot. at 20), any more than the Chapter 9 bankruptcy procedures that local governments administer could be deemed local in nature. PROMESA, like Chapter 9, remains a ***federal*** bankruptcy scheme notwithstanding the local duties exercised by local officers in those proceedings.

The Oversight Board likewise fundamentally misreads *Binns* in arguing that it establishes "that legislation enacted under the Territories Clause is not subject to any uniformity requirement." (Mot. at 18; *see* Ret. Br. at 9-10; U.S. Br. at 9.) The Supreme Court in *Binns* upheld "local taxes" Congress imposed on the territory of Alaska to pay for "the administration of local government in Alaska." 194 U.S. at 491. Because Congress had "created no legislative body" for Alaska and "any state legislature" could have enacted the same tax, the Court reasoned that Congress was "legislating as a local legislature" and was not required to comply with the tax uniformity requirement. *Id.* at 492 (citation omitted). But the Court cautioned that its holding "must not be extended to any case" in which Congress imposed a tax on "a territory . . . for the benefit of the nation, as distinguished from that necessary for the support of the territorial government." *Id.* at

26

496.  *Binns* thus makes clear that Congress cannot evade Article I limitations—including uniformity requirements—simply because a tax relates to a territory and was enacted pursuant to Article IV.  Instead, where, as here, a local legislature would lack power to enact a law like PROMESA, *Binns* confirms that Congress remains subject to constitutional constraints.

The decision in *American Ins. Co. v. 365 Bales of Cotton*, 26 U.S. 511 (1826), is also inapposite.  (Mot. at 20; Ret. Br. at 12.)  That case approved Congress's creation of territorial courts in Florida that did not comply with Article III.  *Id.* at 546; *see also, e.g.*, *Aurelius*, 140 S. Ct. at 1659 (observing that *American Ins. Co.* held that "territorial courts may exercise the judicial power of the Territories without the life tenure and salary protections mandated by Article III for federal judges").  The case is one of many recognizing Congress's authority under Article IV to structure territorial governments and create legislative or local courts outside Article III confines based on practical considerations.  *E.g.*, *Aurelius*, 140 S. Ct. at 1658-59, 1664-65 (describing cases); *Gliden Co. v. Zdaanok*, 370 U.S. 530, 545-47 (1962) (discussing practical problems of life tenure for territorial judges).  Those cases provide no support for the sweeping proposition that legislation like PROMESA qualifies as a "local law" simply because it applies to a territory.

At bottom, the Oversight Board's claim that PROMESA is a "local law" despite the fact that no State or locality could enact a bankruptcy statute remotely like it turns on one fact only: PROMESA governs bankruptcy for a territory.  (Mot. at 17.)  Accepting that argument would have the same practical effect as extending the *Insular Cases*:  The Board's proposed categorical rule that any legislation under Article IV is automatically "local" would eliminate constitutional protections and constraints for the sole reason that a law relates to Puerto Rico.  This Court should reject that argument, which would permit in the guise of expansive "police power" over the territories what the Supreme Court has forbidden by limiting the *Insular Cases* to their facts.

Contrary to the Oversight Board's claims, the uniformity requirement applies to PROMESA—and

must do so to protect the constitutional ends that the Bankruptcy Clause was intended to serve.

## III.    PROMESA VIOLATES THE UNIFORMITY REQUIREMENT.

In enacting PROMESA, Congress singled out Puerto Rico for special treatment in violation

of the Bankruptcy Clause's uniformity requirement—a problem it expressly acknowledged.  *See*

PROMESA § 3(b) (recognizing court could "invalid[ate]" the statute for being non-uniform).  The

uniformity provision prohibits Congress from enacting private bankruptcy laws.  *Gibbons*, 455

U.S. at 473 ("The uniformity requirement . . . prohibits Congress from enacting a bankruptcy law

that, by definition, applies only to one regional debtor.").  And bankruptcy uniformity further bars

Congress from discriminating on the basis of geography.  *Blanchette*, 419 U.S. at 160 ("The

uniformity clause requires that [a statute] apply equally to all creditors and all debtors" in a given

class without regard to location).  PROMESA—a private bankruptcy bill for a geographically

defined debtor—violates both requirements.

### A.    PROMESA Violates The Uniformity Requirement Because It Constitutes A Private Bankruptcy Bill That Discriminates On The Basis Of Geography.

The Bankruptcy Clause's uniformity requirement operates as an "affirmative limitation or

restriction upon Congress' power: bankruptcy laws must be uniform throughout the [nation]."

*Gibbons*, 455 U.S. at 468.  As Supreme Court precedent makes clear, that requirement is violated

when Congress enacts a private bankruptcy bill targeting the particular problems of a particular

debtor.  *Id.*  In *Gibbons*, Congress passed a statute responding to a specific railroad's insolvency

that accorded priority status to the claims of the railroad's employees "over the claims of [the

railroad's] commercial creditors, bondholders, and shareholders."  *Id.* at 467.  The Supreme Court

observed that Congress may permissibly "distinguish among classes of debtors," *id.* at 469, but

ruled that the statute was unconstitutional because it "cover[ed] neither a defined class of debtors

nor a particular type of problem, but a particular problem of one bankrupt railroad," *id.* at 470-71.
While "Congress might deem it sound policy to impose labor protection obligations in all
bankruptcy proceedings involving major railroads," the Court observed that the statute applied "to
only one regional bankrupt railroad" and so could not "be said to 'apply equally to all creditors
and all debtors.'" *Id.* at 471 (quoting *Blanchette*, 419 U.S. at 160). The Court drew support for its
holding from the history and purpose of the Bankruptcy Clause, which established that the
"uniformity requirement was drafted in order to prohibit Congress from enacting private
bankruptcy laws," which historically had the effect of discriminating against particular creditors.
*Id.* at 472. Thus, while the Court concluded that Congress may "define classes of debtors" in
bankruptcy, it held that "[t]he uniformity requirement prohibits Congress from enacting a
bankruptcy law that, by definition, applies only to one regional debtor." *Id.* at 473.

Separate from the prohibition on private legislation, the uniformity requirement prohibits
geographic discrimination. *See, e.g.*, *Hanover Nat. Bank v. Moyses*, 186 U.S. 181, 188 (1902)
(uniformity required by the Bankruptcy Clause "is geographical, and not personal"). While
Congress may "fashion legislation to resolve geographically isolated problems," bankruptcy laws
must "apply equally to all creditors and all debtors" in defined classes irrespective of geography
and must not "restrict[] the right of any creditor wheresoever located to obtain relief because of
regionalism." *Blanchette*, 419 U.S. at 159-160 (internal quotation marks and citation omitted). In
*Blanchette*, the Court rejected a uniformity challenge to a statute governing the reorganization of
railroads in a defined region because the statute "in fact operate[d] uniformly upon all bankrupt
railroads then operating in the United States and uniformly with respect to all creditors of each of
these railroads." *Id.* at 159-60. Accordingly, the Court concluded that "[t]he definition of the
region d[id] not obscure the reality that the legislation applie[d] to all railroads" in bankruptcy. *Id.*

at 161; *see, e.g.*, *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1531-32 (9th Cir. 1994) (holding statute violated uniformity requirement by imposing U.S. Trustee program fees in all States except North Carolina and Alabama, thus exposing "creditors and debtors in states other than North Carolina and Alabama" to "a different, more costly system for resolving bankruptcy disputes").

PROMESA violates the uniformity requirement because it applies only to Puerto Rico and thus constitutes private bankruptcy legislation for a geographically defined debtor. The Act's title calls out Puerto Rico by name. PROMESA § 1(a) ("This Act may be cited as the 'Puerto Rico Oversight, Management, and Economic Stability Act' or 'PROMESA.'"). Numerous provisions of the statute specifically apply only in Puerto Rico. *See, e.g.*, *id.* § 402 ("Nothing in this Act shall be interpreted to restrict Puerto Rico's right to determine its future political status"); *id.* § 405(b)(1) (creating automatic stay of certain actions "against the Government of Puerto Rico"); *id.* § 407(a) (providing creditors with certain protections involving transfers of "property of any territorial instrumentality of Puerto Rico"). Most critically, by providing that an entity can qualify as a debtor only by having an Oversight Board established for it, *id.* § 302(1), and then establishing an Oversight Board only for Puerto Rico, *id.* § 101(b), Congress ensured that Puerto Rico would stand alone in discharging its debts under PROMESA's novel and non-uniform provisions.

PROMESA further contravenes the Bankruptcy Clause's requirement of geographic uniformity. While the Court in *Blanchette* could conclude that the statute there operated uniformly across the country by addressing a problem in a particular industry that was confined to a particular region, 419 U.S. at 160, PROMESA reflects a different approach of defining the problem itself as one of geography. PROMESA does not apply to a class of debtors—and their creditors—capable of definition without reference to geography; instead, geography alone determines the statute's coverage. If Congress could stretch its authority that far, nothing would stop it from enacting non-

uniform bankruptcy regimes on a state-by-state basis as a response to the "geographically isolated problems" presented by each State's individual characteristics, despite the Constitution's requirement of uniform rules. *Id*. at 159. It is thus not surprising that when Congress made such state-level distinctions, the law was invalidated on uniformity grounds. *See St. Angelo*, 38 F.3d at 1532 (concluding bankruptcy provision applying to all States except North Carolina and Alabama could not be said to "apply uniformly to a defined class of debtors"). So too here, "[t]he uniformity requirement . . . prohibits Congress from enacting a bankruptcy law" like PROMESA "that, by definition, applies only to one regional debtor." *Gibbons*, 455 U.S. at 473.

### B.    Arguments That PROMESA Is A Uniform Law Lack Merit.

The Oversight Board contends that *Gibbons* is distinguishable, PROMESA permissibly draws geographic distinctions, and PROMESA's non-uniform provisions can be overlooked based on asserted similarities with Chapter 9. Each of these arguments fails.

### 1.    PROMESA is unconstitutional under the analysis in *Gibbons*.

The Oversight Board and the United States seek to avoid a straightforward application of *Gibbons* by contending that PROMESA applies to multiple debtors: not just the Commonwealth, but also its instrumentalities. (Mot. at 25-26; U.S. Br. at 14.) But PROMESA itself treats the Commonwealth and its instrumentalities as part of the same governmental entity. The statute defines the "Government of Puerto Rico" as "the Commonwealth of Puerto Rico, ***including all of its instrumentalities***." PROMESA § 5(11) (emphasis added). And the statute incorporates a mirror image definition of "territorial instrumentality" as "any political subdivision, public agency, instrumentality . . . or public corporation ***of a territory***." *Id.* § 5(19) (emphasis added).

Other PROMESA provisions confirm the interrelatedness of the Commonwealth and its instrumentalities. Congress appointed the Oversight Board as the single representative of Puerto Rico in the Title III proceedings with authority to oversee and manage restructuring on behalf of

31

the Commonwealth and its instrumentalities.  PROMESA § 101; *see In re Fin. Oversight and Mgm't Bd. for P.R.*, 432 F. Supp.3d at 29 (observing that PROMESA's requirement of "a single Oversight Board that will act as the sole statutory representative of a territory and each of its covered territorial instrumentalities in their Title III cases" is a significant feature of the "unique statutory scheme crafted by Congress").  While the Board emphasizes that it has discretion to create "separate" budgets and fiscal plans for Puerto Rico's instrumentalities (Mot. at 25), it ignores that PROMESA equally authorizes it to ***include*** instrumentalities in Puerto Rico's budget and Fiscal Plan, as it has done on many occasions.  PROMESA §§ 101(d)(1)(B), (d)(1)(D).[8] Similarly, the Board's reliance on its authority to separately initiate Title III proceedings on behalf of the Commonwealth's instrumentalities (Mot. at 25), ignores the inherent relationship between these connected governmental entities, as exemplified by Congress's decision to appoint a single statutory representative to represent all of them.

Indeed, this Court's analysis of the Oversight Board's authority as the sole representative of all governmental entities in Puerto Rico further refutes the claim that strict separation exists between the Commonwealth and its instrumentalities.  This Court has rejected arguments that the Board's "simultaneous representation" creates a conflict of interest on grounds that Puerto Rico's restructuring requires a "holistic approach that focuses on the continuation and future of a government and it instrumentalities and their ability to meet the needs of the Commonwealth's residents as well as provide proper recompense of creditors." *In re Fin. Oversight and Mgm't Bd. for P.R.*, 432 F. Supp.3d at 30.  In upholding that "holistic approach," the First Circuit similarly emphasized that even when "focus[ing] on the interests of the [instrumentality] itself, the

---

[8] *See, e.g.*, Case No. 17-3283, ECF 1-4 (D.P.R. May 3, 2017) (including the Puerto Rico Integrated Transit Authority ("PRITA") and the Puerto Rico Tourism Company ("PRTC") in the list of instrumentalities designated as subject to PROMESA); Oversight Board, *2020 Fiscal Plan for Puerto Rico*, at 255-256 (May 27, 2020) (including PRITA and PRTC in the Commonwealth's 2020 Fiscal Plan); Oversight Board, *FY21 Certified Budget for the Commonwealth of Puerto Rico*, at 4, 7, 159, 212 (June 30, 2020) (including PRITA and PRTC in the Commonwealth's budget).

government of the Commonwealth remains relevant." *Andalusian Global Designed Activity Co.,
et al., v. Fin. Oversight and Mgm't Bd. for P.R.*, 954 F.3d 1, 8 (1st Cir. 2020).

This Court has further found that the financial interests of the Commonwealth and its
instrumentalities are intertwined. *See, e.g.*, Case No. 17-3283, ECF 13541, at 26-33 (D.P.R. July
2, 2020) (concluding the Commonwealth controlled revenues statutorily owing to HTA, such that
HTA bondholders could not obtain stay relief to advocate for use of revenues to pay HTA bonds).
Although Ambac believes this financial intermingling is unlawful, the Commonwealth's exercise
of control over instrumentalities' finances further demonstrates the lack of separation between the
Puerto Rican entities covered by PROMESA. *See id.* at 24 (concluding that certain funds could
not be "used or obtained by HTA" because "they are within the possession and control of the
Commonwealth") (internal quotation marks and citation omitted); *cf.* Case No. 17-159, ECF 156,
at 8 (D.P.R. Feb. 27, 2018) (noting Commonwealth had directed HTA to stop payments on bonds).

Given the relationship between the Commonwealth and its instrumentalities, PROMESA
is properly understood as a private bankruptcy bill for Puerto Rico.  The purposes of bankruptcy
uniformity would be wholly circumvented if the Oversight Board were correct that Congress could
instead permissibly treat multiple related entities as a "class" of distinct debtors, notwithstanding
that the relationship between the debtors is itself the defining feature of the class.  (Mot. at 25.)
Under that view, Congress could pass private bankruptcy legislation for members of one family,
subsidiaries of a single corporation, or the governmental units of a single city, evading the
uniformity requirement by defining the "class" in terms of the relationship—all debtors belonging
to that family, all debtors with the same corporate parent, or all governmental entities in one city.[9]

---

[9] Contrary to the Oversight Board's contentions (Mot. at 24), it should not matter for uniformity purposes whether
related debtors are "juridically separate" when a law uniquely targets a "class" of debtors defined in terms of their
relationship to each other.  Even where (as here) substantive consolidation is not authorized, providing bankruptcy
relief to related debtors presents the same problems as do private bankruptcy laws. *See Gibbons*, 455 U.S. at 472.

Singling out related entities for special treatment in bankruptcy threatens the harms the uniformity requirement is meant to address: discrimination against creditors and disruption of commerce. *See Gibbons*, 455 U.S. at 472; *Matter of Reese*, 91 F.3d at 39 (uniformity provision's prohibition on private bankruptcy laws "protects creditors . . . by preventing the most influential debtors from obtaining their own personal bankruptcy regime"). The Court should reject the argument that Congress need not enact uniform bankruptcy laws when it creates a restructuring regime for related entities that operate as a holistic unit and have assets under the control of a single debtor.

Seeking to avoid that conclusion, the United States (U.S. Br. at 14-15) and the Retiree Committee (Ret. Br. at 18) emphasize that PROMESA defines the term "territory" to include not just Puerto Rico, but also Guam, American Samoa, the Northern Mariana Islands, and the USVI. PROMESA § 5(20). But that argument ignores that Congress purposefully ***excluded*** these other territories from being eligible to qualify as debtors under PROMESA. PROMESA's debt-adjustment process requires the establishment of an Oversight Board, but PROMESA establishes an Oversight Board only for Puerto Rico and provides no mechanism to establish an Oversight Board for any other territory. PROMESA §§ 101(b)(1), 302(1)-(2). Congress's exclusion of other territories was intentional: whereas earlier versions of the statute authorized territories to establish Oversight Boards, Congress removed those provisions before enacting PROMESA to ensure that Puerto Rico would be the sole territory with access to PROMESA's debt-adjustment procedures. *Compare id.* § 101(b), *with* H.R. 4900 § 101, 114th Cong., 2d Sess. The definition of the term "territory" cannot save PROMESA from a uniformity challenge when the statute's text, history, and operation demonstrate it applies only to Puerto Rico—just as Congress intended.

In a last-ditch effort to escape the analysis in *Gibbons*, the Oversight Board contends that a statute must "effectively direct[] a result" to qualify as a private bankruptcy law prohibited by

the uniformity requirement.  (Mot. at 26, 28.)  But that misreads *Gibbons*, which instead held the

statute invalid because it "applie[d] only to one regional debtor."  455 U.S. at 473; *see id.* at 471

("A law can hardly be said to be uniform throughout the country if it applies only to one debtor

and can be enforced only by the one bankruptcy court having jurisdiction over that debtor.").

Moreover, the statute in *Gibbons* did not direct the payment of particular sums to particular

creditors, but instead discriminated among ***classes*** of creditors by according a non-uniform priority

to employees' claims over "the claims of [the debtor's] commercial creditors, bondholders, and

shareholders." *Id.* at 467.  The Board has sought to dictate similarly arbitrary and discriminatory

results among the Commonwealth's creditors, proposing a recovery of at least 91.5% for pension

claimants and 65%-75% for GO bondholders, for example, while revenue bond creditors receive

only 3.9%—which the Board now seeks to further reduce to less than 1%.  (¶ 5; *see* pp. 9-10,

*supra*.)  Under the analysis in *Gibbons*, "such a bankruptcy law is not within the power of Congress

to enact."  455 U.S. at 471.

## 2.    PROMESA is not a constitutionally permissible response to a geographically isolated problem.

PROMESA's defenders fare no better with their argument that Congress may permissibly

enact bankruptcy legislation targeting "a class of one" defined in express geographic terms to

address that particular debtor's "'distinctive and special problem[s].'"  (Mot. at 27 (quoting

*Blanchette*, 419 U.S. at 159); *see* Ret. Br. at 18.)  At the outset, that claim contradicts *Gibbons*,

which held in no uncertain terms that a law that applies "to the affairs of one named debtor can

hardly be considered uniform." 455 U.S. at 473.  Nor does the argument find support in *Blanchette*,

which considered a statute that applied to every railroad in the nation in reorganization

proceedings—eight in total—and rejected a uniformity challenge because the statute "applied

35

equally to all creditors and all debtors" in that class, which could be defined without reference to geography.[10]

The decision in *United States v. Ptasynski*, 462 U.S. 74 (1983)—a tax uniformity case—does not alter the analysis.  (Mot. at 24-25; U.S. Br. at 20.)  The uniformity provisions in the tax and bankruptcy contexts serve distinct purposes, *see* pp. 20-21, *supra*, and no basis exists to ignore clear language in *Gibbons* interpreting the constitutional provision here based on *Ptasynski*'s interpretation of a different constitutional provision.   But even under *Ptasynski*'s analysis, PROMESA does not withstand constitutional scrutiny.  The statute in *Ptasynski* was similar to the statute in *Blanchette* in that it used geographic terminology to identify a class of oil that could in fact be defined without reference to geography.  *See* 462 U.S. at 74, 85 (observing that the covered oil was regulated based on "neutral factors" separate from geography).  Indeed, although the statute referred to "Alaskan oil," the Court emphasized that "the reference is not entirely accurate" because the exemption applied to "only certain oil produced in Alaska" and also included certain oil produced outside Alaska "in certain offshore territorial waters"—thus demonstrating that the classification was "not drawn on state political lines."  *Id.* at 77-78.  Here, in contrast, PROMESA does not apply to a class of debtors defined by "neutral factors" irrespective of geography, but instead uses geography itself as the basis for the non-uniform classification.[11]

Precedent aside, the claim that Congress complies with the uniformity requirement when it enacts a special bankruptcy statute for a single debtor conflicts with common sense.  Such a rule

---

[10] The Retiree Committee misreads *Blanchette* in arguing that the statute there applied to "only one railroad, in one region."  (Ret. Br. at 18.)  To the contrary, the law applied to "eight major railroads in the northeast and Midwest region."  418 U.S. at 108.  The law contemplated that a successful reorganization could *combine* the railroads into a "single, viable system," *id.* at 109, but the railroads did not qualify as one debtor prior to bankruptcy.

[11] Contrary to the claim of the United States (U.S. Br. at 19), the analysis in the *Head Money Cases*, 112 U.S. 580 (1884), is similarly inapposite.  There, the Court upheld a tax law that applied to noncitizen passengers entering American ports from foreign ports "by steam or sail vessel" because the law "operate[d] with the same force and effect in every place where" the noncitizen passenger "is found."  *Id.* at 590.  In contrast, PROMESA does not apply uniformly to any class of debtors and instead establishes unique bankruptcy provisions that apply only to Puerto Rico.

36

would effectively read the uniformity restriction out of the Constitution.  Congress could always define the problems faced by one debtor sufficiently narrowly as to characterize those problems as "distinctive" to that debtor, thus justifying private bankruptcy legislation across the board.

Indeed, the defense of PROMESA in this case perfectly illustrates that concern.  The Oversight Board emphasizes that the statute was enacted in response to Puerto Rico's debt crisis, which it characterizes as "geographically isolated problems."  (Mot. at 25-27.)  But Puerto Rico was not the first—and will not be the last—governmental entity to experience insolvency.  Indeed, it was not even the only *territory* experiencing a fiscal emergency when PROMESA was enacted— as the evidence before Congress established.  *See* 162 Cong. Rec. H3630 (statement of Rep. Byrne) ("[W]e heard testimony from the representatives of two other territories, who told us that they are concerned that their territories are sliding in the same direction as Puerto Rico's").  Indeed, the USVI was in the midst of its own crisis as its debt ballooned to 72% of its GDP by 2015, and Guam's debt-to-GDP ratio had risen to 44%.  *See* U.S. Gov't Accountability Off., GAO-18-160, *U.S. Territories Public Debt Outlook*, at 38 (Oct. 2017) ("2017 GAO Report"); *see id.* at 12 (Puerto Rico's public debt accounted for 66% of GDP in 2014, the most recent data available in 2017).[12]

Since then, the situation in the USVI has notably worsened.  "In 2017, Hurricanes Irma and Maria caused widespread damage and destruction in Puerto Rico and USVI, placing additional financial pressures on their already strained economies."  U.S. Gov't Accountability Off., GAO-19-525, *U.S. Territories Public Debt Outlook—2019 Update*, at Overview, Highlights (June 2019).  The USVI "has not been able to access capital markets at favorable interest rates since early 2017,"

---

[12] The Oversight Board cites a 2019 report to argue that Puerto Rico had greater financial problems than the U.S.V.I. in 2016.  (*See* Mot. at 27 n.32.)  But the Board offers no precedent or principle to explain how such minor variations support a constitutional distinction when it comes to bankruptcy uniformity.  Nor is there any indication that Congress excluded other territories on this basis, as opposed to simply sacrificing uniformity to address opposition to the bill. *See, e.g., Puerto Rico Oversight, Management, and Economic Stability Act: Hearing on H.R. 4900 Before the H. Comm. on Nat. Resources*, 114th Cong. 83 (2016) (statement of Stacey E. Plaskett, Delegate from the USVI to Congress) (objecting to Oversight Board provisions as "detrimental to the advance of our local government").

and its "continued ability to repay public debt depends primarily on whether it can access capital markets at favorable rates in the future, its ability to create economic growth, and its ability to address its pension liabilities and the pending insolvency of its public pension system." *Id.*; *see, e.g.*, Robin Respaut, *Shunned from bond markets, U.S. Virgin Islands faces cash crisis*, Reuters (Aug. 2, 2017) (observing that the USVI has the "biggest per capita debt load of any U.S. territory or state" and is "on the hook for billions more in unfunded pension and healthcare obligations"). Indeed, in January 2017, Moody's downgraded certain USVI bonds to noninvestment grade. *See* 2017 GAO Report at 54; Respaut, *supra* ("Ratings agencies have downgraded the islands' credit ratings deep into junk territory.").

In enacting PROMESA, Congress nowhere explained why it was necessary to devise a restructuring scheme unique among all governmental debtors and territories for Puerto Rico alone. The Oversight Board attempts to fill that gap by asserting that "PROMESA applies to the entire category of territories that required reorganization." (Mot. at 27.)[13]  But it splits hairs to distinguish between Puerto Rico's and the USVI's fiscal emergencies, and the Oversight Board does not articulate why any difference between the two territories supports a constitutional distinction.  Nor would it make sense to allow Congress to pass unique bankruptcy legislation for whatever debtor most urgently "required reorganization" at any given time; such a rule is boundless and would permit Congress to pass private bankruptcy laws at will.  In short, PROMESA cannot be said to

---

[13] The Oversight Board's own-say-so assertion that the USVI does not "require reorganization" ignores that the USVI **cannot** reorganize under federal bankruptcy law because it is excluded from both Chapter 9 (which applies to municipal debtors but not territories) and from PROMESA (which applies only to Puerto Rico).  It surely is not dispositive that no other territory has filed for bankruptcy since PROMESA was enacted given that no other territory **possibly could have** filed for bankruptcy.  The Oversight Board errs in suggesting that Congress may exclude the territories from the nation's bankruptcy regime; pass a law targeting one territory; and shield that law from the uniformity requirement by arguing that the statute permissibly targets a "class of one" because other territories— which cannot access bankruptcy proceedings—were not in bankruptcy proceedings.

address a "geographically isolated problem" within the context of the territories when the problems addressed by PROMESA were not isolated to Puerto Rico at the time or going forward.

The United States tries a different tack, arguing that Congress could permissibly enact a private bankruptcy bill for Puerto Rico alone among territories because other territories are less populous and have fewer governmental entities (in the USVI, for example, "forty-two agencies and public corporations," by the federal government's count). U.S. Br. at 17. But the United States does not explain why a territory's size constitutes a permissible "debtor class" distinction that should determine its entitlement to bankruptcy relief—or why it is constitutional to enact a private bankruptcy bill that discriminates against creditors based on which territory issued their bonds. *Cf.* H.R. Rep. No. 79-2246, at 4 (1946) ("[A] bankruptcy law under which bondholders of a municipality are required to surrender or cancel their obligations should be uniform throughout the 48 States, as the bonds of almost every municipality are widely held."). Bankruptcy uniformity cannot and should not be rendered inapplicable based on such arbitrary distinctions.

### 3.    PROMESA cannot be upheld on grounds that it is sufficiently similar to Chapter 9.

The Oversight Board's final bid to avoid the uniformity mandate hinges on its assertion that the "differences between PROMESA and Chapter 9 are insubstantial." (Mot. at 35.) But the Board's attempt to minimize or explain away the many differences between the two statutory schemes misses the point: PROMESA is a non-uniform bankruptcy law because it creates a unique restructuring scheme for Puerto Rico alone, as compared to all other territories (which have no access to bankruptcy) and all other municipalities (which are governed by Chapter 9). *See Gibbons*, 455 U.S. at 470, n.11 ("[I]t is no argument that [a bankruptcy law] is uniform because another statute imposes similar obligations upon [another debtor].").

The Oversight Board is also wrong on the facts.  As detailed in Ambac's complaint, there are myriad differences between bankruptcy proceedings under PROMESA and Chapter 9.  (¶¶ 41-46.)  PROMESA vests the Board with unique control over debt adjustment for the Commonwealth and its instrumentalities.  (*Id.*)  PROMESA additionally alters the role of the bankruptcy court, limiting judicial review of certain decisions of the Board.  PROMESA § 106(e).  And PROMESA's plan-confirmation provisions further differ from Chapter 9 and all other bankruptcy laws by providing that a plan of adjustment cannot be proposed or confirmed unless it is consistent with the Board-certified Fiscal Plan.  *Id.* §§ 104(j)(3), 314(b)(7).  PROMESA's Fiscal Plan provisions, in turn, establish unique requirements for allocating funding among creditors that the Board interprets and applies in its discretion, with statutory limits on judicial review.  *Id.* §§ 106(e), 201(b)(1).  The Board has exploited these non-uniform provisions of PROMESA by claiming expansive powers under the statute to eliminate creditors' rights and the authority of courts to vindicate those rights, (¶¶ 73-80)—in sharp contrast to the restructuring process under Chapter 9.

Seeking to avoid that conclusion, the Oversight Board spills much ink arguing that Titles I and II are not bankruptcy laws.  (Mot. at 29-32.)  But the unique and non-uniform provisions the Board claims are irrelevant are in fact integral to PROMESA's debt-restructuring scheme—as Congress recognized in providing generally for severability ***except*** that "title III is not severable from titles I and II, and titles I and II are not severable from title III."  PROMESA § 3(a).  While the Board asserts that "Titles I and II are not reliant on Title III" and "serve their purposes independently of Title III," (Mot. at 30-31 & n.33), Congress made a different judgment in specifying that these provisions should rise or fall together if any one of them is deemed invalid.

That severability clause reflects what is clear from PROMESA's operation: Titles I, II, and III together provide a comprehensive bankruptcy scheme for Puerto Rico.  *See, e.g.*, 162 Cong.

Rec. H3609 (daily ed. June 9, 2016) (statement of Rep. Ryan) ("What this bill will do is allow

Puerto Rico to restructure its debts and set up an oversight board that will oversee this process.").

PROMESA Section 302, for example, provides that a territory may be a debtor only if an Oversight

Board has been established pursuant to Section 101—thus ensuring that creation of the Board

under that Title I provision acts as the gateway to bankruptcy proceedings under Title III.

PROMESA §§ 101, 302.  PROMESA's Title III restructuring process further incorporates the

Board's Title II Fiscal Plan authority by providing that a court may not confirm a plan for debt

adjustment unless it is consistent with the Board-approved Fiscal Plan.  *Id.* § 314(b)(7); *see id.* §§

201-202 (authorizing the Board to develop and approve Fiscal Plans and budgets and prescribing

requirements for the Fiscal Plan).  Congress thus assigned a "central, discretionary role . . . to the

Oversight Board in the Title III debt adjustment process," embodied in the Board's "exclusive

right to propose a Title III plan of adjustment that must be consistent with the applicable certified

Fiscal Plan to be eligible for confirmation." *Ambac Assur. Corp. v. Puerto Rico*, 297 F. Supp. 3d

269, 283-84 (D.P.R. 2018).  The Board blinks reality in arguing that Titles I and II "do not govern

the relationship between a debtor and its creditors," (Mot. at 30), given the essential role the

provisions play in PROMESA's Title III debt-adjustment scheme.

Indeed, the Ninth Circuit in *St. Angelo* rejected an argument similar to the Oversight

Board's claim here.  38 F.3d at 1530-31.  That case involved a uniformity challenge to the U.S.

Trustee program, which Congress had implemented in all States except Alabama and North

Carolina.  *Id.* at 1529.  The regional U.S. trustee contended that "the U.S. Trustee program serves

a purely administrative function and therefore is not constrained by the requirements of the

Uniformity Clause," but the Ninth Circuit rejected that argument.  *Id.* at 1530.  As the court

explained, U.S. Trustees are vested with "extensive discretion" to "monitor and supervise

41

bankruptcy proceedings," with "a direct effect upon the rights and liabilities of both debtors and creditors." *Id.* The court further reasoned that "[t]he U.S. Trustee program is not only intimately connected to the government's regulation of the *relationship* between debtor and creditor, it also has a concrete effect upon the *relief* available to creditors" due to fees owed for that supervision of the bankruptcy proceedings. *Id.* at 1530-31. The Board's supervision of Puerto Rico's debt restructuring—authorized and implemented through Titles I, II, and III of PROMESA—similarly has a direct and concrete effect on the relationship between the Commonwealth and its creditors, rendering that integrated scheme subject to the bankruptcy uniformity requirement.

Even focusing solely on Title III, the Oversight Board cannot seriously dispute that PROMESA differs from all other bankruptcy laws. The Board acknowledges that Section 314—the plan-confirmation provision—"affects the relationship between the debtor and its creditors." (Mot. at 32.) But the Board does not meaningfully grapple with PROMESA's non-uniform requirement that a plan can be confirmed only if it "is consistent with the applicable Fiscal Plan certified by the Oversight Board"—a mandate with no analog in Chapter 9 or any other bankruptcy scheme. PROMESA § 314(b)(7). Nor can the Board minimize and dismiss the novel PROMESA provisions granting it authority to supervise all aspects of the Title III cases (Mot. at 35), which produce conflicts of interest and profound differences in political accountability. (¶¶ 43, 46).

Armed with PROMESA's unique, non-uniform provisions, the Oversight Board has run roughshod over creditors' rights, steering Puerto Rico's bankruptcy far afield from how other territorial debtors are permitted to engage with creditors to voluntarily adjust their debts and from how other municipal bankruptcies are conducted under Chapter 9. (¶¶ 4-5, 68-80) The Board's assertions of authority and actions under PROMESA demonstrate that Puerto Rico's bankruptcy is a radical departure from all other restructuring proceedings. Because PROMESA is not a

42

uniform bankruptcy law and instead functions as a private bill for Puerto Rico, it cannot withstand

scrutiny under the Bankruptcy Clause's uniformity requirement.

## IV.    PROMESA'S SEVERABILITY CLAUSE IS NOT ENFORCEABLE AND CANNOT CURE THE STATUTE'S NON-UNIFORMITY.

In creating a bankruptcy scheme for Puerto Rico alone, Congress specifically recognized

that a court could "hold[] invalid provision[s] of th[e] Act" as a violation of the Bankruptcy

Clause's uniformity requirement.   PROMESA § 3(b).   Instead of addressing and fixing the

uniformity problem itself, however, Congress purported to delegate that responsibility to the

Judicial Branch, providing that if a court finds any PROMESA provision invalid because it "fails

to treat similarly situated territories uniformly," the court should "order that the provision . . . be

extended to any other similarly situated territory, provided that the legislature of that territory

adopts a resolution signed by the territory's governor requesting" an Oversight Board.  *Id.*  That

directive would impermissibly require courts to engage in legislative tasks and would in any event

continue to subject Puerto Rico to different rules in bankruptcy.   Section 3(b) reveals Congress's

awareness of PROMESA's constitutional infirmity but cannot—and does not—cure the violation.

### A.    Implementing Section 3(b) Would Impermissibly Require Courts To Make Legislative Judgments About Which Territories PROMESA Should Cover.

Courts have no authority to "rewrite" a law "to conform it to constitutional requirements"

without violating separation-of-powers principles dividing judicial authority from "the legislative

domain."  *United States v. Stevens*, 559 U.S. 460, 481 (2010) (internal quotation marks and citation

omitted).  In applying severability principles, therefore, courts must avoid "making distinctions in

a murky constitutional context, or where line-drawing is inherently complex."  *Ayotte v. Planned*

*Parenthood of N. New England*, 546 U.S. 320, 330 (2006).   Just this year, the Supreme Court

reaffirmed those remedial rules in distinguishing between the act of striking an unlawful provision

from a statute and more elaborate remedies that courts "lack[] the authority to provide."  *Seila Law*

43

*LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2211 (2020).  The Court in *Seila Law* severed an unconstitutional provision that insulated an agency's director from removal and contrasted that straightforward remedy with "alternative responses to the problem" like converting the agency to a multimember agency.  *Id.* at 2211.  As the Court explained, while Congress itself may implement those alternatives, the Court's "only instrument" for remedying a statute is a "blunt one": it has the "negative power to disregard an unconstitutional enactment" but cannot "re-write" the law.  *Id*.

That prohibition holds true even when Congress invites courts to exceed judicial authority.  As the Supreme Court has emphasized, a severability clause is "an aid" only and "not an inexorable command."  *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 884 n.49 (1997); *Ackerley Commc'ns of Mass., Inc. v. City of Cambridge*, 135 F.3d 210, 216 (1st Cir. 1998) (declining to enforce severability clause out of "respect" for separation of powers).  Thus, "[a] severability clause is not grounds for a court to devise a judicial remedy . . . that entail[s] quintessentially legislative work."  *Whole Woman's Health v. Hellerstedt,* 136 S. Ct. 2292, 2319 (2016) (citation omitted).

Section 3(b) of PROMESA contravenes these limits on judicial authority by directing courts to extend PROMESA to "similarly situated" territories.  To implement that remedy, the Court would have to engage in the legislative task of determining under what circumstances and criteria a territory should be deemed sufficiently similar to Puerto Rico as to be subject to PROMESA.  Is the similarity of territorial status itself enough?  (Mot. at 36-37 (suggesting court should "mak[e] PROMESA available to the other territories"—apparently meaning all of them); *cf.* 11 U.S.C. § 109(c) (municipalities may be debtors under Chapter 9).)  Or does size and number of governmental units matter?  (*See* U.S. Br. at 16-17 (attempting to distinguish other territories on this basis).)  Should financial insolvency be the relevant metric and, if so, is another territory similarly situated when a credit agency downgrades its bonds to "junk" status, or when its debt-

to-GDP ratio approximates Puerto Rico's, or when a certain number of its instrumentalities are in financial distress, or based on some other measure?  (*See* Mot. at 24 (urging courts to evaluate whether territories are "in need of reorganization").  Congress answered none of these questions, and courts lack authority to fill in that gap.  *See Reno*, 521 U.S. at 884 (refusing to enforce severability clause where "the open-ended character of the [statute] provide[d] no guidance what ever for limiting its coverage"); *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 479 & n.26 (1995) (refusing to craft nexus requirement to save law when Court "c[ould not] be sure" that remedy would "correctly identify [what] Congress would have adopted").

Section 3(b)'s directive that courts resolve the difficult definitional and policy questions about when other territories should have access to debt-adjustment proceedings implicates the Supreme Court's warning that courts must be "wary of legislators who would rely on [the courts'] intervention" to "announce to whom the statute may be applied."  *Ayotte*, 546 U.S. at 330 (internal quotation marks and citation omitted); *United States v. Reese*, 92 U.S. 214, 221 (1875) (declining remedy that would "leave[] it to the courts to step inside and say who" a statute covers).  If Congress could avoid the strictures of the Bankruptcy Clause by directing courts to extend the scope of the statute to cure a uniformity violation, it could routinely pass private bankruptcy laws and leave it to courts to say who else the law should cover.  That result would impermissibly "substitute the judicial for the legislative department of the government."  *Ayotte*, 546 U.S. at 330.

Against all this, the Oversight Board and the United States contend that Congress's delegation of a legislative remedy is permissible because the Court will necessarily determine which territories are "similarly situated" in finding PROMESA non-uniform.  (Mot. at 38-39; U.S. Br. at 22-23.)  But that misconceives how the uniformity analysis operates.  In ruling that Congress may not permissibly enact a private bankruptcy bill for Puerto Rico alone, this Court need not (and

should not) attempt to resolve hypothetical questions about the bounds of Congress's authority to draw the line elsewhere—whether to sweep in some territories, all of them, or more broadly legislate for governmental entities as a class.  Indeed, the Oversight Board cites no precedent holding that a court must affirmatively define which other classifications would be permissible in adjudicating a uniformity challenge—as opposed to simply reviewing the law before it.  Nor has the Board identified any court that has taken over the legislature's work by extending a non-uniform bankruptcy statute to other entities rather than simply invalidating the non-uniform provision.  *See, e.g.*, *Gibbons*, 455 U.S. at 473 (invalidating bankruptcy statute and enjoining enforcement); *St. Angelo*, 38 F.3d at 1533 (striking down non-uniform amendment rather than seeking to identify other similarly situated States to exempt from the U.S. Trustee program).

Indeed, Section 3(b) may be inapplicable by its own terms because it applies only when a court invalidates PROMESA for "fail[ing] to treat similarly situated territories uniformly," but no "similarly situated" analysis is necessary to resolve the uniformity challenge.  *Gibbons*, 455 U.S. at 470 n.11 (the uniformity requirement is "not an Equal Protection Clause for bankrupts" requiring consideration of "whether Congress has discriminated against" a particular debtor).  Whether Section 3(b) simply does not apply or is unenforceable, the end result is the same: the Oversight Board cannot save PROMESA by inviting this Court to define a permissible debtor class in this "murky constitutional context" when Congress did not do that work itself.  *Ayotte*, 546 U.S. at 330.

## B. Enforcing Section 3(b) Would Require The Court To Impermissibly Insert New Words Into The Statute.

Even if this Court could make legislative judgments about which territories PROMESA should cover, implementing that remedy would require inserting new provisions into the statute in further violation of judicial authority.  While courts may "strik[e] out or disregard[] words in" a statute to cure a constitutional violation in line with Congress's intent, they lack authority to

"insert[] [words] that are not now there." *Reese*, 92 U.S. at 221.  Adding provisions to save a statute would "make a new law"—"not . . . enforce" that law—which is "no part of [the court's] duty." *Id.*; *see Hill v. Wallace,* 259 U.S. 44, 70 (1922) (refusing to "dissect an unconstitutional measure and reframe a valid one out of it by inserting limitations it does not contain").

The Oversight Board's argument that Title III's provisions "could be applied to other territories as written," (Mot. at 37), ignores Section 302's limitation of Title III to territories that have requested or had Oversight Boards established "in accordance with [S]ection 101." PROMESA § 302(a)(A).  Section 101, in turn, establishes an Oversight Board only for Puerto Rico and provides no mechanism to establish Oversight Boards for other territories. *Id.* § 101(b).  To extend PROMESA, therefore, the Court would have to add a provision to codify the remedy of providing a new opt-in mechanism for other "similarly situated" territories, however defined by the Court.  The Court would further have to consider whether and how to extend other PROMESA provisions that apply only to Puerto Rico but that Congress apparently deemed necessary when establishing an Oversight Board.  *See id.* § 405(b) (providing for automatic stay of certain claims based on "the establishment of an Oversight Board for Puerto Rico"); *id.* § 407(b) (providing creditors with protections against transfers of "property of any territorial instrumentality of Puerto Rico" so long as "an Oversight Board for Puerto Rico is in existence").  To extend these sections to other territories, the Court would need to do what it cannot: rewrite PROMESA by "strik[ing]" the words "Puerto Rico" and "inserting new words" to expand the provisions' operation to other territories.  *Reese*, 92 U.S. at 221; *see Hill,* 259 U.S. at 70 (1922) (refusing to insert new words into a statute because a severability clause "does not give the court power to amend the act").

The Oversight Board cites no authority to support its contention that the Court may rewrite the statute in this manner.  While the Board contends that a "judicial severability ruling that has

the effect of broadening a statute's application is not improper legislation," (Mot. at 37), every case it relies on involved *striking* a "discriminatory exception or classification, and thereby extend[ing] the relevant statutory benefits or burdens to those previously exempted." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2354 (2020); *Heckler v. Mathews*, 465 U.S. 728, 739 n.5 (1984) (noting general preference for severing discriminatory provisions to extend benefits). Here, in contrast, there is nothing to strike; the Court could not sever any provision of PROMESA with the resulting effect of expanding its coverage to other territories. *See Reno*, 521 U.S. at 883-84 ("A severability clause requires textual provisions that can be severed."). Instead, this Court would need to develop its own criteria for defining "similarly situated" territories, determine which territories qualify, and add words to PROMESA to expand the statute's coverage. That is "legislative work beyond the power and function of the court." *Hill,* 259 U.S. at 70.

## C.     Implementing Section 3(b) Would Not Cure PROMESA's Non-Uniformity.

In any event, enforcement of Section 3(b) would not cure PROMESA's non-uniformity because Congress's proposed remedy itself constitutes a unique opt-in regime for other territories different from Puerto Rico. Whereas Congress established an Oversight Board for Puerto Rico, PROMESA § 101(b), Section 3(b) directs that the statute should be extended to other "similarly situated" territories only if "the legislature of that territory adopts a resolution signed by the territory's governor requesting" an Oversight Board, *id.* § 3(b). Thus, while other territories *may* request an Oversight Board, Puerto Rico is *required* to have one—notwithstanding their "similar[] situat[ion]." *Id.* § 3(b). That differentiation itself violates the uniformity requirement. *See St. Angelo*, 38 F.3d at 1530-31 (law that permitted two States to opt in to the U.S. Trustee program, but required other States to participate, violated the Bankruptcy Clause's uniformity requirement).

The Oversight Board cannot evade that result by rehashing its argument that PROMESA's provisions concerning the establishment and duties of the Board are not bankruptcy laws subject

48

to the uniformity requirement.  (Mot. at 38.)  To recap: the establishment of a Board acts as the gateway to bankruptcy proceedings under Title III, PROMESA § 302, and Congress emphasized the link by providing that the Titles I and II are not severable from Title III, *id.* § 3(a).  The creation of a Board thus is "intimately connected" to the "relationship between creditor and debtor" and has "a concrete effect upon the relief available to creditors."  *St. Angelo*, 38 F.3d at 1530-31.  Because the establishment of an Oversight Board dictates whether a territory will be eligible to restructure its debts under federal bankruptcy law at all and Section 3(b) does not create uniform treatment among territories even on that most basic level, it cannot cure PROMESA's invalidity.

The Oversight Board fares no better in arguing that Section 3(b)'s non-uniform opt-in regime is "irrelevant" because only Puerto Rico faced a fiscal emergency.  (Mot. at 38.)  That is factually inaccurate and legally irrelevant.  As discussed, Puerto Rico was not the only territory in fiscal distress.  *See* pp. 37-38, *supra*.  And in any event, the uniformity requirement demands that bankruptcy laws "***apply*** uniformly to a defined class of debtors."  *Gibbons*, 455 U.S. at 473 (emphasis added).  Section 3(b) violates that requirement by directing courts to include other territories within the defined class of debtors, but on different terms than Puerto Rico.

*       *       *

The ultimate significance of PROMESA's severability provision is to highlight the statute's non-uniformity—not to save PROMESA from invalidation.  Despite knowing PROMESA was vulnerable to constitutional challenge, Congress enacted a law for Puerto Rico alone.  Nothing precludes Congress from enacting constitutional legislation to provide Puerto Rico with a process to restructure its debts.  But Congress would need to do that legislative work itself through debates, findings, and drafting of constitutionally uniform legislation.  Congress cannot

undo the constitutional wrong in enacting a bankruptcy law just for Puerto Rico—with its attendant

risk of discrimination against Puerto Rico's creditors—by directing courts to rewrite the law.

## V.   NO PROCEDURAL BAR PREVENTS CONSIDERATION OF THE UNIFORMITY CHALLENGE.

In a final bid to exempt PROMESA from constitutional scrutiny, the Oversight Board

raises a hodgepodge of procedural objections to Ambac's complaint.  (Mot. at 39-47.)  But none

of the equitable or contractual doctrines the Board invokes applies here.

### A.   Ambac Is Not Constitutionally Estopped From Challenging PROMESA.

The Oversight Board distorts the constitutional estoppel doctrine in arguing that it broadly

bars a constitutional challenge for any creditors who have "benefited" under PROMESA by

participating in Title III proceedings.  That argument ignores that creditors were forced to defend

their rights and interests in Puerto Rico's ongoing bankruptcy proceedings and received no benefit

by suffering losses on payments to which they were entitled under pre-PROMESA law.  The

Board's constitutional estoppel argument accordingly cannot be squared with precedent.

The Supreme Court has applied constitutional estoppel in narrow circumstances, such as

where an entity that "utilized [a statute] to gain advantages of corporate existence" then sought to

invalidate statutory limits that were "vital conditions" on the entity's corporate structure.  *Fahey

v. Mallonee*, 332 U.S. 245, 256 (1947).  In that context, the Court observed that "one may not

retain the benefits of the Act while attacking the constitutionality of one of its important

conditions."  *Id.* (internal quotation marks and citation omitted).  Courts have likewise applied the

doctrine to litigants who voluntarily opted in to the benefits of a statutory scheme but then sought

to invalidate corresponding limits on the receipt of that benefit.  *See, e.g.*, *Robertson v. Fed.

Election Comm'n*, 45 F.3d 486, 489-90 (D.C. Cir. 1995) (presidential candidate received matching

funds at the direction of the FEC and could not thereafter challenge the FEC as unconstitutional

when it attempted to enforce limits on the receipt of those funds); *Booth Fisheries Co. v. Indus. Comm'n of Wis.*, 271 U.S. 208, 211 (1926) (plaintiff elected to participate in administrative proceeding he later argued was subject to unconstitutional limitations). Thus, "where the grant of a substantive right is inextricably intertwined with the limitations on the procedures which are to be employed in determining that right, a litigant . . . must take the bitter with the sweet." *Arnett v. Kennedy*, 416 U.S. 134, 152-54 (1974) (rejecting attempt by plaintiff to take advantages of "for cause" employment protection in statute while challenging procedure for determining cause).

But the Supreme Court has cautioned that courts must not expand the constitutional estoppel doctrine based on a broad theory that a litigant in some way benefitted from a statute or where a plaintiff had no real choice but to make the best of the statute it later challenged. In *Kadrmas v. Dickinson Pub. Schools*, 487 U.S. 450 (1988), for example, the Court rejected the argument that constitutional estoppel barred an equal protection challenge to school bus fees by plaintiffs who used the bus service. *Id.* at 455-56. Although the cost of private transportation was "10 times the fee," the Court observed the fee still imposed "a burden rather than a benefit." *Id.* at 455, 457. And the Court further expressed "doubt that plaintiffs are generally forbidden to challenge a statute simply because they are deriving some benefit from it." *Id.* at 456-57.

The Supreme Court has additionally declined to apply constitutional estoppel where, instead of voluntarily opting in to a statutory scheme, the plaintiff needed to comply with statutory procedures to protect its business interests. In *Abie State Bank v. Weaver*, 282 U.S. 765 (1931), for example, the Court held that the plaintiff bank's conduct in "endeavor[ing] to do business under the [challenged] law and to make the best of the state's policy embodied in it" did not "estop[] [it] from asserting [a] constitutional right." *Id.* at 776. The Court explained that "earlier compliance with [the challenged] regulation d[id] not forfeit the right to protest it when the regulation became

51

intolerable." *Id.*  Nor did it matter that the bank had "extolled" the regulation "while [it was] being

obeyed." *Id.*  Similarly, in *Union Pac. R. Co. v. Pub. Serv. Comm'n of Mo.*, 248 U.S. 67 (1918),

the Court refused to apply constitutional estoppel when a plaintiff made the "choice" to apply for

a certificate to operate its business and pay the statutory fee it later challenged because "[t]he

certificate was a commercial necessity." *Id.* at 70.  A contrary rule, the Court emphasized, would

make it possible to "impose an unconstitutional burden by the threat of penalties worse than . . .

[the] failure to accept [the burden], and then to declare the acceptance voluntary." *Id.*

          As these cases demonstrate, constitutional estoppel has no application here, where Ambac

had to participate in Title III proceedings in an effort to protect its rights and interests and where

the court-ordered discharge of debt does not constitute a benefit.  The Oversight Board asserts that

Ambac "invoked" PROMESA in the COFINA Title III case.  (Mot. at 40.)  But it was the Oversight

Board—not Ambac—that invoked that Title III debt-adjustment process for COFINA by filing a

restructuring petition.  *See* Case No. 17-3284, ECF 1 (D.P.R. May 3, 2017).  At that point, Ambac

had no choice but to participate in the proceedings, submit claims, and advocate for its interests in

the context of COFINA's reorganization.  The Board's theory of estoppel would apparently require

creditors to forfeit their claims entirely or at least refuse to sign a Plan Support Agreement that

helps to minimize their losses in the context of cancellation of the debt they are owed.   But

Ambac's actions in the COFINA Title III proceeding reflect "commercial necessity," *Union Pac.*,

248 U.S. at 70, and an effort "to do business under [PROMESA] and to make the best of the state's

policy embodied in it," *Abie State Bank*, 282 U.S. at 776.  And the COFINA PSA specified that

nothing in that agreement should be "construed in any manner to waive, limit, impair or restrict

any right or ability of the Parties to protect and preserve their rights, remedies and interests" under

any source of law—including the Constitution.  COFINA PSA § 7.11.  Because Ambac did not

initiate the COFINA Title III proceeding or any of the other Title III cases and cannot voluntarily

opt out of those proceedings, constitutional estoppel principles are inapplicable.

The Oversight Board further errs in contending that PROMESA conferred an "economic

benefit" on Ambac. (Mot. at 40.)[14]  The Oversight Board relies on *Robertson*, where a presidential

candidate chose to receive "over $10 million in public funds" under a law it later challenged.  45

F.3d at 490.  But far from creating a comparable benefit, PROMESA's provisions authorizing the

discharge of debt ***threatens*** creditors' rights by "impair[ing] the obligation of contracts."  *Gibbons*,

455 U.S. at 466; *see Kadrmas*, 487 U.S. at 456-57 (school bus fee was "itself a burden rather than

a benefit").  While the Board emphasizes that Ambac "recovered over $1 billion on the COFINA

bonds it insures," (Mot. at 40), it ignores that Ambac's right to payment on those bonds existed

prior to and independent of PROMESA.  And the Board's effort to characterize the COFINA Plan

as a windfall to Ambac ignores that the Plan caused Ambac to suffer a loss on bonds that were not

in payment default.  *See* Case No. 17-3283, ECF 4652 § 6.1 (D.P.R. Jan. 9, 2019); Mot. at 41

(acknowledging that Ambac held or insured "approximately $1.3 billion of COFINA senior

bonds").  The fact that Ambac's right to payment on those bonds was only partially and not fully

impaired does not constitute a "benefit" for constitutional estoppel purposes—further

demonstrating the doctrine cannot apply.

### B.      Ambac Is Not Judicially Estopped From Challenging PROMESA.

The Oversight Board fares no better with judicial estoppel.  For that doctrine to apply, three

conditions "must be satisfied": (1) a party's positions must be "clearly inconsistent"; (2) "the party

---

[14] AAFAF makes a different claim that Ambac's receipt of consummation costs constitutes a benefit triggering estoppel. (AAFAF Br. at 4.)  But those costs serve the purpose of expense reimbursement and are not unique to cases under PROMESA, much less to statutory restructuring processes generally.  Indeed, such costs were conferred by ***contract***—not by PROMESA.  *See* Case No. 17-3283, ECF 4652 §§ 1.77, 1.33 (D.P.R. Jan. 9, 2019).  The costs accordingly cannot be characterized as a special statutory benefit capable of supporting a constitutional estoppel claim in this separate Title III case.  Nor can those costs support a judicial estoppel claim given AAFAF's failure to identify any clearly inconsistent position implicated by that reimbursement and relied on by this Court.  *See* pp. 53-56, *infra*.

must have succeeded in persuading a court to accept the earlier position"; and (3) the party "must stand to derive an unfair advantage if the new position is accepted by the court." *RFF Family P'Ship, LP v. Ross*, 814 F.3d 520, 528 (1st Cir. 2016).  None of these requirements is met here.

The Oversight Board's request for judicial estoppel stumbles at the first step because Ambac has not taken any positions that are "directly inconsistent, that is, mutually exclusive." *Alt. Sys. Concepts, Inc. v. Synopsis, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004).  Ambac has never argued that PROMESA is not subject to the uniformity requirement or satisfies that requirement.  *See, e.g.*, *Lydon v. Boston Sand & Gravel Co.*, 175 F.3d 6, 12-13 (1st Cir. 1999) (finding "directly inconsistent" positions when party first argued state law provided exclusive remedy and then made "precisely the opposite argument" in second case that federal law provided exclusive remedy).

The Oversight Board and AAFAF do not contend otherwise, instead plucking out various sentences from a statement Ambac submitted in the COFINA proceeding that was "limited to the question of the Court's authority to declare the substantive validity of the New Bond Legislation" and did not address—let alone contradict—any positions Ambac takes here.  Case No. 17-3283, ECF 4889, at 2 n.3 (D.P.R. Jan. 24, 19).  Ambac's statement that Congress passed PROMESA pursuant to the Territories Clause is not inconsistent with the argument that the Bankruptcy Clause's uniformity requirement still restricts the scope of Congress's authority when it exercises its Article IV powers.  *Id.* at 4.  And Ambac's observation that Section 314(b)(5) of PROMESA differs from Chapter 9 by authorizing the Court "to scrutinize Commonwealth legislative activity" is not inconsistent with the argument that PROMESA violates the uniformity requirement.  *Id.*

Far from establishing any direct inconsistency in Ambac's positions, AAFAF acknowledges that the judicial estoppel arguments hinge on the suggestion that Ambac "***implicitly*** acknowledg[ed] the validity of PROMESA."  (AAFAF Br. at 2 (emphasis added).)  But the First

Circuit has made clear that an "implied[] position in . . . prior litigation does not meet the 'directly inconsistent' requirement for judicial estoppel." *RFF Family P'ship*, 814 F.3d at 529 (declining to apply estoppel based on argument that party had "impliedly . . . contend[ed]" in prior litigation that the disputed mortgage was "*valid*, rather than invalid"); *see also, e.g.*, *In re Oparaji*, 698 F.3d 231, 237 (5th Cir. 2012) (courts are "reluctan[t] to apply judicial estoppel in situations where a party's alleged change of position is merely implied rather than clear and express").  And where, as here, a party's previous statements were addressed to distinct legal issues, courts routinely decline to find direct contradiction.  *RFF Family P'ship*, 814 F.3d at 529-30 (holding that party's actions and statements in bringing a malpractice claim and enforcing a settlement agreement related to a senior mortgage were not inconsistent with the later position that the senior mortgage was invalid); *Blankenship v. Buenger*, 653 F. App'x 330, 336 (5th Cir. 2016) (concluding that "state law official immunity defense" was not "clearly inconsistent" with a later denial of "state action" doctrine under Section 1983).  Here, Ambac has never taken the position that PROMESA is a uniform bankruptcy law and so cannot be estopped from maintaining this uniformity challenge.

Second, and relatedly, this Court did not "adopt[] and rel[y] on" any directly inconsistent position advanced by Ambac. *RFF Family P'ship*, 814 F.3d at 528.  AAFAF emphasizes that this Court exercised the authority granted by PROMESA to consider the validity of the New Bond Legislation, ruled that the Legislation was valid, and referred to the Legislation in confirming the COFINA Plan.  *See* Case No. 17-3283, ECF No. 5053 (D.P.R. Feb. 5, 2019); *see also* Case No. 17-3283, ECF No. 5055 ¶¶ 1(B)(v), (ix), (xi) (D.P.R. Feb. 5, 2019).   But that exercise of jurisdiction under PROMESA is a separate and distinct question from whether the statute survives review under the uniformity requirement—which this Court has never previously considered or addressed.  Indeed, this Court's order confirming the COFINA Plan specifically provided "[f]or

the avoidance of doubt" that "nothing in the Plan or in this Order shall . . . affect any claim, cause of action, or litigation not directly related to COFINA." *Id.* ¶ 52.

Finally, this Court's adjudication of the uniformity issue would not confer an "unfair advantage" on Ambac. *RFF Family P'Ship*, 814 F.3d at 528.  Courts have repeatedly concluded that no unfairness or threat to the integrity of the judicial process occurred when a party did not immediately raise a legal argument at the initial stage of a proceeding. *See, e.g.*, *Liberty Mutual Fire Ins. Co. v. Woolman*, 913 F.3d 977, 990-91 (10th Cir. 2019) (no "unfair advantage" where defendant failed to argue lack of duty at earlier stages in litigation but raised it at summary judgment); *Randle v. Crawford*, 604 F.3d 1047, 1054 (9th Cir. 2010) (no "unfair detriment" where state asserted statute of limitations barred a habeas claim after stipulating to allow petitioner to exhaust administrative remedies); *In re Atrium Med. Corp.*, 299 F. Supp. 3d 324, 330 (D.N.H. 2017) (judicial estoppel did not apply where defendant failed to raise jurisdictional objection in two previous proceedings and raised it in later proceeding).

Because none of the prerequisites for judicial estoppel is satisfied, the doctrine provides no basis to avoid adjudication of the uniformity challenge to PROMESA.

## C.    Ambac Is Not Contractually Barred From Challenging PROMESA.

Contrary to the Oversight Board's contention, the COFINA PSA does not "expressly bar[]" Ambac's uniformity challenge.  (Mot. at 43.)  The PSA terminated more than one year ago and the provision the Oversight Board cites has no continuing effect.  *See* COFINA PSA § 6.1(b).  In any event, this challenge does not breach the PSA because the COFINA Plan has been substantially consummated and will not be affected by this suit.

### 1.    The COFINA PSA terminated and has no force and effect.

Conspicuously absent from the Oversight Board's summary of the COFINA PSA is the provision stating that the Agreement "shall automatically terminate upon the occurrence of the

COFINA Effective Date," COFINA PSA § 6.1(b), defined as the date when the COFINA Plan was "substantially consummated" and "no later than the tenth (10th) calendar day following the date on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with its terms," *id.* § 1.2.   The COFINA Effective Date triggering automatic termination of the PSA occurred on February 12, 2019—more than 20 months ago.   Case No. 17-3284, ECF 587, at 1 (D.P.R. Feb. 12, 2019) (providing notice that the "Effective Date of the Plan occurred and the Plan was substantially consummated on February 12, 2019").

The COFINA PSA's "[e]ffect of [t]ermination" provision provides that the Agreement is "null and void" following termination and has "no force and effect."   PSA § 6.2.   Parties accordingly "shall not have obligations to any other Party arising out of, and shall have no further rights, benefits or privileges under" the PSA.   *Id.*   And while the PSA specifies a limited number of provisions that "are intended to survive the expiration or termination of this Agreement and shall continue in full force and effect in accordance with the terms hereof," the provision the Oversight Board invokes here does not appear on that list.   *Id.* (Sections 2.1, 2.2, 7.2, 7.5, and 7.14 survive the PSA's termination); Mot. at 41-45 (relying only on Section 4.6(c) to assert contractual bar).   Because the contractual term the Oversight Board seeks to enforce has no continuing effect, the COFINA PSA provides no basis to dismiss Ambac's complaint.   *See Teragram Corp. v. Marketwatch.com, Inc*., 444 F.3d 1, 14 (1st Cir. 2006) (termination extinguished party's rights under provisions where contract did not list those provisions as surviving termination).

### 2.   Ambac's uniformity challenge does not breach the COFINA PSA.

In any event, a ruling that PROMESA violates the Bankruptcy's Clause's uniformity requirement will not impede "the consummation, implementation, and administration" of the COFINA Plan—so this suit could not breach Section 4.6(c) even if that provision were in effect. (Mot. at 42 (quoting COFINA PSA § 4.6(c).)   The COFINA Plan has been consummated since

February 2019 and the Oversight Board has itself recognized that the Plan "has been implemented

to such a degree" that it cannot be undone.  Oversight Board's Motion to Dismiss Appeal at 10-

12, *In re Fin. Oversight and Mgmt. Bd. for P.R.*, No. 19-1391 (1st Cir. Jun. 28, 2019) (explaining

that COFINA's obligations have been cancelled and the reorganized COFINA has issued billions

in new bonds and distributed hundreds of millions under the Plan).[15]

Moreover, Ambac's requested relief—to enjoin the Oversight Board from taking further

action under PROMESA—would not impede the continued implementation and administration of

the COFINA Plan.  The Plan is now self-effectuating under Puerto Rico's New Bond Legislation.

*See* Case No. 17-03283, ECF 560 ¶ 120 (D.P.R. Feb. 5, 2019) (describing Puerto Rico's New Bond

Legislation).  If PROMESA were invalidated tomorrow and the Oversight Board was disbanded,

Puerto Rico's New Bond Legislation would remain in effect and continue "to carry out the terms

of the Plan."  *Id*.; *see also* COFINA Plan § 30.24 (providing that upon termination or dissolution

of the Oversight Board "all rights, powers and authorities of the Oversight Board to implement

and perform under the Plan shall vest in COFINA or Reorganized COFINA").[16]

This case is nothing like the Oversight Board's cited authority, which found a party likely

violated a reorganization support agreement by seeking "reversal of confirmation of the Plan,"

which would "delay or obstruct" its consummation—an event that had not yet occurred.  *In re

Swift Energy Co.*, No. 15-12670 (MFW), 2016 WL 3566962, at *6 (D. Del. June 29, 2016).  Here,

---

[15] Because the COFINA Plan has been consummated, the Oversight Board is wrong to assert that the parties appealing the Plan could "seize" on a uniformity ruling to disturb the Plan.  (Mot. at 43-44.)  In addition to the equitable mootness bar, those parties did not raise a uniformity challenge in the district court and cannot properly challenge the COFINA Plan on that basis now.  *See Hormel v. Helvering*, 312 U.S. 552, 556 (1941) (appellate court "[o]rdinarily . . . does not give consideration to issues not raised below").  And it is well established that a judgment based on a constitutionally invalid statute is still final.  *Chicot Cty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 375-376 (1940).

[16] Indeed, payments under the COFINA Plan are scheduled to occur through 2058—but the Oversight Board surely will not be in existence throughout that time.  COFINA Plan § 16.1 (providing for issuance of bonds with maturity dates between 2024 and 2058); *id*. § 17.1 (providing for trust certificates with redemption dates in 2047 and 2058).

the COFINA PSA is no longer in effect, Ambac is not seeking reversal of the COFINA Plan's confirmation, and this challenge could not delay or obstruct the implementation of the COFINA Plan, which has been consummated.  The COFINA PSA accordingly does not bar this suit.

D.     **Ambac's Complaint Is Not Barred By Laches.**

The laches doctrine likewise provides no basis to avoid adjudication of the uniformity challenge.   Laches cannot bar Ambac's request for injunctive relief to remedy its ongoing constitutional injuries. *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*, 533 F.3d 1287, 1321 (11th Cir. 2008).   Nor can the Oversight Board establish that Ambac unreasonably delayed or that any delay caused cognizable prejudice. *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 911 (1st Cir. 1989) ("[A] defendant claiming laches has the burden of proving both unreasonableness of the delay and the occurrence of prejudice.").

1.     **Laches does not bar prospective relief for Ambac's ongoing injury.**

As numerous courts have recognized, laches generally "serves as a bar only to the recovery of retrospective damages, not to prospective relief." *Peter Letterese*, 533 F.3d at 1321; *see also, e.g.*, *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 567 (S.D.N.Y. 2013) (laches "not available . . . to the extent [plaintiff] seeks prospective injunctive relief").  That rule reflects that "[a] prospective injunction is entered only on the basis of current, ongoing conduct that threatens future harm"—and "[i]nherently, such conduct cannot be so remote in time as to justify the application of the doctrine of laches." *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001).  Accordingly, absent aggravating circumstances such as inducing the defendant's detrimental reliance, laches generally cannot bar claims for prospective relief for ongoing injuries. *See Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Credito Oriental*, 698 F.3d 9, 21 n.8 (1st Cir. 2012) (describing trademark infringement cases holding that laches can bar injunctive relief where detrimental reliance acts as an estoppel); *Transp. Workers Union of Am.*,

59

*Local 100, AFL-CIO v. N.Y.C. Transit Auth.*, 341 F. Supp. 2d 432, 453 (S.D.N.Y. 2004) ("Laches is generally not applicable where a plaintiff seeks only to enjoin continuing future unlawful conduct."), *appeal dismissed and remanded*, 505 F.3d 226 (2d Cir. 2007).

The general rule that laches does not bar prospective relief carries additional weight when a plaintiff seeks an injunction to restrain a continuing constitutional violation.  *See, e.g.*, *Garza v. Cty. of Los Angeles*, 918 F.2d 763, 772 (9th Cir. 1990) (noting "ongoing nature of the violation" in declining to apply laches to a constitutional challenge); *Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1026 (N.D. Fla. 2018) (rejecting laches defense in voting rights case and expressing doubt that laches can permissibly "appl[y] when a plaintiff seeks prospective relief for continuing constitutional violations"), *appeal dismissed as moot sub nom. Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790 (11th Cir. 2020).  "[I]t would be the epitome of inequity to allow an unconstitutional law to remain in effect merely because someone slumbered on his or her rights," and "[c]aution in the application of laches" accordingly applies when the defense is invoked in response to a constitutional challenge to a statute with "ongoing effect."  27A Am. Jur. 2d Equity § 119.

Applying these principles here, laches cannot bar adjudication of whether PROMESA violates the Bankruptcy Clause's uniformity requirement.  In the years following PROMESA's enactment, the Oversight Board has taken increasingly expansive views of its authority under the statute, characterizing PROMESA's unique and non-uniform provisions as an all-encompassing delegation of authority to arbitrarily discriminate against and among Puerto Rico's creditors.  (¶¶ 4, 72-80.)  PROMESA's non-uniform provisions—and the Oversight Board's actions relying on those provisions in the ongoing Title III proceedings—creates continuing constitutional injury that warrants prospective relief.  *See Garza* 918 F.2d at 772 (9th Cir. 1990).

The cases invoked by the Oversight Board and AAFAF do not hold to the contrary.  While the Oversight Board asserts that "[l]aches can bar constitutional claims," it cites no case applying the doctrine to prohibit a challenge to a constitutionally infirm statute with ongoing effect.  (Mot. at 45; *see* AAFAF Br. at 8.)  In *Southside Fair Hous. Comm. v. City of New York*, 928 F.2d 1336 (2d Cir. 1991), for example, the Second Circuit applied laches to bar a First Amendment and equal protection challenge to the past sale of land to a religious congregation.  *Id.* at 1356.  Similarly, in *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176 (9th Cir. 1988), the Ninth Circuit held that laches barred an equal protection challenge to a special election that had already occurred. *Id.* at 1181.  And in *Gay Men's Health Crisis v. Sullivan*, 733 F. Supp. 619 (S.D.N.Y. 1989), the court ***rejected*** a laches defense to "a challenge to the constitutionality of ongoing government regulations," *id.* at 631—the same result that should obtain here.

## 2.    The Oversight Board cannot establish that any delay was unreasonable.

Even if laches were available to bar a continuing constitutional violation, the Oversight Board has not carried its burden to establish unreasonable delay.  The Board suggests that Ambac should have asserted a uniformity challenge at the moment PROMESA was enacted.  (Mot. at 45.)[17]  But that argument runs counter to the bankruptcy policy of encouraging consensual negotiations and would incentivize potentially unnecessary constitutional litigation before the scope of a party's injury is clear.  *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Sagardía-De Jesús*, 634 F.3d 3, 9 (1st Cir. 2011) (rejecting laches defense where plaintiff first pursued numerous extra-judicial means of resolving dispute); *Murphy v. Timberlane Reg'l School Dist.*, 973 F.2d 13, 16 (1st Cir. 1992) (reversing application of laches where plaintiffs delayed filing suit

---

[17] Notably, the cases the Oversight Board cites to support its claim that "a nearly four-year delay is unreasonable on its face" (Mot. at 45-46) adopt no such bright-line rule.  *See Mark Bric Display Corp. v. Joseph Struhl Co.*, No. 98-532, 2003 WL 21696318, at *19 (D.R.I. July 9, 2003) ("Under varying circumstances, courts have found delays . . . [of] four years, to be both reasonable and unreasonable."); *Chretian v. Exxon Co., U.S.A.*, 701 F. Supp. 266, 271 (D.N.H. 1988) (observing that whether delay is reasonable "depend[s] upon the circumstances of each action").

for six years because "they chose instead to negotiate with the [defendant]" and because they were "not certain" that a future injury would occur).

Here, the Oversight Board initially did not exploit PROMESA's non-uniform provisions to the detriment of creditors and instead hewed to ordinary bankruptcy procedures by, for example, appointing an independent representative in the COFINA proceedings not subject to the same conflicts of interest that have more recently caused the Board to subjugate the interests of the Commonwealth's instrumentalities to the Commonwealth itself.  (¶¶ 43-45); *see* Case No. 17-3283, ECF 996 (D.P.R. Aug. 10, 2017) (authorizing appointment of COFINA representative).  As the Title III cases have progressed, however, the Oversight Board has increasingly wielded PROMESA's unique and non-uniform provisions to claim unprecedented power to dictate the terms of Puerto Rico's debt adjustment and to pick the winners and losers in the Commonwealth's bankruptcy.  (¶¶ 72-80.)  Courts have rejected claims of unreasonable delay where, as here, the party's injury has become more pronounced over time—and where the threat of even greater harm exists in the future.  *See, e.g.*, *Garza*, 918 F.2d at 772 (declining to apply laches even though plaintiffs could have challenged unconstitutional redistricting seven years earlier because "the injury [plaintiffs] suffered at that time has been getting progressively worse" as additional elections occurred); *Mark Bric Display Corp. v. Joseph Struhl Co., Inc.*, 2003 WL 21696318, at *19 (D.R.I. July 9, 2003) (recognizing plaintiffs have "leeway" to wait until defendants' actions "impact [them] significantly" before filing suit).[18]

---

[18] The cases the Oversight Board (Mot. at 45-46) and AAFAF (AAFAF Br. at 8-10) cite to support their claim of unreasonable delay arise in the different circumstance of a past injury, with no explanation for the plaintiff's delay in suing to redress that injury.  *See Reedco, Inc. v. Hoffman-La Roche, Inc.*, 667 F. Supp. 1072, 1082 (D.N.J. 1987) (laches barred plaintiff's request for a preliminary injunction to restrain a trademark violation); *In re Shea & Gould*, 214 B.R. 739 (Bankr. S.D.N.Y. 1997) (applying laches to belated challenge to a debtor's eligibility to file a bankruptcy petition—an alleged violation that remained unchanged from the moment the petition was filed); *Sch. Union No. 37 v. Ms. C.*, 518 F.3d 31, 37 (1st Cir. 2008) (laches barred action for reimbursement for past education expenses).

The Oversight Board further errs in contending that the timing of Ambac's uniformity challenge is "inexcusable" because it has raised other challenges in the Title III cases.  (Mot. at 46.)   Contrary to that argument, the First Circuit has held that parties may permissibly delay bringing a constitutional challenge while pursuing other efforts to resolve disputes "through legislative, administrative, and judicial avenues."  *Watchtower,* 634 F.3d at 9 (declining to apply laches to bar a facial challenge to a statute enacted more than a decade earlier given plaintiffs' other efforts to resolve the dispute); *see also, e.g.*, *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 481 (1st Cir. 2009) (refusing to apply laches based on delay while parties "attempt[ed] to settle their grievances through administrative remedies and negotiations"); *Travelers Ins. Co. v. Cuomo,* 14 F.3d 708, 714 (2d Cir. 1993) (no laches where plaintiffs awaited a change in the law and then sought a legislative remedy prior to bringing suit), *rev'd on other grounds,* 514 U.S. 645 (1995).   As the Supreme Court recently observed in rejecting a similar argument that claim preclusion should bar successive facial challenges to a statute, "[s]uch a rule would encourage a kitchen-sink approach to any litigation challenging the validity of statutes," an "outcome [that] is less than optimal—not only for litigants, but for courts."  *Whole Woman's Health*, 136 S. Ct. at 2308.  Ambac did not unreasonably delay by pursuing other claims in the Title III proceedings and bringing this challenge only after the extent of its injury based on the Board's unwarranted actions under the non-uniform statute became apparent.

### 3.     The Oversight Board cannot establish that it has been prejudiced by any delay.

Nor can the Oversight Board establish prejudice caused by the timing of Ambac's suit. The First Circuit has emphasized that "the laches doctrine may be invoked only where the prejudice to the defendant flows from the plaintiff's delay."  *Murphy*, 973 F.2d at 17 (reversing application of laches where defendant failed to establish prejudice caused by plaintiff's delay in

63

bringing suit).  That standard may be satisfied when, for example, the plaintiff's delay has caused witnesses' memories to fade.  *Puerto Rican-American Ins. Co. v. Benjamin Shipping Co. Ltd.*, 829 F.2d 281, 284 (1st Cir. 1987) (finding it appropriate to apply laches when delay impeded discovery because of witnesses' availability and memories).  But "[p]rejudicial harm does not occur merely because one loses what he otherwise would have kept; there must be a delay which causes a disadvantage in asserting and establishing a claimed right or defense, or other damage caused by detrimental reliance."  *Cruz v. Hauck*, 762 F.2d 1230, 1238 (5th Cir. 1985); *see Murphy*, 973 F.2d at 17 (citing *Cruz* for prejudice standard).  Moreover, a defendant cannot point to problems "posed by the existence of the lawsuit" itself to establish prejudice.  *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 882, 907 (9th Cir. 2003) (no cognizable prejudice based on difficulty in moving an election due to constitutional challenge to voting method), *rev'd on other grounds on reh'g en banc*, 344 F.3d 914 (9th Cir. 2003); *see also Shouse v. Pierce Cty.*, 559 F.2d 1142, 1147 (9th Cir. 1977) ("Difficulties caused by the pendency of a lawsuit, and not by delay in bringing the suit do not constitute prejudice within the meaning of the laches doctrine.").

The Oversight Board argues it has suffered prejudice due to the labor and fees expended in the Title III actions.  But it cannot reasonably claim to have incurred those expenses because of any delay in the filing of a uniformity challenge.  Indeed, PROMESA has been subject to numerous constitutional challenges throughout the pendency of the Title III proceedings, including an Appointments Clause challenge that was only finally resolved by the Supreme Court after Ambac filed its uniformity complaint.  *See* Case No. 17-3283, ECF 913 (D.P.R. Aug. 7, 2017); *see also, e.g.*, Case No. 18-041, ECF 1 (D.P.R. Apr. 24, 2018); Case No. 18-059, ECF 1 (D.P.R. May, 24 2018); Case No. 18-066, ECF 1.  Yet all parties continued to press ahead and incur additional expenses while those challenges ran their course.  Against this backdrop, the Oversight Board

64

cannot tenably suggest that it would not have incurred fees or expended efforts in the Title III proceedings if only Ambac had filed a uniformity challenge earlier.

That conclusion does not change based on AAFAF's and the Retiree Committee's reliance on cases where laches barred claims that would have destroyed property the defendants developed during the period of delay.  (AAFAF Brief at 11-12; Retiree Committee Brief at 19-20.)  In *Chirco v. Crosswinds Cmtys., Inc.*, 474 F.3d 227 (6th Cir. 2007), the court applied laches because a copyright holder waited to challenge architectural plans and then sought the demolition of more than 100 housing units that had been built, sold, and occupied during the delay.  *Id.* at 235-36. And in *In New Era Publ'ns Int'l v. Henry Holt & Co.*, 873 F.2d 576 (2d Cir. 1989), the court concluded that laches barred a copyright holder from seeking an injunction preventing the publication of a book after thousands of copies had been printed, packed, and shipped.  *Id.* at 584-85.  Those cases are inapposite here, where Ambac does not seek to destroy existing property and claims only prospective—rather than retrospective—relief.

Finally, the Oversight Board cannot obtain dismissal by contending that the uniformity challenge "prejudices every stakeholder" because "PROMESA represents hope for the people of Puerto Rico."  (Mot. at 47).  That asserted harm has been caused by ***Congress*** in enacting an unconstitutional statute—not by any delay in the filing of this suit.  Laches is an equitable doctrine, but "equity follows the law."  *Hedges v. Dixon Cty.*, 150 U.S. 182, 192 (1893) ("Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law.").  This Court should decline the Oversight Board's invitation to rely on the equitable doctrine of laches to exempt Congress from complying with constitutional requirements.

## CONCLUSION

For the foregoing reasons, Ambac respectfully requests that this Court enter an order denying the Motion as requested herein.

65

Dated:  October 23, 2020
San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: */s/ Roberto Cámara-Fuertes*

    Roberto Cámara-Fuertes (USDC-PR No. 219002)
    Sonia Colón (USDC-PR No. 213809)
    221 Ponce de León Avenue, 5th Floor
    San Juan, PR 00917
    Telephone: (787) 766-7000
    Facsimile:  (787) 766-7001
    Email:     rcamara@ferraiuoli.com
              scolon@ferraiuoli.com

**COOLEY LLP**

By: */s/ Elizabeth B. Prelogar*

    Elizabeth B. Prelogar (admitted *pro hac vice*)
    1299 Pennsylvania Ave. NW, Suite700
    Washington, DC 20004
    Telephone: (202) 842-7800
    Facsimile:  (787) 766-7001
    Email:     eprelogar@cooley.com

    Reed Smith (admitted *pro hac vice*)
    55 Hudson Yards
    New York, New York 10001-2157
    Telephone:  (212) 479-6000
    Facsimile:  (212) 479-6275
    Email:     reed.smith@cooley.com

**MILBANK LLP**

By: */s/ Atara Miller*

    Dennis F. Dunne (admitted *pro hac vice*)
    Atara Miller (admitted *pro hac vice*)
    Grant R. Mainland (admitted *pro hac vice*)
    John J. Hughes, III (admitted *pro hac vice*)
    Jonathan Ohring (admitted *pro hac vice*)
    55 Hudson Yards
    New York, NY 10001
    Telephone: (212) 530-5000
    Facsimile:  (212) 530-5219
    Email:     ddunne@milbank.com
              amiller@milbank.com
              gmainland@milbank.com
              jhughes2@milbank.com
              johring@milbank.com

*Attorneys for Ambac Assurance Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send automatic notification of such filing to all case participants.

<u>/s/ *Roberto Cámara-Fuertes*</u>
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email: rcamara@ferraiuoli.com